# Exhibit A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CV-14102-MIDDLEBROOKS

DONALD J. TRUMP,

     Plaintiff,

v.

HILLARY R. CLINTON, et al.,

     Defendants.

_____/

## <u>ORDER ON MOTIONS TO DISMISS</u>

THIS CAUSE comes before the Court on Defendants' various Motions to Dismiss. (DE 224; DE 225; DE 226; DE 227; DE 228; DE 256; DE 260). Plaintiff has responded to them all. (DE 237; DE 238; DE 239; DE 240; DE 241; DE 262; DE 265). Defendants replied. (DE 249; DE 250; DE 251; DE 252; DE 258). For the reasons explained below, the United States' Motions to Dismiss (DE 224; DE 256), Defendants Charles Halliday Dolan, Jr., Rodney Joffe, and Orbis Business Intelligence, Ltd.'s Motions to Dismiss (DE 225; DE 227; DE 260), and the Defendants' Joint Motion to Dismiss Under Rule 12(b)(6) (DE 226) are granted, and Plaintiff's Amended Complaint (DE 177) is dismissed in its entirety.

## I.     BACKGROUND

Plaintiff initiated this lawsuit on March 24, 2022, alleging that "the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious information about Donald J. Trump and his campaign, all in the hopes of destroying his life, his political career and rigging the 2016 Presidential Election in favor of Hillary Clinton." (DE 177, Am. Compl. ¶ 9). On this general premise, Plaintiff brings a claim for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), predicated on the theft of trade secrets,

obstruction of justice, and wire fraud (Count I). He additionally brings claims for: injurious falsehood (Count III); malicious prosecution (Count V); violations of the Computer Fraud and Abuse Act ("CFAA") (Count VII); theft of trade secrets under the Defend Trade Secrets Act of 2016 ("DTSA") (Count VIII); and violations of the Stored Communications Act ("SCA") (Count IX). The Amended Complaint also contains counts for various conspiracy charges and theories of agency and vicarious liability. (Counts II, IV, VI, and X–XVI).

Plaintiff's theory of this case, set forth over 527 paragraphs in the first 118 pages of the Amended Complaint, is difficult to summarize in a concise and cohesive manner. It was certainly not presented that way. Nevertheless, I will attempt to distill it here.

The short version: Plaintiff alleges that the Defendants "[a]cting in concert . . . maliciously conspired to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty." (Am. Compl. ¶ 1). The Defendants effectuated this alleged conspiracy through two core efforts. "[O]n one front, Perkins Coie partner Mark Elias led an effort to produce spurious 'opposition research' claiming to reveal illicit ties between the Trump campaign and Russian operatives." (*Id.* ¶ 3). To that end, Defendant Hillary Clinton and her campaign, the Democratic National Committee, and lawyers for the Campaign and the Committee allegedly hired Defendant Fusion GPS to fabricate the Steele Dossier. (*Id.* ¶ 4). "[O]n a separate front, Perkins Coie partner Michael Sussman headed a campaign to develop misleading evidence of a bogus 'back channel' connection between e-mail servers at Trump Tower and a Russian-owned bank." (*Id.*). Clinton and her operatives allegedly hired Defendant Rodney Joffe to exploit his access to Domain Name Systems ("DNS") data, via Defendant Neustar, to investigate and ultimately manufacture a suspicious pattern of activity between Trump-related servers and a Russian bank with ties to Vladimir Putin, Alfa Bank. (*Id.* ¶ 3). As a result of this "fraudulent

evidence," the Federal Bureau of Investigations ("FBI") commenced "several large-scale investigations," which were "prolonged and exacerbated by the presence of a small faction of Clinton loyalists who were well-positioned within the Department of Justice"—Defendants James Comey, Andrew McCabe, Peter Strzok, Lisa Page, Kevin Clinesmith, and Bruce Ohr. (*Id.* ¶ 7). And while this was ongoing, the Defendants allegedly "seized on the opportunity to publicly malign Donald J. Trump by instigating a full-blown media frenzy." (*Id.* ¶ 6). As a result of this "multi-pronged attack," Plaintiff claims to have amassed $24 million in damages.[1] (*Id.* ¶ 527).

Defendants now move to dismiss the Amended Complaint as "a series of disconnected political disputes that Plaintiff has alchemized into a sweeping conspiracy among the many individuals Plaintiff believes to have aggrieved him." (DE 226 at 1). They argue that dismissal is warranted because Plaintiff's claims are both "hopelessly stale"—that is, foreclosed by the applicable statutes of limitations—and because they fail on the merits "in multiple independent respects." (*Id.* at 2). As they view it, "[w]hatever the utilities of [the Amended Complaint] as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit." (*Id.*). I agree. In the discussion that follows, I first address the Amended Complaint's structural deficiencies. I then turn to subject matter jurisdiction and the personal jurisdiction arguments raised by certain Defendants. Finally, I assess the sufficiency of the allegations as to each of the substantive counts.

## II.   DISCUSSION

First, the pleading itself. A complaint filed in federal court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1). Each allegation must be simple, concise, and direct. Each claim must be stated in numbered paragraphs,

---

[1] This figure includes fees amassed in bringing the present action. (Am. Compl. ¶ 527).

and each numbered paragraph limited as far as practicable to a single set of circumstances. Fed. R. Civ. P. 10.

Plaintiff's Amended Complaint is 193 pages in length, with 819 numbered paragraphs. It contains 14 counts, names 31 defendants, 10 "John Does" described as fictitious and unknown persons, and 10 "ABC Corporations" identified as fictitious and unknown entities. Plaintiff's Amended Complaint is neither short nor plain, and it certainly does not establish that Plaintiff is entitled to any relief.

More troubling, the claims presented in the Amended Complaint are not warranted under existing law. In fact, they are foreclosed by existing precedent, including decisions of the Supreme Court. To illustrate, I highlight here just two glaring problems with the Amended Complaint. There are many others. But these are emblematic of the audacity of Plaintiff's legal theories and the manner in which they clearly contravene binding case law. First, the Amended Complaint's answer to the Defendants' Motion to Dismiss the original Complaint, wherein Defendants noted the lack of predicate RICO offenses, was to add another predicate offense—wire fraud. The Amended Complaint alleges that the Defendants "engaged in a calculated scheme to defraud the news media, law enforcement, and counterintelligence officials for the purpose of proliferating a false narrative of collusion between Trump and Russia." (Am. Compl. ¶ 577). Not only does Plaintiff lack standing to complain about an alleged scheme to defraud the news media, but his lawyers ignore the Supreme Court's holdings that the federal wire fraud statute prohibits only deceptive schemes to deprive the victim of money or property. It is necessary to show not only that a defendant engaged in deception, but that an object of the fraud was *property*. *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020); *Cleveland v. United States*, 531 U.S. 12, 26 (2000). Likewise, the Amended Complaint, like its predecessor, fails to account for the Supreme Court's requirement that to

4

obstruct justice there must be a nexus to a judicial or grand jury proceeding. *United States v. Aquilar*, 515 U.S. 593, 599 (1995); *see also United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011).

Many of the Amended Complaint's characterizations of events are implausible because they lack any specific allegations which might provide factual support for the conclusions reached. For instance, the contention that former FBI director James Comey, senior FBI officials, and Deputy Attorney General Rod Rosenstein "overzealously targeted" Plaintiff and conspired to harm him through appointment of special counsel are strikingly similar to the conclusory and formulaic allegations found deficient in the seminal Supreme Court case of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). What the Amended Complaint lacks in substance and legal support it seeks to substitute with length, hyperbole, and the settling of scores and grievances.

Plaintiff has annotated the Amended Complaint with 293 footnotes containing references to various public reports and findings. He is not required to annotate his Complaint; in fact, it is inconsistent with Rule 8's requirement of a short and plain statement of the claim. But if a party chooses to include such references, it is expected that they be presented in good faith and with evidentiary support. Unfortunately, that is not the case here.

Two examples illustrate this. Paragraph 3 of the Amended Complaint states in part: "[t]he scheme was conceived, coordinated and carried out by top-level officials at the Clinton Campaign, and the DNC—including 'the candidate' herself—who attempted to shield her involvement behind a wall of third parties." To support that statement, footnote 1 cites the U.S. Department of Justice Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 96 (2019) ("Inspector General's Report" or "IG Report"). I went to page 96 of the Inspector General's Report looking for support for Plaintiff's conclusory

and argumentative statement but found none. The Inspector General's Report is referenced

throughout the Amended Complaint (*see* Am. Compl. ¶¶ 426, 427, 465–69, fns. 155–56, 158–60,

246), in support of Plaintiff's claim that senior officials of the FBI and Department of Justice

conspired to harm him through a baseless investigation. However, the Amended Complaint fails

to acknowledge that the Inspector General's Report, while acknowledging deficiencies, reached

the following ultimate conclusion:

> The decision to open the Crossfire Hurricane Investigation was made by the FBI's
> then Counterintelligence Division (CD) Assistant Director (AD) E.W. "Bill"
> Priestap, and reflected consensus reached after multiple days of discussions and
> meetings among senior FBI officials. We conclude AD Priestap's exercise of
> discretion in opening the investigation was in compliance with Department and FBI
> policies, and we did not find documentary or testimonial evidence that political bias
> or improper motivations influenced his decision—we found that Crossfire
> Hurricane was opened for an authorized investigative purpose and with sufficient
> factual predicate.

IG Report at 410. Plaintiff and his lawyers are of course free to reject the conclusion of the

Inspector General. But they cannot misrepresent it in a pleading.

Likewise, the Amended Complaint cites copiously to the indictment of Michael Sussmann

and a substantial portion of the Amended Complaint contains its allegations. (*See* Am. Compl. fns.

58, 60, 66, 67, 69, 101, 107–11, 114, 120–21, 124–35, 138, 139, 206, 210, 214, 259). Exhibits and

testimony from the trial are also included. (*See id.* ns.5, 17, 31, 59, 61, 64, 65, 67, 70, 75–77, 90–

92, 98, 99, 101–06, 112, 115, 117–19, 122, 123, 136, 137, 140–47, 157, 171–82, 187–89, 215,

231, 267, 268). But nowhere does the Amended Complaint mention Mr. Sussmann's acquittal. *See*

*United States v. Sussmann*, No. 21-cr-582 (D.D.C.) In presenting a pleading, an attorney certifies

that it is not being presented for any improper purpose; that the claims are warranted under the

law; and that the factual contentions have evidentiary support. *See* Fed. R. Civ. P. 11. By filing the

Amended Complaint, Plaintiff's lawyers certified to the Court that, to the best of their knowledge,

"the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and that "the factual contentions have evidentiary support[.]" Fed. R. Civ. P. 11(b)(2). I have serious doubts about whether that standard is met here.

The sprawling nature of the Amended Complaint and the number of defendants makes analysis difficult to organize. I will endeavor to examine each count, separately referencing individual defendants where appropriate.

**A.    The Pleading**

*1.  Shotgun Pleading*

As I have already alluded, Plaintiff's pleading contains glaring structural deficiencies. I would be remiss to not expound upon these further before I set out to evaluate the substantive viability of Plaintiff's claims.

Plaintiff's Amended Complaint is a quintessential shotgun pleading, and "[c]ourts in the Eleventh Circuit have little tolerance for shotgun pleadings." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). Such pleadings waste judicial resources and are an unacceptable form of establishing a claim for relief. *Id.*; *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295–96 & ns. 9, 10 (11th Cir. 2002).

The Eleventh Circuit has generally identified four categories of shotgun pleadings: (1) one "containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint[;]" (2) one that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action[;]" (3) "one that . . . [does] not separat[e] into a different count each cause of action or claim for relief[;]" and (4) one that "assert[s] multiple

7

claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions or which of the defendants the claim is brought against." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (citations omitted).

To say that Plaintiff's 193-page, 819-paragraph Amended Complaint is excessive in length would be putting things mildly. And to make matters worse, the Amended Complaint commits the "mortal sin" of incorporating by reference into every count all the general allegations and all the allegations of the preceding counts. *See id.* at 1323; *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001). Such a format hopelessly complicates any effort to untangle what facts apply to which claims or defendants. For example, Count XIV, entitled "Respondeat Superior, Vicarious Liability" names Fusion GPS but realleges all of the 785 preceding paragraphs then, in conclusory fashion, the Amended Complaint contends that "[as] a direct and proximate result of the torturous [sic] actions by agents, servants, representatives, employees and/or contractors as alleged above, Fusion GPS is vicariously liable to plaintiff[.]" (Am. Compl. ¶ 796). By incorporating all preceding paragraphs by reference, "each count is replete with factual allegations that could not possibly be material to that specific count, and any allegations that are material are buried beneath innumerable pages of rambling irrelevancies." *See Magluta*, 256 F.3d at 1284; *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1332 (11th Cir. 1998) ("These general allegations [incorporated by reference into each count] operated as camouflage, obscuring the material allegations of [Plaintiff's] claims and necessarily implying that all the allegations were material to each claim.").

2.   *Fictitious Defendants*

The Amended Complaint also contains impermissible fictitious-party pleading. "As a general matter, fictitious-party pleading is not permitted in federal court." *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010); Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties."). A limited exception exists: "when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" *Id.* (quoting *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992)).

Plaintiff's Amended Complaint does not describe the fictitious defendants with the requisite specificity to proceed against them in this fashion. He describes the John Doe defendants as "journalists, publishers, editors, investigators, state or federal officials, co-conspirators, officers, employees, agents, managers, owners, principals and/or other duly authorized individuals who caused or contributed to the incident or incidents for which the Plaintiff seeks damages[.]" (Am. Compl. ¶ 44). He describes the ABC corporations as "media companies, publication companies, editorial companies, municipalities, state or federal agencies, law enforcement authorities, investigative agencies, political organizations, political affiliates, private firms and/or other duly authorized corporate or governmental entities who caused or contributed to the incident or incidents for which the Plaintiff seeks damages[.]" (*Id.* ¶ 45). These descriptions do nothing to specifically identify the John Doe individuals or ABC corporations. *See Richardson*, 598 F.3d 734 (holding that "identif[ying] [a] defendant as 'John Doe (Unknown Legal Name), Guard, Charlotte Correctional Institute' . . . was insufficient to identify the defendant among the many guards employed at CCI. . ."). As a result, the fictitious individual and corporate defendants are dismissed without prejudice.

#### B.      Subject Matter Jurisdiction (United States)

I turn next to the United States' argument that this Court lacks subject matter jurisdiction over Plaintiff's claims against it, as "[i]t is axiomatic that a court may not proceed at all in a case unless it has jurisdiction." *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 (11th Cir. 2001) (citing *Ex Parte McCardle*, 7 Wall. 506, 514 (1868)). "[A] federal district court may not dismiss a case on the merits by hypothesizing subject-matter jurisdiction." *Id.* "Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by th[e] [Supreme Court] from the beginning." *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 101 (1998).

The United States argues that this Court lacks subject matter jurisdiction over Plaintiff's claims against it under the doctrine of sovereign immunity. Fed. R. Civ. P. 12(b)(1). To invoke the limited waiver of sovereign immunity contained in the Federal Tort Claims Act ("FTCA"), a plaintiff must first administratively present his claim to the appropriate federal agency -- here, the FBI, the House of Representatives, and the Department of Justice. *See* 28 U.S.C. §§ 1346(b)(1), 2675(a). The United States argues that Plaintiff has not done so, and accordingly his claims are not administratively exhausted. (DE 224 at 2; DE 256 at 2). "Absent a waiver, sovereign immunity shields the federal government and its agencies from suit. Sovereign immunity is jurisdictional in nature. Indeed, 'the terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citation omitted) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).

Plaintiff argues that the United States should not be substituted for Defendants James Comey, Andrew McCabe, Kevin Clinesmith, Peter Strzok, Lisa Page, Adam Schiff, and Rod

Rosenstein (collectively, the "Federal Defendants"), and that the exhaustion requirement in the FTCA is therefore inapplicable. He appears to concede that, in the event the United States is the proper party, Plaintiff has not exhausted his administrative remedies, and he suggests that I should dismiss without prejudice to allow Plaintiff to pursue those remedies. (DE 238 at 13).

Because a delegate of the Attorney General certified that the Federal Defendants were acting within the scope of their employment, the United States was substituted for them as an "automatic consequence" of the Westfall Act certification. *See S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990). The certification is not dispositive for purposes of substitution, but it constitutes *prima facie* evidence that the employees were acting within the scope of their employment. *See id.* Plaintiff bears "the burden of altering the status quo by proving that the employee acted outside the scope of employment[.]" *Id.* He must allege specific facts establishing that the Federal Defendants exceeded the scope of their employment. *Jacobs v. Vrobel*, 724 F.3d 220, 220 (D.C. Cir. 2013).

Plaintiff has not met that burden here, and the United States therefore remains the proper party to this litigation. *See Osborn v. Haley*, 549 U.S. 225, 252 (2007) (explaining that the United States remains the defendant "unless and until the district court determines that the federal officer originally named as defendant was acting outside the scope of his employment."). To determine whether a federal officer was acting within the scope of his or her employment, the FTCA instructs the district court to apply "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), not the law of the state where the alleged tort had its "operative effect," *Richards v. United States*, 369 U.S. 1, 10 (1962). Here, the Parties agree that Plaintiff's claims against the Federal Defendants involve actions related to Crossfire Hurricane and the FISA

application processes undertaken during that investigation, which took place in the District of Columbia. (*See* DE 224 at 7; DE 238 at 6).

Under District of Columbia law, an employee's conduct falls within the scope of his or her employment if: (1) "it is of the kind he [or she] is employed to perform"; (2) "it occurs substantially within the authorized time and space limits"; and (3) "it is actuated, at least in part, by a purpose to serve" the employer. *Jacobs*, 724 F.3d at 221 (internal quotation marks omitted). The Circuit Court for the District of Columbia "appl[ies] [this] test 'very expansively,' and, in essence, "ask[s] 'whether the defendant merely was on duty or on the job when committing the alleged tort.'" *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1330 (D.C. Cir. 2014) (quoting *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008)).

Beginning with the first prong, "[t]o qualify as conduct of the kind an employee was to perform, his or her actions must either have been of the same general nature as that authorized or incidental to the conduct authorized." *Allaithi*, 757 F.3d at 1332 (internal quotation, alteration marks, and emphasis omitted). The focus is on "the type of act" performed by the employee, not its "wrongful character." *Jacobs*, 724 F.3d at 221–22. The former FBI Federal Defendants and Defendant Rosenstein all satisfy this element because counterintelligence operations and FISA surveillance are all activities of the FBI and the Department of Justice. *See* E.O. 12333 § 1.14 (Dec. 4, 1981), *amended by* E.O. 13284 (Jan. 23, 2003), E.O. 13355 (Aug. 27, 2004), and E.O. 13470 (July 30, 2008) (assigning to the Director of the FBI, under the Attorney General, oversight and supervision for conducting and coordinating counterintelligence activities within the United States); *see also* 28 C.F.R. § 0.85(d) (same). The same is true of Defendant Schiff. Plaintiff's allegations pertain to Defendant Schiff's actions as a member and chair of the House Permanent Select Committee on Intelligence, which investigated whether Plaintiff or his campaign colluded

with the Russian government in the 2016 election. Defendant Schiff's statements relating to the investigation fell squarely within the scope of his employment. Speaking to the press about public policy concerns falls within the scope of the duties of a member of Congress. *See Wuterich v. Murtha*, 562 F. 3d 375 (D.C. Cir. 2009); *Council on American Islamic Relations v. Ballenger*, 444 F. 3d 659 (D.C. Cir. 2006). *Accord Does 1-10 v. Haaland*, 973 F. 3d 591 (6th Cir. 2020); *Williams v. United States*, 71 F. 3d 502 (5th Cir. 1995); *Operation Rescue Nat'l v. United States*, 147 F. 3d 68 (5th Cir. 1998).[2]

Next, the challenged conduct needs to be "substantially within the authorized time and space limits[.]" *Jacobs*, 774 F.3d at 221 (internal quotation omitted). Plaintiff's Amended Complaint contains no allegations that any of the Federal Defendants' actions occurred outside the "time and space limits" of their official government work. Because the Westfall Act certification provides *prima facie* evidence that the Federal Defendants were acting within the scope of their employment, and because Plaintiff has not alleged sufficient facts to rebut this evidence, this factor also favors substitution.

Finally, the actions taken by the Federal Defendants must be "actuated, at least in part, by a purpose to serve" the United States. *Jacobs*, 774 F.3d at 221. The Federal Defendants here acted in furtherance of an approved and authorized counterintelligence operation. *See* IG Report at 410 (concluding that "[t]he decision to open the Crossfire Hurricane Investigation was made by the FBI's then Counterintelligence Division (CD) Assistant Director (AD) E.W. "Bill"

---

[2] In his Response, Plaintiff argues that Mr. Schiff's actions were outside the scope of his duties because his statements disclosed confidential information of the House Select Committee on Intelligence. However, the Amended Complaint does not plausibly allege or even suggest that Mr. Schiff disclosed any confidential information. But even if it were to be assumed Mr. Schiff divulged confidential information, that would not change the scope of employment determination here. *See Wilson v. Libby*, 535 F. 3d 697, 710 (D.C. Cir. 2008) (disclosure of identity of CIA agent was not outside scope of employment).

Priestap, and reflected consensus reached after multiple days of discussions and meetings among senior FBI officials" and that "AD Priestap's exercise of discretion in opening the investigation was in compliance with Department and FBI policies[.]"). Plaintiff's conclusory allegations to the contrary are belied by the material cited in his own Amended Complaint. As such, substitution of the United States for the Federal Defendants was proper under the Westfall Act.

Because the United States is the proper party to this action, Plaintiff was required to exhaust his administrative remedies before bringing his claim in this Court under the FTCA. He didn't, and he doesn't claim that he did. I therefore lack jurisdiction to consider Plaintiff's claims against the United States, and Plaintiff's claims against the United States are dismissed without prejudice.

### C.    **Personal Jurisdiction**

#### 1.  *Legal Standard*

In addition to challenging the sufficiency of Plaintiff's allegations to state substantive claims, three defendants, Charles Halliday Dolan, Jr., Rodney Joffe, and Orbis Business Intelligence, Ltd.[3] also challenge this Court's exercise of personal jurisdiction over them. Federal Rule of Civil Procedure 12(b)(2) permits dismissal when the court lacks personal jurisdiction over a defendant.  *See* Fed. R. Civ. P. 12(b)(2). "A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts

---

[3] I note that Defendant Neustar, Inc. also filed a separate Motion to Dismiss, asserting not that this Court lacks personal jurisdiction over it but that it is not a proper party and should be dropped pursuant to Federal Rule of Civil Procedure 21. (DE 228). Its argument is based on transactions in late December 2021 through which TransUnion, LLC acquired Neustar, Inc.'s marketing, fraud, and communications solutions business and Neustar Security Services, LLC ("NSS") began operating as an independent security business. (*Id.* at 3–4). Neustar, Inc. contends that NSS is the proper party, and Plaintiff added NSS as a party in the Amended Complaint. Ultimately, though, I need not decide whether Neustar, Inc. or NSS is the proper party because none of Plaintiff's claims survive against either party.

to make out a *prima facie* case of jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)) (italics added). The Eleventh Circuit has described the standard for satisfying the *prima facie* case as the presentation of "enough evidence to withstand a motion for directed verdict." *See, e.g., Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

"When a defendant challenges personal jurisdiction 'by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *Mosseri*, 736 F.3d at 1350 (quoting *Madara*, 916 F.3d at 1514). At that stage, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *Polski Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986) (internal citation omitted). I must "accept[] as true all unchallenged facts in the plaintiff's complaint." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021). "To the extent that 'the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, [I] must construe all reasonable inferences in favor of the plaintiff.'" *Id.* at 1364 (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010)). However, I need only consider "specific factual declarations within the affiant's personal knowledge," and not "statements . . . [which] are in substance legal conclusions." *Posner v. Essex Ins. Co. Ltd.*, 178 F.3d 1209, 1215 (11th Cir. 1999) (per curiam).

To exercise personal jurisdiction over a defendant, "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015). "Only if both prongs of the analysis are satisfied may a

federal or state court exercise personal jurisdiction over a nonresident defendant." *Madara*, 916 F.2d at 1514 (citations omitted).

Florida's long-arm statute provides two ways in which a defendant can be subject to personal jurisdiction. *Carmouche*, 789 F.3d at 1203–04. "[F]irst, section 48.193(1)(a) lists acts that subject a defendant to specific personal jurisdiction--that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida." *Id*. at 1204 (citing Fla. Stat. § 48.193(1)(a)). "[S]econd, section 48.193(2) provides that Florida courts may exercise general personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida—if the defendant engages in 'substantial and not isolated activity' in Florida." *Id*. (emphasis omitted) (quoting § 48.193(2)).

"If there is a basis for the assertion of personal jurisdiction under the state statute, [I] next determine whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Madara*, 916 F.2d at 1514 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (additional citations omitted). The minimum contacts sufficient to comport with Due Process differ when assessing the exercise of "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). The general jurisdiction provision of Florida's long-arm statute "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010). Therefore, when assessing this Court's exercise of general jurisdiction, "[I] need only determine whether the . . . exercise of jurisdiction . . . would exceed constitutional bounds." *Id.*

2. *Discussion*

Plaintiff contends that this Court may constitutionally exercise personal jurisdiction over Defendants Dolan, Joffe, and Orbis for two reasons: first, because 18 U.S.C. § 1965(b) authorizes nationwide service of process for RICO claims, and second, even if it didn't, the Defendants had sufficient minimum contacts with the state of Florida for the exercise of personal jurisdiction over them. Because I have concluded that Plaintiff has failed to state a claim under RICO, as more fully set forth below, Plaintiff may not rely on § 1965(b) to establish personal jurisdiction over these Defendants. *See infra* section III(D)(1). I therefore need not address this argument further.

That leaves Plaintiff's minimum contacts argument. To exercise personal jurisdiction over Defendants, the exercise of jurisdiction must be both appropriate under Florida's long-arm statute—either because there is general jurisdiction over Defendants or because Plaintiff's claims arise out of or relate to their contacts with Florida—and in accordance with the Due Process Clause of the Fourteenth Amendment. Plaintiff does not argue that general jurisdiction exists over these Defendants, so I need not address that prong of the Florida statute. Instead, under both the Florida long-arm statute and the Due Process Clause, I must determine whether the Defendants had sufficient minimum contacts with the forum state. "The proper focus of the . . . inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* 571 U.S. 277, 291 (2014) (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)).

I outline Plaintiff's allegations as to each Defendants' contacts with the forum state—which are tellingly sparse—below. I then discuss the ways that Plaintiff misunderstands the applicable law with respect to the constitutional exercise of personal jurisdiction over non-resident defendants, which render Plaintiff's allegations insufficient for the exercise of personal jurisdiction over Defendants Dolan, Joffe, and Orbis.

17

*i. Dolan*

Plaintiff argues that Defendant Dolan has sufficient contacts with Florida for this Court's exercise of personal jurisdiction over him because he "provid[ed] false information to Igor Danchenko, which information was subsequently used in the Steele [D]ossier" and "assisted his co-conspirators in creating a document which was published throughout the world," including the state of Florida. (DE 241 at 5). According to Plaintiff, this document "harmed both the Plaintiff, Donald J. Trump, and residents of the state of Florida" such that this Court may properly exercise jurisdiction over Defendant Dolan. (*Id.*).

*ii. Joffe*

Next, Defendant Joffe. Plaintiff argues that this Court may exercise jurisdiction over Defendant Joffe because he "accessed information, which he should never have accessed, in an attempt to provide Sussmann with information to present to the FBI and to include with the dossier created by Christopher Steele" and that this information led to the publication of documents "read and published within the state of Florida." (DE 239 at 5).

*iii. Orbis*

Finally, Orbis. Plaintiff contends that this Court may exercise personal jurisdiction over Defendant Orbis because Defendant Orbis's "conduct was targeted at many high-level U.S. based actors – including a presidential candidate and eventual sitting president, top-ranking federal law enforcement officials, and major U.S. media outlets – coupled with the pervasive, negative impact that Defendant's actions had upon the country as a whole." (DE 262 at 4). Plaintiff further argues that he has "sufficiently plead[] that Defendant [Orbis] participated in a RICO conspiracy with other co-conspirators that caused harm in the state of Florida" particularly "the DNC and Perkins

Coie [who] both maintain a continuous presence in the state of Florida, and [who] commissioned the creation of the Dossier." (DE 262 at 5).

*iv.  Analysis*

To determine whether this Court may exercise personal jurisdiction over Defendants, I must consider whether Florida's long-arm statute provides for specific jurisdiction. Under Florida's long-arm statute, specific jurisdiction can only be exercised over a defendant in causes of action that "aris[e] from" a list of enumerated acts. § 48.193(1)(a). And Florida's long-arm statute is strictly construed. *Sculptchair, Inc., v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (applying Florida law). If the long-arm statute applies, I must then consider whether the exercise of specific jurisdiction over Defendants would comport with Due Process (as this constitutional standard is analyzed within the context of a specific jurisdiction analysis). *Carmouche*, 789 F.3d at 1203.

Plaintiff argues that "[i]t is irrelevant that [Defendants] [have] never traveled or conducted business in Florida" because the conduct "directly led to the dissemination of false information within Florida that harmed the Plaintiff." (DE 239; DE 241). According to Plaintiff, the fact that Defendants conveyed information that "led to the dissemination of false information within Florida" combined with the fact that they "knew that Florida is a state in the United States which was an important one" is sufficient to confer jurisdiction over Defendants under the "effects" test recognized in *Calder v. Jones*, 465 U.S. at 789. (*Id.* at 8). Plaintiff appears to rely on Florida Statute § 48.193(1)(a)(2), which provides for specific jurisdiction over a defendant for "committing a tortious act within the [s]tate." However, "[i]n Florida, before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine 'whether the allegations of the complaint state a cause of action." *PVC Windoors, Inc. v. Babbitbay Beach*

*Const., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010) (citing *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002)); *see also 8100 R.R. Ave. Realty Trust v. R.W. Tansill Constr. Co.*, 638 So.2d 149, 151 (Fla. 4th DCA 1994) ("Since the only support in the record for [Plaintiff's] argument is the complaint, we must of necessity determine whether it states a cause of action in tort, in order to determine jurisdiction."). This is because, for the Court to have jurisdiction over a defendant for a tort committed in Florida, a plaintiff must have alleged sufficient facts to make out a claim that the tort actually occurred. As set forth *infra* at Section D, none of the torts alleged in Plaintiff's Complaint survive Rule 12(b)(6) scrutiny. And without these predicate torts, this Court does not have jurisdiction over Defendants under § 49.193(1)(a)(2) of Florida's long-arm statute.

To the extent that Plaintiff is attempting to rely on some provision other than § 49.193(1)(a)(2) to confer personal jurisdiction over the Defendants, Plaintiff has still failed to plead facts sufficient to do so. "It is undisputed that no part of [Defendants'] course of conduct occurred in [Florida]." *Walden*, 571 U.S. at 288. Thus, Plaintiff's argument focuses on the "effects" of Defendants' conduct to confer jurisdiction over them under *Calder*, which requires a plaintiff to establish that a tort was: (1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013). Here, Plaintiff has not alleged that Defendants "aimed" any conduct at Florida or could reasonably have anticipated that Plaintiff would be harmed in Florida, particularly in light of the fact that Plaintiff was a resident of New York at the time of the occurrences giving rise to Plaintiff's claims. Knowledge that Florida is a state in the United States does not equate to knowledge that Defendants' actions will have consequences in Florida. If that were the case, there would be nationwide personal jurisdiction

over almost all claims arising in the United States. Such is clearly not contemplated by Florida's long-arm statute, and I therefore reject Plaintiff's argument.

Plaintiff's *Keaton* argument fairs no better. In *Keaton v. Hustler Magazine, Inc.*, the Supreme Court held that New Hampshire had jurisdiction over a magazine publisher in a libel action where the publisher sold "some 10 to 15,000 copies of [the magazine] in th[e] [forum state] each month." 465 U.S. 770, 772 (1984). Through these repeated and continuous sales of the magazine, the Court concluded that the defendant "ha[d] continuously and deliberately exploited the [forum state] market" and it was therefore reasonable for the defendant to "anticipate being haled into court there in a libel action based on the contents of its magazine." *Id.* at 781 (citation omitted). There are no allegations in the Amended Complaint that outline any contacts with any Defendant that rise anywhere near this level. There are no allegations in the Amended Complaint of any repeated and continuous efforts by any Defendant to avail themselves of Florida or its laws.

For these reasons, I conclude that this Court may not exercise personal jurisdiction over Defendants Dolan, Joffe, or Orbis[4] consistent with the Florida long-arm statute. And because I have determined that no basis exists to assert specific jurisdiction over Defendants under Florida's long-arm statute, I need not consider whether the exercise of specific jurisdiction would satisfy the Due Process Clause. *See Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x. 852, 862, (11th Cir. 2013) ("Because the district court properly concluded there is no [statutory] basis for specific jurisdiction . . . we do not reach the second question of the personal jurisdiction analysis—whether such an exercise of personal jurisdiction would be constitutional."); *see also Madara*, 916 F.2d at

---

[4] Because I have concluded that this Court does not have personal jurisdiction over Defendant Orbis, I do not reach Defendant Orbis's arguments under Rule 12(b)(4) and 12(b)(5) for insufficient process and service of process.

1514 ("Only if both prongs of the analysis are satisfied may a federal . . . court exercise personal jurisdiction over a nonresident defendant."). Thus, these Defendants are dismissed from this lawsuit.

### D.     Failure to State a Claim

Now for the allegations themselves. A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the allegations in a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing legal sufficiency, courts are bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). That is, "a complaint must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).

At this stage, a court must construe the complaint in the light most favorable to the plaintiff and accept as true all the plaintiff's factual allegations. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. A pleading that offers "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed. 2004)). Federal Rule of Civil Procedure 8(a)(2) requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

### 1.   *RICO & RICO Conspiracy (Counts I and II)*

Defendants first assert that Plaintiff's RICO claims should be dismissed as both (1) barred by the statute of limitations and (2) inadequately pled and thus substantively deficient.

### i.   *Statute of Limitations*

"[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate . . . if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845–46 (11th Cir. 2004) (quotation marks omitted). This essentially requires a plaintiff to plead himself out of the cause of action alleged in the complaint. *See Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005) (explaining that an action should only be dismissed on statute of limitations grounds at the motion to dismiss stage "if it appears beyond a doubt that Plaintiff[] can prove no set of facts that toll the statute.") (internal quotation omitted).

Defendants argue that Plaintiff has so pled himself out here. The statute of limitations for civil RICO actions and conspiracy to commit RICO violations is four years from when the injury was or should have been discovered. *See Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013); *Agency Holding Corp v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Plaintiff was therefore required to file his lawsuit no later than October 2021, according to Defendants. Defendants argue that Plaintiff's own tweets, of which they urge I take judicial notice, demonstrate that he was on notice of his purported claims, at the very latest, by October 2017. At least one circuit has concluded that a district court may take judicial notice of tweets.[5] *See Hawaii v. Trump*,

---

[5] Plaintiff's tweets included, *inter alia*, the following declarations that appear directly on point to his claims in the instant litigation:

It now turns out that the phony allegations against me were put together by my political opponents and a failed spy afraid of being sued…. Totally made up facts

859 F.3d 741, 773 n.14 (9th Cir.) (taking judicial notice of Plaintiff's tweets), *vacated on other grounds*, 138 S. Ct. 377 (2017).[6] And at least one other circuit has held that it is proper to take judicial notice of a blogger's online blog posts. *See Mirlis v. Greer*, 952 F.3d 51, 63 n. 11 (2d Cir. 2020).

Federal Rule of Evidence 201 permits a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Paez v. Sec., Florida Dep't of Corrs.*, 947 F.3d 649, 651 (11th Cir. 2020). "A court may take judicial notice of appropriate adjudicative facts at any stage in a proceeding[.]" *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1204 (11th Cir. 2004) (citing Fed. R. Evid. 201(f)). But taking judicial notice of facts under Federal Rule of Evidence 201 is "a highly limited process" which

---

by sleazebag political operatives, both Democrats and Republicans – FAKE NEWS! Russia says nothing exists. Probably… released by "Intelligence" even knowing there is no proof, and never will be. My people will have a full report on hacking within 90 days!

Donald J. Trump (@realDonaldTrump), Twitter (Jan. 13, 2017).

Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake Dossier (now $12,000,000?) …. … the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia . . . . . . "collusion," which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's . . . . . . are now fighting back like never before. There is so much GUILT by Democrats/Clinton, and now the facts are pouring out. DO SOMETHING!

Donald J. Trump (@realDonald Trump), Twitter (Oct. 29, 2017).

[6]At least two district courts have reached the same conclusion regarding tweets. *See Rock the Vote v. Trump*, No. 20-cv-06021, 2020 WL 6342927, at *4 n.2 (N.D. Cal. Oct. 29, 2020); *United States v. Flynn*, 507 F.Supp. 2d 116, 126 n.6 (D.D.C. 2020).

"bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

The Eleventh Circuit has not addressed the propriety of taking judicial notice of tweets or other social media, however it has taken judicial notice of some internet sources. *See Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd. of Registration and Elections*, 36 F.4th 1100, 1123 (11th Cir. 2022) (taking judicial notice of information on a website); *R.S.B. Ventures, Inc. v. F.D.I.C.*, 514 Fed. App'x 853, 856 (11th Cir. 2013) (same). But other circuits that have considered the issue have found it appropriate. *See Hawaii v. Trump*, 859 F.3d at 773 n.14 (tweets); *Mirlis v. Greer*, 952 F.3d at 63 n.11 (blog posts). Moreover, Plaintiff's tweets appear to fall within the category of information that this Circuit has recognized as appropriate for taking judicial notice: facts that are not subject to reasonable dispute from sources whose accuracy cannot reasonably be questioned. *See Paez*, 947 F.3d at 651. The Parties do not dispute that Plaintiff made the statements in the tweets, nor do they dispute that Twitter accurately depicts the tweets; indeed, both Parties have relied on tweets in this litigation—Plaintiff in his Amended Complaint, and Defendants in their Motion to Dismiss. Thus, taking judicial notice of Plaintiff's tweets—not for the truth of their contents but for what they reveal about Plaintiff's knowledge—appears consistent with Eleventh Circuit caselaw, and Plaintiff has not opposed Defendants' request. I therefore find it appropriate to take judicial notice of Plaintiff's tweets.

I note, though, that even without Plaintiff's tweets, the allegations in Plaintiff's Amended Complaint demonstrate that Plaintiff was aware of the basis of his claims since at least 2017. Although the tweets provide further support, they are not essential to my ruling on the RICO statute of limitations.

Plaintiff argues that his claims are timely and that, even if they aren't, they should be equitably tolled for the duration of his presidential term. I begin with the text of the Amended Complaint. The RICO predicates alleged to exist in the Amended Complaint—the creation and circulation of the Steele Dossier and initiation of the Crossfire Hurricane Investigation (obstruction of justice); the data mining of DNS data (theft of trade secrets), and false statements to law enforcement and the media (wire fraud)—are said to have commenced in the summer and fall of 2016. *See, e.g.*, Am. Compl. ¶¶ 140, 158, 218. The Steele Dossier is alleged to have been initially furnished in June 2016 and provided to the FBI between July and October 2016, then published by the media in January 2017. The Trump-Alfa Bank server information resulting from the data mining was widely circulated by the media and Clinton campaign in October 2016, and the statements identified as being misleading to law enforcement and the media occurred between September 2016 and October 2017. *See, e.g.*, Am. Compl. ¶¶ 150, 152, 154, 156, 158, 165, 166, 191, 192, 217, 227, 229, 268, 274, 292. These allegations compel only one logical conclusion: that Plaintiff was aware of the factual basis underlying his RICO claims since at least October 2017, if not earlier. It is not reasonable or plausible to conclude that, despite the allegations in the Amended Complaint that numerous prominent media outlets ran stories on the theory underlying Plaintiff's claims as early as 2016, which were shared by his political opponent in the 2016 presidential election, Plaintiff was not aware of his claims until the Sussmann indictment was returned in September 2021. And indeed, Plaintiff does not appear to meaningfully dispute that he knew of his claims since that time. Instead, he argues that the statute of limitations for his RICO claims should be tolled, either because he was President, under the Clayton Act, because of fraudulent concealment, or under the discovery rule. I address each argument in turn.

First, Plaintiff's equitable tolling argument. In short, Plaintiff argues that it is "in the interests of justice to accommodate . . . [his] right to assert a meritorious claim when equitable circumstances have prevented a timely filing." (DE 237 at 16, quoting *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559, 1561 (11th Cir. 1987)). He argues that his duties as President interfered with his ability to timely file the instant lawsuit. But, for the reasons discussed below, Plaintiff's claims are not meritorious, and most are completely lacking any evidentiary support as required by the Federal Rules. *See* Fed. R. Civ. P. 11. Moreover, Plaintiff's presidency evidently did not deter him from filing other lawsuits in his personal capacity during the duration of his term in elected office. *See, e.g., Trump v. Vance*, 140 S. Ct. 2412, 2420 (2020) (suit brought by "[t]he President, acting in his personal capacity," to enjoin enforcement of a subpoena); *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2028 (2020) (suit brought by "the President in his personal capacity" to challenge subpoenas); *Trump v. Comm. on Ways & Means*, 391 F. Supp. 3d 93, 95 (D.D.C. 2019) (suit brought by Plaintiff "in his personal capacity"). Plaintiff cites *Clinton v. Jones*, 520 U.S. 681 (1997) for support, but the Supreme Court in that case arrived at the opposite conclusion than that which Plaintiff urges: it *rejected* a stay of litigation during President Clinton's term and concluded that his engagement in civil litigation would *not* unduly interfere with his presidential duties. *See* 520 U.S. at 708–10. I therefore agree with Defendants that Plaintiff's conduct while in office "belies any claim that the equities require his novel theory of tolling," which Plaintiff is unable to support with any relevant legal authority.

Plaintiff next argues that his RICO and RICO conspiracy claims are timely under the Clayton Act, which provides for the tolling of private suits "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations *of any of the antitrust laws*[.]" 15 U.S.C. § 16(i) (emphasis added). Defendants contend that this provision is

inapplicable for two reasons: first, because this is not an antitrust action, and second, because Plaintiff has not identified any civil or criminal proceeding instituted by the United States to punish a RICO violation. It appears to be an open question whether the Clayton Act's tolling provision applies in RICO actions. Plaintiff cites a handful of out-of-circuit and non-binding district court cases holding as much, *see, e.g., Pension Fund Mid Jersey Trucking Indus. v. Omni Funding*, 687 F. Supp. 962, 965 (D.N.J. 1988), while Defendants argue that the RICO statute lacks any indication of an intent to include a specialized tolling provision *a la* the Clayton Act. I need not resolve the question though, because without any civil or criminal proceeding instituted by the United States to prevent, restrain, or punish a RICO violation, Plaintiff's claims would not be subject to tolling even if RICO did contain a provision analogous to the Clayton Act. None of the proceedings Plaintiff identifies in his Response were directed at a RICO violation. (*See* DE 237 at 9–12). Indeed, the Government has not instituted any proceedings to punish a RICO violation, nor any RICO predicate act relating to the circumstances giving rise to this litigation. Without any government proceeding initiated to prevent, restrain, or punish a RICO violation or RICO predicate act, there can be no statutory tolling under this theory.

Plaintiff also argues that the statute of limitations on his RICO claims should be tolled because the RICO Defendants attempted "to fraudulently conceal their wrongdoing." (DE 237 at 26). "Under the fraudulent concealment doctrine, even when a claim has already accrued, a plaintiff may benefit from equitable tolling in the event that the defendant took specific steps to conceal her activities from the plaintiff." *Fedance v. Harris*, 1 F. 4th 1278, 1283 (11th Cir. 2021). It requires that a plaintiff show "that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195–96 (1997). "The defendant must have actively concealed facts such that the plaintiff remained 'ignoran[t] of

a potential claim,' not 'merely ignoran[t] of evidence.'" *Fedance*, 1 F. 4th at 1287 (rejecting tolling).

Both the Amended Complaint and Plaintiff's tweets belie any argument that his claims should be equitably tolled under the doctrine of fraudulent concealment. To invoke this doctrine, Plaintiff must have been "ignoran[t]" of a potential claim because of the Defendants' efforts to conceal their activities from him. But, since at least 2017, Plaintiff has known about the facts underlying his claims—that the Steele Dossier was allegedly "put together by [his] political opponents and a failed spy afraid of being sued," "Clinton made," and connected to "the Comey fix" and "phony Trump/Russia . . . collusion." Plaintiff cannot in good faith claim to have had no knowledge of a claim that he broadcasted to his social media followers nearly five years ago. Plaintiff is not entitled to statutory tolling under this doctrine.

Plaintiff's third attempt to avoid a statute of limitations bar is the discovery rule. Under this rule, "accrual is delayed until plaintiff has 'discovered'" his injury. *Fedance*, 1 F.4th at 1285 (citing *Gabelli v. SEC*, 568 U.S. 442, 449 (2013)). Plaintiff asserts that the Amended Complaint includes "three subsets of categories" of damages that reset the clock on his RICO Claim: (1) "attorneys' fees and costs of defense" related to "numerous federal investigations"; (2) "losses Plaintiff sustained to his business and political reputation"; and (3) "loss of trade secrets." (DE 237 at 16).

With respect to the first and second categories, Plaintiff asserts that his legal expenses and harm to his business and political reputation "were incurred between September 2017 and 2020, in connection with the Mueller Investigation" and that "the true extent of this portion of Plaintiff's injuries was not discoverable until April 2018 at the earliest," and that this renders his RICO claims timely. (DE 237 at 28). Plaintiff misunderstands the law. "[T]he statute of limitations commences

to run[] when the wrongful act or omission results in damages" and a "cause of action accrues *even though the full extent of the injury is not then known or predictable.*" *Wallace v. Kato,* 549 U.S. 384, 391 (emphasis added). Thus, Plaintiff's concession that he was damaged beginning in September 2017 means that the clock began ticking despite that Plaintiff did not yet appreciate the "true extent" of his injuries.

Plaintiff's third category of damages also fails to save these time barred claims. He argues that he "was not aware that his sensitive, confidential, and proprietary data had been stolen and misappropriated until September 16, 2017, when these 'revelations were exposed for the first time in the Sussman indictment and/or subsequent motions filed by Special Counsel John Durham.'" (DE 237 at 16 (citing Am. Compl. ¶ 146)). But the release of DNS information, as more fully explained below, on which Plaintiff's claims are predicated, was public in October 2016. (Am. Compl. ¶¶ 124–30, 253–77). I therefore find that Plaintiff's RICO claims are time barred.

*ii.   Failure to State a Claim*

But even if Plaintiff's RICO claims were timely, they still fail on the merits at every step of the analysis. Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). "To recover, a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (citation omitted). Further, the plaintiff must establish "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Id.* (citation omitted). "[T]he RICO statute provides that its terms are to be liberally

30

construed to effectuate its remedial purposes." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citation omitted).

Defendants argue that Counts I and II of the Amended Complaint fail to satisfy any of these elements. I agree. While Plaintiff's failure to satisfy any one of the RICO elements is sufficient to grant Defendants' Motion, for the sake of completeness I address them all below.

### a.   Predicate Acts

Plaintiff's RICO claims first fail because the Amended Complaint lacks allegations pertaining to any plausible predicate act, let alone two valid predicate acts. "[A]bsent any valid predicate acts, [the plaintiff] cannot state a claim for RICO violations." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1068 (11th Cir. 2007) (citation omitted). Plaintiff purports to identify three predicate acts: obstruction of justice, theft of trade secrets, and wire fraud. None survive judicial scrutiny.

### i.   Obstruction of Justice

Obstruction of justice does not supply Plaintiff with a valid predicate act because Plaintiff does not identify any "official proceedings" that Defendants allegedly obstructed.

Perplexingly, Plaintiff appears to argue that the Defendants obstructed investigation Crossfire Hurricane *by contributing to the initiation* of Crossfire Hurricane. That Defendants could have obstructed a proceeding by initiating it defies logic. In any event, Crossfire Hurricane does not qualify as an "official proceeding" within the meaning of the statute, and Plaintiff does not point to any other "official proceeding" to satisfy this element of an obstruction of justice predicate act.

The federal witness tampering statute Plaintiff cites, 18 U.S.C. § 1512, provides for criminal penalties for "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record,

document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding," or who "otherwise obstructs, influences, or impedes any official proceeding." 18 U.S.C. § 1521(c). Under the statute, "official proceedings" are limited to federal judicial cases or proceedings before Congress or a federal agency. *Id.*§ 1515(a). Investigations that do not result in charges are not "official proceedings" within the meaning of the statute.[7] *See United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019) (FBI investigation is insufficient); *United States v. Ermoian¸* 752 F.3d 1165, 1171–72 (9th Cir. 2013) (same).

Alternatively, Plaintiff argues that he has sufficiently pled obstruction of justice under § 1512(b)(3), which criminalizes "misleading conduct toward another person, with intent to . . . hinder, delay or prevent the communication to a law enforcement officer . . . relating to the commission or possible commission of a federal offense." 18 U.S.C. § 1512(b)(3). Specifically, Plaintiff points to the following purported misrepresentations: (1) certain reports within the Steele Dossier, which Defendant Steele[8] allegedly provided to the FBI (Am. Compl. ¶¶ 158, 169); (2) Sussmann's statement to the FBI that he was not acting "on behalf of a client or company"[9] when he conveyed information suggesting a suspicious pattern of activity between Trump servers

---

[7] Plaintiff cites *United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993), as supporting the contrary position: that an FBI investigation *is* sufficient to support an obstruction of justice charge. But that case doesn't say so, and it actually hurts Plaintiff's position. There, the Fourth Circuit held that "an obstruction of justice prosecution cannot rest solely on the allegation or proof of perjury; rather, what must additionally be proven is that the false statements given, in some way, *either obstructed or were intended to obstruct the due administration of justice*." (emphasis added). The Amended Complaint is wholly devoid of any allegation that the Defendants' purported actions, even accepting them as true, obstructed justice.

[8] I note that Defendant Steele is not a RICO Defendant.

[9] Plaintiff's heavy reliance on the Sussmann indictment throughout his Amended Complaint is curious given that Sussmann was acquitted by a unanimous jury of making a false statement to the FBI, a fact which Plaintiff fails even to acknowledge anywhere in the pleading.

and Alfa Bank (*Id.* ¶¶ 204–14), and (3) the "deceptive analysis" of the Trump-Alfa Bank activity supposedly contained in white papers Sussmann provided to the FBI (*Id.* ¶ 206). Notably absent from the Amended Complaint, though, is any allegation that any Defendant interfered with law enforcement with respect to the commission or possible commission of any federal offense. Plaintiff endeavors to significantly broaden this provision to criminalize the dissemination of *any* purportedly misleading information, regardless of any connection to some federal offense. (*See* DE 237 at 27–28). He argues that because Defendants "made numerous false and misleading statements to federal law enforcement officers, withheld pertinent and relevant information, and provided falsified and fabricated materials and records," they violated § 1512(b)(3), even though their statements did not concern a federal offense. (*Id.*). But that is not what the statute says, and Plaintiff may not misconstrue it in this way. Even accepting Plaintiff's allegations as true, perjury and falsifying documents are not RICO predicate acts. *See* 18 U.S.C. § 1961(1). Moreover, this obstruction provision proscribes engaging in misleading conduct toward another person to hinder, delay, or *prevent communication to a law enforcement officer*—not statements made *to* law enforcement officers themselves. For these reasons, Plaintiff cannot rely on obstruction of justice to supply a predicate act for his RICO claim.

ii.   Theft of Trade Secrets

Plaintiff alleges that the RICO Defendants stole proprietary "internet data, records and/or information," including "DNS internet traffic data pertaining to Plaintiff, including data originating from" Plaintiff's servers. (Am. Compl. ¶¶ 544–57).

Before turning to the substance of this claim, a brief overview of DNS, or "Domain Name Service," is first necessary. DNS is a "distributed computing system" or "engine" comprised of "computing and communication entities that are geographically distributed throughout the world."

33

U.S. Dep't of Commerce, Nat'l Inst. Of Standards & Tech, *Secure Domain Name System (DNS)*

*Deployment Guide*, iii, 2-1, 2-2 (Sept. 2013) (hereinafter "NIST Report");[10] *see Akamai Techs.*

*Inc. v. Cable & Wireless Internet Svcs., Inc.*, 344 F.3d 1186, 1188 (Fed. Cir. 2003) ("The DNS is

administered by a separate network of computers [or "servers"] distributed throughout, and

connected to, the Internet"). DNS acts as a translator of domain names to IP addresses and vice

versa. *See* NIST Report at iii, 2-1. Here's how it generally works: internet users access websites

via domain names, such as flsd.uscourts.gov. NIST Report at 2-1. Computers speak in a different

language—Internet Protocol ("IP") addresses. *Id.* When a user types in a domain name, the

computer must "resolve" the domain name into an IP address. Paul Schmitt et. al., *Oblivious DNS:*

*Practical Privacy for DNS Queries*, Proceedings of the Applied Networking Research Workshop

17 (2019).[11] The user's computer tells the DNS resolver the domain name the user wishes to visit,

and this DNS server looks up the corresponding IP address and relays back that information. NIST

Report at 2-1. Here, I use a website search as an example, but this same process occurs with any

internet communication, including emails. *See* Paul Schmitt, *supra*, at 17.

---

[10] Defendants request that I take judicial notice of the NIST Report. Courts may take judicial notice
of adjudicative facts that "[are] not subject to reasonable dispute" either because they are
"generally known" or "can be accurately and readily determined from sources whose accuracy
cannot reasonably be questioned." Fed. R. Evid. 201(b). A basic understanding of DNS is
necessary to the resolution of this Motion, and the accuracy of this governmental resource cannot
reasonably be questioned. *See Kremen v. Cohan*, 337 F.3d 1024, 1033 n.10 (9th Cir. 2003) (citing
Federal Rule of Evidence 201(b) as supportive of the fact that the court may consider extra-record
facts regarding DNS on a motion for summary judgment). Furthermore, I view this request as
unopposed, given Plaintiff's failure to contest it or question the authenticity of this source. (*See
generally* DE 237).

[11] Defendants additionally cite this source and thus implicitly request that I take judicial notice of
certain facts contained therein. Again, Plaintiff does not contest the propriety of considering this
source at this stage, (*See* DE 237 at 30–31), and I therefore view this lack of opposition as tacit
agreement.

"DNS data is meant to be public." NIST Report at iii, 1.1, 2.3; *see also id.* at ES-1 ("Because [DNS] is an infrastructure system for the global internet . . . the data should be accessible to any entity."). Those who operate the DNS resolvers, generally internet service providers but also other third-parties, "can see all of the DNS queries that a user issues" and can associate DNS queries with the IP address of the computer that sent the query. Paul Schmitt, *supra*, at 17.

Turning now to Plaintiff's theft of trade secrets claim under DTSA, the following elements must be pled: "[1] the defendant must intend to convert proprietary information to the economic benefit of anyone other than the owner; [2] the proprietary information must be a trade secret; [3] the defendant must knowingly steal, take without authorization, or obtain by fraud or deception trade secret information; [4] the defendant must intend or know that the offense would injure the owner of the trade secret; and [5] the trade secret must be related to a product that is in interstate or foreign commerce." *United States v. Smith*, 22 F.4th 1236, 1243 (11th Cir. 2022) (citing 18 U.S.C § 1832(a)(1)).

For one, Plaintiff has not alleged facts that bring the DNS internet traffic at issue within the statutory definition of a "trade secret."[12] Plaintiff suggests that because DNS data could reveal a compilation of sensitive information about him, it is a trade secret.[13] (DE 237 at 31). That is

---

[12] I reject Plaintiff's suggestion that I may not consider at this stage whether certain information constitutes a trade secret. (DE 237 at 30). Although true that whether something constitutes a trade secret is generally a fact question, whether the Plaintiff bringing such a claim has sufficiently plead the existence of a trade secret, as that term is statutorily defined, is permissibly assessed at the motion to dismiss stage. *See Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021) (analyzing whether the plaintiff sufficiently plead a trade secret on review of a motion to dismiss, and noting that "information alleged to be a misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it"); *see also Kairam v. West Side GI, LLC*, 793 F. App'x 23, 28 (2d Cir. 2019) (affirming dismissal of trade secret claim in part for failure to allege economic value).

[13] It is also worth noting that the vast majority of allegedly sensitive information DNS data could or does reveal, according to Plaintiff, is not alleged to have been stolen by Defendants here. (*See*

incorrect. To constitute a "trade secret," as that term is statutorily defined, "the owner [must have] taken reasonable measures to keep such information secret" and the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. 1839(3). Critically, Plaintiff fails to allege that he or anyone else could or did derive *economic* value from information regarding the frequency with which his computers interacted with certain other computers. *See Kairam v. West Side GI, LLC*, 793 F. App'x 23, 28 (2d Cir. 2019) (affirming dismissal of DTSA claim in part for failure to allege how the purported trade secret derives independent economic value from nondisclosure). He alleges that such data has *political* value and that Clinton, as his political rival, sought it for political purposes. (Am. Compl. ¶ 138). But this does not suffice to plausibly allege a trade secret, which must derive economic value from nondisclsoure.

Even if DNS data is a trade secret, Plaintiff has not plausibly alleged that he has a protectable interest in it. DNS data is public, *see* NIST Report at 2-1 to 2-2, a fact which Plaintiff does not contest. (*See* DE 237 at 31). Nevertheless, he suggests that because that data "*originat[ed]* from his servers" or that "DNS internet traffic data "*pertain[ed]* to him," it belongs to him.[14] (*Id.*

---

Am. Compl. ¶ 548) (e.g., "client lists . . . techniques, patterns, methods, processes, and procedures"). Plaintiff does not, for example, allege that the DNS data revealed a proprietary client list that Defendants then stole. What DNS data *could* reveal as a theoretical matter is irrelevant for purposes of this motion. And the fact that Plaintiff alleges a list of boilerplate buzzwords is of no matter. My focus is, as it must be, on Plaintiff's non-conclusory allegations. The theory Plaintiff pled is that the theft of DNS internet traffic revealing interactions between his servers and other servers constitutes theft of trade secrets.

[14] Plaintiff's ownership theory is further flawed in that he alleges that he owns DNS data that was obtained from EOP servers (during a time in which Plaintiff was not even in office (*See* Am. Compl. ¶¶ 143–144)) and the Trump Organization, both of which are nonparties to this litigation. *See Vill. Of Alington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) ("The plaintiff must show that he himself is injured by the challenged action of the defendant"); *Sierra v. City of*

¶ 544) (emphasis added). Recall that DNS is a distributed internet-based computing system comprised of geographically distributed infrastructure. Indeed, Plaintiff repeatedly describes DNS data as "internet data" or "internet traffic." (Am. Compl. ¶¶ 141–42, 491, 544–46, 708). It is thus implausible that Plaintiff owns "DNS internet data" just because it pertains to him or because his servers sent it into the DNS infrastructure. *See* 18 U.S.C. § 1839(4) (defining "owner" as "a person or entity in whom . . . rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. § 1839(4)). Nor does *Kremen v. Cohen* lend Plaintiff any support. Contrary to Plaintiff's contention (DE 237 at 31–32), *Kremen* did not address ownership rights in DNS data, it addressed ownership rights in a domain name, which is not at issue here. 337 F.3d 1024, 1030–31 (9th Cir. 2003). Plaintiff thus has not alleged that he owned DNS lookup data pertaining to him.

Nor does Plaintiff allege that Defendants "st[ole]" the DNS data from Plaintiff, or "t[ook] [it] without authorization, or obtain[ed] [it] by fraud or deception." *Smith*, 22 F.4th at 1243 (citing 18 U.S.C. § 1832(a)). To the contrary, Neustar allegedly provides DNS resolution services and Joffe had permission to access DNS data through Neustar. (Am. Compl. ¶¶ 126, 130, 142, 143–44, 491). Joffe allegedly obtained the DNS internet traffic pertaining to Plaintiff by "mining" the data sources he had authority to access, which does not equate to theft. (*Id.* ¶ 130, 134, 140–42, 491). For the foregoing reasons, Plaintiff has not stated a cognizable theft of trade secrets claim.

### iii.   Wire Fraud

Plaintiff's Amended Complaint added a new purported predicate act: wire fraud. However, this predicate act also fails for at least two reasons. First, to plead fraud, Plaintiff must satisfy the heightened pleading requirements of Rule 9(b); that is, Plaintiff must specify with precision

---

*Hallandale Beach*, 996 F.3d 1110, 1124–25 (11th Cir. 2021) (Newsom, J., concurring) (explaining that a plaintiff may only sue for injury to the government in a *qui tam* action).

exactly why any allegedly fraudulent statements were false and how they mislead him. *See Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1159 (11th Cir. 2019). Plaintiff has not done so. (*See* Am. Compl. ¶ 583(a)–(c),(j),(m)–(p)). Conclusory allegations that Plaintiff has suffered "loss of competitive position, . . . loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations" fall woefully short of Rule 9(b)'s particularity requirement. Plaintiff does not specify in what way he has lost any competitive position or goodwill attributable to Defendants' actions, and, as explained *supra* he has not explained how he has lost any trade secrets.

Second, Plaintiff's Amended Complaint fails to successfully allege wire fraud as a predicate act because Plaintiff does not allege that "an object of the[] dishonesty was to *obtain* . . . money or property." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (emphasis added). The federal wire fraud statute prohibits "only deceptive schemes to deprive the victim of money or property"—not "all acts of dishonesty." *Id.* With this predicate act, Plaintiff tries to fit a square peg into a round hole. The alleged harm Plaintiff describes to his "political and/or business reputation" is not the type of harm the wire fraud statute remediates. *See United States v. Wheeler*, 16 F.4th 805, 820 (11th Cir. 2021). "Damage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)." *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999) (collecting cases).

Nor does "misreporting" payments to Fusion GPS in campaign finance reports qualify as wire fraud. Violations of federal campaign finance laws are not RICO predicate offenses. *See Ayres v. Gen. Motors Corp.*, 243 F.3d 514, 522 (11th Cir. 2000) (holding that violations of the federal Safety's Act disclosure requirements could not be prosecuted as wire fraud under the civil RICO

statute). Plaintiff's Amended Complaint is devoid of any allegation that Defendants obtained money or property or deprived anyone else of it. Thus, wire fraud is not a viable predicate act.

b.  Pattern

Plaintiff has also failed to plausibly allege a pattern of racketeering activity, and this further precludes him from stating a RICO claim. "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis in original) (citations omitted). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 1265 (citation omitted).

For the reasons previously discussed, Plaintiff has failed to plausibly allege that Defendants committed any one predicate act, let alone two or more within a ten-year time span. But even if any of his predicate acts were viable, Plaintiff has not alleged any facts to plausibly suggest that they are either related to one another, or that the acts are of a continuing nature.

A party can allege closed-ended continuity "by proving a series of related predicates extending over a substantial period of time." *Jackson*, 372 F.3d at 1265. Plaintiff has not done so here. The predicate acts he alleges occurred over an approximately six-month time period around the 2016 election: (1) the alleged theft of trade secrets between July 2016 and "early 2017," (Am. Compl. ¶¶ 134, 140, 298, 321); (2) the alleged witness tampering between September 2016 and February 2017, (*id.* ¶¶ 205, 218, 304, 561–65); and (3) the alleged wire fraud between May and October 2016, (*id.* ¶ 581(a)–(y)). The Eleventh Circuit has rejected allegations of closed-ended

continuity when the supposed pattern of racketeering activity lasted less than nine months, and other circuits impose even stricter requirements. *See Jackson*, 372 F.3d at 1266 (collecting cases); *Halvorssen v. Simpson*, 807 F. App'x 26, 31 (2d Cir. 2020) (noting two-year "minimum" for closed-ended continuity). Thus, the activity Plaintiff alleges did not run long enough to satisfy the requirements for demonstrating closed-ended continuity.

Plaintiff's "pattern" allegations fail for another reason: there is no closed-ended continuity where "the RICO allegations concern only a single scheme with a discrete goal." *Jackson*, 372 F.3d at 1267; *see also Ferrell v. Durbin*, 311 F. App'x 253, 257 (11th Cir. 2009) ("[S]ingle schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity."). But that is exactly what Plaintiff alleges here: that the Defendants shared a single, time-limited objective "to vilify Donald J. Trump" in connection with his 2016 campaign and presidency. (Am. Compl. ¶ 2). Plaintiff even identified a "deadline" for this *singular* objective: "Election Day." (*Id.* ¶ 533).

The Amended Complaint is also devoid of any allegations that demonstrate open-ended continuity. To allege open-ended continuity, a plaintiff must show that "the alleged acts were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future." *Jackson*, 372 F.3d at 1267 (quotation marks omitted). There are no such allegations in the Amended Complaint. That Plaintiff may run for office again in 2024 is not sufficient to suggest that Defendants will commit any predicate acts in the future; such a proposition is far too speculative and cannot be plausibly inferred from the allegations. Plaintiff argues that "[g]iven the RICO Defendants' history, there is a significant risk that they will resort to engaging in 'theft of trade secrets, obstruction of justice, and other unlawful tactics'" to oppose Plaintiff's future presidential bid. But, for the reasons explained above, there is no evidence, and Plaintiff has not

alleged any facts to support, that the Defendants committed any predicate acts in the past; thus, Plaintiff's attempt to rely on Defendants' "history" to establish open-ended continuity falls short.

### c. Enterprise

An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Boyle*, 556 U.S. at 947 (footnote and citation omitted); *see also id.* ("[I]f the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect. . . . [E]vidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" (citation omitted)). In addition, a RICO enterprise is "a continuing unit that functions with a common purpose." *Boyle v. United States*, 446 U.S. 938, 948 (2009). "[T]he relevant 'purpose' in an association-in-fact enterprise is the members' shared purpose of engaging in *illegal activity*." *Al-Rayes v. Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019) (emphasis added).

Defendants argue that the RICO Defendants "shared a purpose that was not only legitimate, but constitutionally protected: opposing Plaintiff, the Republic candidate, in the 2016 presidential election." (DE 226 at 8 (citing Am. Compl. ¶¶ 2, 9)). Plaintiff contends that this is not so, and that the Defendants' purpose was "corruptly and wrongfully harming Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, impeding his ability to effectively govern, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not limited to, falsely implicating Plaintiff, the

41

Trump Campaign, and the Trump Administration as colluding with Russia." (DE 237 at 19 (citing Am. Compl. ¶ 531)). But Plaintiff's assertions that the Defendants acted "through deceptive, criminal, and fraudulent means" is a legal conclusion that is not entitled to the presumption of truth at the motion to dismiss stage. Plaintiff offers nothing plausible in support to suggest that Defendants had an *illegal* purpose or an intent to commit racketeering acts. These allegations fail for the same reasons the conclusory allegations of discrimination failed in *Iqbal*: they are "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Moreover, neither politically opposing Plaintiff, disliking Plaintiff, nor engaging in political speech about Plaintiff that casts him in a negative light is illegal. Without an illegal purpose plausibly alleged in the Amended Complaint, Plaintiff has failed to allege a RICO enterprise.

### d. RICO Standing

Finally, Defendants argue that Plaintiff has failed to adequately allege RICO standing—an injury directly caused by a predicate racketeering act. To state a claim for RICO, a plaintiff must allege both an injury to the plaintiff's business or property and "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp. v. City of New York*, 559 U.S. 1, 9 (2010) (citation omitted). "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Id.* Similarly, that an injury was "foreseeable" is not enough; instead, "the injury must be direct." *Ray v. Spirit Airlines*, 836 F.3d 1340, 1349 (11th Cir. 2016).

Plaintiff contends that he has alleged RICO standing because the Amended Complaint points to "at least nine independent and distinct harms to his business and property," which include: (i) "loss of political []reputation"; (ii) "loss of business reputation"; (iii) "loss of existing and future business opportunities"; (iv) "loss of competitive position"; (v) "loss of business revenue"; (vi) loss of goodwill"; (vii) "loss of trade secrets"; (viii) "loss of contractual relations"; and

(ix) "defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom." (Am. Compl. ¶¶ 615–16). Missing from the Amended Complaint, though, is any allegation directly connecting Defendants' conduct to any of these harms. Plaintiff has not alleged facts of any specific business opportunities, revenue, or goodwill lost because of Defendants' actions. Without any such allegations, Plaintiff has not, and cannot, show that any of these harms were the direct result of any racketeering activity. For this reason, I agree that Plaintiff has failed to allege facts that establish RICO standing.

## 2.   *Injurious Falsehood & Conspiracy to Commit Injurious Falsehood (Counts III and IV)*

As with Plaintiff's RICO claims, Defendants argue the Plaintiff's injurious falsehood claims should be dismissed as both barred by the applicable statute of limitations and as substantively failing on the merits. I agree on both grounds.

The statute of limitations for injurious falsehood under Florida law is two years from publication. *See Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanigan*, 629 So.2d 113, 114–115 (Fla. 1993); Fla. Stat. § 95.11(4)(g). And the statute of limitations for conspiracy to commit injurious falsehood is four years from the date of injury. *See Davis v. Monahan*, 832 So.3d 708, 709 (Fla. 2002). The statute of limitations on most of the statements Plaintiff identifies ran long ago. (*See, e.g.*, Am. Compl. ¶¶ 268–69) (Clinton's tweets dated October 31, 2016); (*id.* ¶ 265) (Sullivan's campaign statement dated October 31, 2016); (*id.* ¶ 503) (Wasserman Schultz's MSNBC interview on May 10, 2019).

Since the initial Complaint was filed in this court on March 24, 2022, the two-year statute would have expired on March 24, 2020. (DE 1). The statement attributed to Defendant Sullivan is alleged to have occurred on October 31, 2016. (Am. Compl. ¶ 265). Defendant Podesta's statement

was made October 11, 2016 (*Id.* ¶ 276) and October of 2017 (*Id.* ¶ 496).[15] Defendant Sussmann is alleged to have met with a New York Times reporter on September 1, 2016 (*Id.* ¶ 191), the FBI on September 19, 2016 (*Id.* ¶ 205), and employees of the CIA on February 9, 2017 (*Id.* ¶ 304). While Defendant Danchenko is named in Count III, the Amended Complaint does not attribute any statement to him about Plaintiff, injurious or otherwise. The Amended Complaint alleges that Defendant Danchenko was an analyst for the Steele Dossier and provided information to him from May 16 through December 2016 (*Id.* ¶¶ 109-110), had meetings and communications during that time with Defendant Dolan (*Id.* ¶¶ 111, 112, 114, 118, 119, 120), and was interviewed by the FBI from January 2017 through November 2017 (*Id.* ¶¶ 330–337).

Defendant Steele, a resident of the United Kingdom, is alleged to have drafted a dossier about Plaintiff, the first report of which was furnished June 20, 2016. (*Id.* ¶¶ 110, 147). Defendant Steele, described in the Amended Complaint as a paid FBI informant, began sending the dossier to the FBI on July 5, 2016 (*Id.* ¶ 158), and September 19, 2016 (*Id.* ¶ 226), met with members of the news media on September 21, 2016, FBI agents and a State Department official on October 3 and October 11, 2016 (*Id.* ¶¶ 233-234), and a reporter for Mother Jones on October 31, 2016 (*Id.* ¶ 272). A copy of Defendant Steele's dossier was then provided to Senator John McCain in early 2016, who provided a copy to Defendant FBI director Comey on December 9, 2016. (*Id.* ¶¶ 290, 291). Copies of the dossier were leaked to the press, and it was published in full by Buzzfeed on January 10, 2017 (*Id.* ¶¶ 292, 294, 295). Despite all of these references to Defendant Steele scattered throughout the Amended Complaint, none specifically attribute any false statement about

---

[15] Mr. Podesta is not named in Count III but is named in Count IV, the conspiracy to commit injurious falsehood claim.

Plaintiff to him. All of these activities are alleged to have occurred well outside the statute of limitations for injurious falsehood.

The Amended Complaint does allege statements by Defendants Clinton and Schiff that would fall within the two-year statute of limitations. With respect to Defendant Clinton, the Amended Complaint attributes the following statements made on June 16, 2021: (1) "We don't have Trump as spokesperson for Putin anymore"; and (2) "After [a] disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected of course." (*Id.* ¶ 520).[16] And as to Defendant Schiff, Plaintiff points to: (1) a March 24, 2019 episode of ABC's This Week where Defendant Schiff "called it congresses [sic] duty to expose e [sic] Trump's relationship with Russia"; (2) CNN's State of the Union on May 9, 2020, where Defendant Schiff "claimed . . . there was 'more than circumstantial evidence' that Donald Trump's 2016 presidential campaign colluded with Russia"; and (3) on April 16, 2021 on MSNBC's The Last Word, Defendant Schiff stated that the "Trump campaign was passing strategic polling and strategic information to a Russian intelligence agent" and "[n]ot just any Russian intelligence, but the same ones that tried to help [Plaintiff] win the 2016 election, what most people would call collusion." (*Id.* ¶¶ 511, 513, 514). But while perhaps not barred by the statute of limitations, these statements by Defendants Clinton and Schiff nevertheless do not constitute injurious falsehood for the reasons explained below.

---

[16] In the multitude of paragraphs preceding Count III, the Amended Complaint references two other statements by Defendant Clinton. (Am. Compl. at ¶¶ 521–22). In the February 16, 2022 tweet, she is responding to a statement by Plaintiff directed at her campaign, which is discussed in the Vanity Fair article she attaches. In the quotation from the Financial Times article, she does not reference Plaintiff and is answering a question about the direction of the Democratic Party. These do not appear to relate to the Russia allegations, and they are therefore not relevant to the claims in Plaintiff's Amended Complaint.

Under Florida law, "[a] group of torts recognized under the collective title of 'injurious falsehood' . . . 'is the intentional interference with another's economic relations.'" *Salit v. Ruden McCloskey, Smith Schuster & Russel, P.A.*, 742 So.2d 381, 386 (Fla. 4th DCA 1999) (quoting *Procacci v. Zacco*, 422 So.2d 425, 426 (Fla. 4th DCA 1981)). A claim for injurious falsehood involves the publication of a false statement that is "harmful to the interests" of others and results in their "pecuniary loss." *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1153 (11th Cir. 2011) (quoting Restatement (Second) of Torts, § 623A (1977)). The Eleventh Circuit has explained that the fundamental difference between a claim for defamation and one for injurious falsehood is that the former protects the reputation of an injured party, while the latter protects that party's *property interests*. *Id.* at 1154.

The elements of the tort of injurious falsehood are: (1) a falsehood, (2) published or communicated to a third party, (3) the defendant knew that the falsehood would likely induce others not to deal with the plaintiff, (4) the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff, and (5) special damages. *Bothmann v. Harrington,* 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984). Damages for injurious falsehood are "restricted to [loss] which results directly and immediately from the falsehoods' effect on the conduct of third persons and the expenses incurred to counteract the publication." *Id.* at 1170 (citing Restatement (Second) of Torts Section 633 (1977)). Damages recognizable are also limited to a plaintiff's realized pecuniary losses. *Salit,* 742 So.2d at 387; *Collier County Pub. Co., Inc. v. Chapman,* 318 So 2d. 492, 495 (Fla. 2d DCA 1975). Special damages pled must be foreseeable and normal consequences of the alleged wrongful conduct, and the conduct must be a substantial factor in bringing about the losses. In addition, under Federal Rule 9(g), "[i]f an item of special damages is

claimed, it must be specifically stated." *See Browning v. Clinton,* 292 F.3d 235, 245 (D.C. Cir. 2002); *Erick Bowman Remedy Co. v. Jersen Salsbery Labs,* 17 F.2d 255, 261 (8th Cir. 1926).

Plaintiff expressly disclaims any recovery for reputational damage. (Am. Compl. ¶ 656). Instead, he "seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities . . . ." (*Id.* ¶ 666). He says he has been injured in his business and property and has "incurred and will[] incur significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations." (*Id.* ¶ 654). Finally, he claims to have been forced to incur expenses in excess of $24,000,000 in the form of defense costs, legal fees, and related expenses incurred "in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings that arose therefrom." (*Id.* ¶ 655).

While Plaintiff's decision to forego a claim for damage to personal reputation is perhaps understandable, the choice of injurious falsehood as a cause of action, with its focus on property interests, is a poor fit. The Supreme Court has held that political office is not a property or contract right. *Taylor v. Beckham,* 178 U.S. 548, 577 (1900) ("[P]ublic offices are mere agencies or trusts, and not property as such . . . [T]he nature of the relation of a public officer to the public is inconsistent with either a property or a contract right."); *see also Snowden v. Hughes,* 321 U.S. 1, (1944) ("More than forty years ago this Court determined that an unlawful denial . . . of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause."). Because Plaintiff does not have a property or contract right to political office, attacks on his fitness for such a role do not constitute trade libel. And even if they did, Plaintiff does not

plausibly allege that any supposed falsehoods actually damaged his political career: as Plaintiff

knows, he—not Defendant Clinton—won the 2016 presidential election.

The allegations of the Amended Complaint also fall far short of stating a claim for injurious

falsehood in other respects. First, apart from boilerplate conclusory language that Plaintiff

"suffer[ed] economic losses" and "has been injured in his business and property," it is not alleged

that any statement was made for the purpose of interference with Plaintiff's property or economic

interests. (*See* Am. Compl. ¶¶ 653–54). The crux of Plaintiff's grievances is that Defendants

allegedly conspired "to cripple Trump's initial bid for presidency and tarnish his electability for

future elections[.]" (*Id.* at ¶ 2). But opposing Plaintiff's presidential campaign does not amount to

a realized pecuniary loss. Statements to law enforcement or comments made in a political

campaign are not intended to induce others not to deal with Plaintiff or his business, or to cause

direct or immediate financial loss. The damages sought are not recoverable and there is a lack of

any allegation tying Plaintiff's claim for attorneys' fees "directly or immediately" to any alleged

falsehood.

The Amended Complaint also fails to allege falsity,[17] that any falsehood impacted third

parties' desire to deal with him or resulted in pecuniary loss, or special damages. "The special

damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated,

as in the case of specific lost sales." *Salit*, 742 So.2d at 388. It requires proof that the pecuniary

loss is directly attributed to defendants' conduct and not some other factor. *See Funny Cide*

*Ventures, LLC v. Miami Herald Publ'g Co.*, 955 So.2d 1241, 1246 (Fla. 4th DCA 2007). And

---

[17] Plaintiff's conclusory allegations that "Defendants . . . made, disseminated and/or published false and damaging statements concerning Plaintiff, specifically that he was colluding with Russia and its President Vladimir Putin" are not sufficient under *Twombly* absent some allegations explaining the basis for Plaintiff's falsity claim.

special damages must be "specifically stated" in the complaint. Fed. R. Civ. P. 9(g). The Amended Complaint lacks this "crucial element." *Salit*, 742 So.2d at 388.

Moreover, many of the statements that Plaintiff characterizes as injurious falsehoods qualify as speech plainly protected by the First Amendment. Some are statements of opinion based upon Plaintiff's four years in office.[18] *See From v. Tallahassee Democrat, Inc.*, 400 So.3d 52, 57 (Fla. 1st DCA 1981). Others are "part of the conventional give-and-take in our economic and political controversies[.]" *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974); *see also Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002).

Because Plaintiff has failed to allege the essential elements of an injurious falsehood claim, this count must be dismissed. And as for Count IV, the conspiracy allegations are formulaic, conclusory, and implausible. Moreover, "the gist of a civil action for conspiracy is not conspir[ing] itself but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Balcor Property Mgmt. v. Ahronovitz*, 634 So.2d 277, 279 (Fla. 4th DCA) (quoting *Berger v. Levin*, 231 So.2d 875, 877 (Fla. 3d DCA 1970)). Without the underlying injurious falsehood claim, there can be no conspiracy to commit injurious falsehood.

---

[18] In paragraphs 647 and 648 of the Amended Complaint, Plaintiff alleges that Defendant Wasserman-Schultz published numerous false and damaging statements about Plaintiff and his alleged collusion with Russia. "For example, she told CNN's Erin Burnett on 'Out Front' that reported contacts between President Donald J. Trump's campaign aides and Russia amounted to collusion." Defendant Wasserman-Schultz told the reporter: "[W]ith every passing day, it gets more and more disturbing and more and more evidence that there was collusion" and "Donald Trump should be the first person asking for one but since I think he was likely part of it, it's not surprising that hasn't happened." No date is provided, and from the context it appears the interview probably occurred before the appointment of Special Counsel Robert Mueller in May 2017, and outside the statute of limitations. In any event, for the reasons stated above concerning the necessary elements of injurious falsehood, the Amended Complaint does not state a claim against Defendant Wasserman-Schultz.

3.  *Malicious Prosecution & Conspiracy to Commit Malicious Prosecution (Count V and VI)*

In Count V, Plaintiff sues: his own Deputy Attorney General, Rod Rosenstein; former Director at the FBI, James Comey; former Deputy Director of the FBI, Andrew McCabe; lawyers for the FBI, Kevin Clinesmith and Lisa Page; an official with the Department of Justice, Bruce Ohr, and his wife Nellie Ohr; and an FBI agent, Peter Stzok, for malicious prosecution. But Plaintiff was never prosecuted.[19]

In order to prevail in a malicious prosecution action, a plaintiff must establish (1) an original criminal or civil judicial proceeding against the plaintiff was commenced or continued; (2) the defendant was the legal cause of the proceeding against the plaintiff; (3) the termination of the proceeding constituted a *bona fide* termination in favor of the plaintiff; (4) there was an absence of probable cause for the proceeding; (5) there was malice on the part of the defendant, and (6) the plaintiff suffered damage as a result of the proceeding. *Alamo Rent-A-Car v. Mancusi*, 632 So.2d 1352, 1354 (Fla 1994); *see also DeMartini v Town of Gulf Stream,* 942 F.3d 1277, 1309 (11th Cir. 2019) (listing elements). "The failure of a plaintiff to establish any one of these six elements is fatal to a claim of malicious prosecution." *Alamo*, 632 So.2d at 1354.

The Amended Complaint fails to allege that any criminal or civil complaint has been commenced against Plaintiff, that the Defendants were the legal cause of such a proceeding, or that there has been a *bona fide* termination in his favor. Plaintiff appears to be basing this claim on his allegations that Defendants "induced or conspired to induce the Crossfire Hurricane investigation," as well as certain "extrajudicial surveillance," "the Mueller investigation," and "other related investigations regarding the Trump-Russia Connection." (*See* Am. Compl. ¶¶ 669–

---

[19] Because there was no prosecution from which the statute of limitations could accrue, I do not address a statute of limitations argument with respect to this claim.

71, 680–82, 674). But the tort is for malicious prosecution, not malicious investigation. These investigations, therefore, do not amount to a "judicial proceeding" because none is a civil or criminal lawsuit, and "[a]n action for malicious prosecution . . . [can] never occur outside the context of *litigation*." *Fischer v. Debrincat*, 169 So.3d 1204, 1209 (Fla. 4th DCA 2015) (emphasis added). Plaintiff attempts to argue otherwise, but his argument lacks support. He cites *Caplan v. Johnson*, 414 F.2d 615, 618 (5th Cir. 1969), but that case did not hold that there exists a cause of action for malicious prosecution absent some criminal or civil proceeding. Instead, it held that "[a]rrest is not an essential element for malicious prosecution under Florida law"—but a judicial proceeding still is. *Id.* at 618.

In addition to failing to identify any judicial proceeding that satisfies the first element of a malicious prosecution action, the Amended Complaint also fails to allege the second and fourth elements—namely, that Defendants were the legal cause of the judicial proceeding and that the alleged proceeding suffered from an absence of probable cause. Indeed, the Inspector General report cited by Plaintiff compels the opposite conclusion; in it, the Department of Justice Inspector General concluded that the FBI operated Crossfire Hurricane "for an authorized purpose" and "with adequate factual predication" that had nothing to do with any Defendant. *See* IG Report at 347. Further, the Inspector General Report specifically explained that the investigation was not predicated on DNC information or the Steele Dossier, but on a tip from a friendly foreign government. *Id*. Of course, Plaintiff is free to disagree with the conclusions of the Inspector General's Report. But, as I have already cautioned, he may not misrepresent it in a pleading, and he certainly may not misconstrue it in an attempt to offer support for this ill-fated claim.

The Amended Complaint also fails to satisfy the third element of a malicious prosecution claim. "That element is satisfied by either a favorable decision on the merits or a *bona fide*

termination of the proceedings," that is, "a good faith nollo prosequi or declination to prosecute." *Union Oil of Cal. V. Watson*, 468 So.2d 349, 353 & n.3 (Fla. 3d DCA 1985). Plaintiff does not, and cannot, allege that Crossfire Hurricane or the Mueller investigation were terminated in his favor. While it is true that the Report states that it does not affirmatively conclude Plaintiff committed a crime, it also "does not exonerate him." Office of Special Counsel, U.S. Dep't of Justice, 2 *Report on the Investigation into Russian Interference in the 2016 Presidential Election* 1–2 (2019) (citing Am. Compl. ¶ 460). This conclusion was neither "on the merits" nor "favorable" toward Plaintiff. *See Union Oil of Cal. v. Watson*, 468 So.2d 349, 353 & n.3 (Fla. 3d DCA 1985).

For these reasons, Count V is dismissed with prejudice. And for the reasons discussed *supra* section III(D)(2), the conspiracy claim, Count VI, must also be dismissed. *See Balcor,* 634 So.2d at 279. An allegation of conspiracy to commit malicious prosecution is properly dismissed where the underlying claim for malicious prosecution is not actionable. *Buchanan v. Miami Herald Publishing Co.*, 206 So.2d 465 (3d DCA 1968). Count VI is also dismissed with prejudice.

### 4.   Computer Fraud and Abuse Act (Count VII)

The CFAA is a criminal anti-hacking statute with a civil cause of action. *See* 18 U.S.C. § 1030(g). Plaintiff alleges that Neustar and Joffe, conspiring with other Defendants, accessed "internet data" and "DNS records" from computers belonging to the Executive Office of the President ("EOP") and the Trump Organization, and did so with a "nefarious purpose." (Am. Compl. ¶¶ 694–700). The CFAA claim is not only time barred, but it fails to state a substantive claim for relief.

The statute of limitations on a civil CFAA claim is "2 years [from] the act complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g). Based on Plaintiff's allegations, the limitations period commenced on October 31, 2016 or, at the latest, early November 2016.

Plaintiff alleges the following: on October 31, 2016, "eight days before the 2016 Presidential Election," *Slate* published an article on the Trump-Alfa Bank connection based on DNS lookup data, titled: "Was a Trump Server Communicating with Russia?" (Am. Compl. ¶ 261 & n.185). On the same date, Sullivan published a written campaign statement reiterating the contents of the Trump-Alfa Bank server story, attributing the "discovery [to] the work of independent experts—'computer scientists'" and noting that "'federal authorities' were investigating 'this direct connection between Trump and Russia.'" (*Id.* ¶ 265). Also on the same date, Clinton published two tweets relaying that a "covert server" linking Trump and Alfa Bank was discovered by "computer scientists." (*Id.* ¶¶ 268–269). Moreover, the Trump-Alfa Bank server connection allegedly continued to receive public attention; Plaintiff alleges that on October 8, 2018, a *New Yorker* article profiled Joffe's DNS lookup information. (*Id.* ¶¶ 324–26). Per Plaintiff's allegations, the information about the DNS lookup data purportedly connecting Plaintiff to Alfa Bank was circulating publicly, including by Clinton and her campaign, mere days before the presidential election. Plaintiff's conclusory allegation that the offense was not discoverable until September 2021 would require me to infer that Plaintiff lacked knowledge of the Trump-Alfa Bank server story not just when the press and his political rival publicized it mere days before the presidential election, but throughout his presidency. (Am. Compl. ¶¶ 146, 704). That is implausible, and it is belied by his more specific factual allegations, as above-described.

The Second Circuit addressed and rejected the argument Plaintiff raises—that his claim did not begin to accrue until he discovered the identity of the offender. (DE 237 at 17–18). Holding that a CFAA claim begins to accrue when the Plaintiff learns of the alleged violation even if the offender's identity is unknown, the Second Circuit explained: "if a plaintiff cannot discover the hacker's identity within two years of the date []he discovers the damage or violation, [his] claims

under the CFAA . . . will be untimely." *Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015).[20] That Plaintiff did not know the name of the "computer scientist" or "computer expert" who allegedly obtained the DNS data does not excuse his failure to investigate and identify the offender during the limitations period. *See id.* The CFAA claim is thus time barred.

But even if timely filed, this claim would still be subject to dismissal. The Amended Complaint suffers from at least two fundamental substantive flaws, which I address in turn.

First, Plaintiff has not alleged unlawful access to a computer within the meaning of the CFAA. All of the subsections alleged in the Amended Complaint, §§ 1030(a)(2), (a)(3) and (a)(4),[21] require the alleged perpetrator to have accessed a protected computer "without authorization." Subsections (a)(2) and (a)(4) also prohibit accessing a protected computer by "exceed[ing] authorized access." A computer user "without authorization" is one who accesses a computer the user has no permission to access whatsoever—an "outside hacker[]." *Van Buren v. United States*, 141 S. Ct. 1648, 1658 (2021). To "exceed authorized access" is "to access a computer with authorization and to use such access to obtain information in the computer that the access is not entitled so to obtain." § 1030(e)(6). Meaning, a computer user who "exceeds authorized access" has permission to access the computer, but "exceed[s] the parameters of authorized access by entering an area of the computer . . . such as files, folders, or databases . . . to

---

[20] Plaintiff puzzlingly cites to *Sewell* with respect to his statute of limitations argument for the SCA, despite that *Sewell* contradicts his argument with respect to his CFAA claim (and also with respect to his SCA claim, as addressed further below). (DE 237 at 17). Perhaps Plaintiff failed to recognize the Second Circuit's statute of limitations analysis applied to the CFAA as well as the SCA. Whatever the reason, all Parties cite *Sewell* as persuasive authority. (DE 226 at 7; DE 237 at 17).

[21] Subsection (a)(6), which Plaintiff also cites, proscribes trafficking in "passwords or similar information through which [certain] computer[s] may be accessed without authorization." (Am. Compl. ¶ 696). A claim under § 1030(a)(6) fails for the additional reason that Plaintiff alleges no trafficking of passwords or anything of the like.

which [that] authorization does not extend"—an "inside hacker[]." *Van Buren*, 141 S. Ct. at 1658 (citation and internal quotation marks omitted). Neither type of unauthorized access is alleged.

Plaintiff does not plausibly allege that any EOP or Trump Organization computer was hacked. Plaintiff argues that because he *alleged* that the access was unlawful, his CFAA claim "is viable on this basis alone." (DE 237 at 54). That is simply incorrect. Labeling access as "unlawful" or as "hacking" are legal conclusions which are not entitled to the presumption of truth at the motion to dismiss stage. *Ashcroft*, 556 U.S. at 678–79. Looking to Plaintiff's factual allegations for support of this legal conclusion, I find none. Plaintiff alleges that Joffe and Neustar "exploited" their permissions to gain access to DNS data, which is "internet data," using their own computers and other data sources they had permission to access, but did so with "nefarious purposes." (*E.g., id.* ¶¶ 125, 130, 142) ("Joffe had access to numerous data sources through his various positions with Neustar," including to "domain name system (DNS) internet traffic," which the Defendants "exploited for their nefarious purposes"); (*id.* ¶ 144) ("Joffe and Neustar exploited this arrangement [to provide DNS resolution services to the EOP] by . . . mining EOP's DNS traffic for the purpose of gathering derogatory information on [Plaintiff].")); (*see also id.* ¶¶ 125–130, 134, 142–45, 240, 212, 327, 491). There is no external hacking alleged, and so a "without authorization" theory necessarily fails.

An "exceeds authorized access" theory fares no better. Plaintiff's theory of violation—that Defendants accessed information they were entitled to access but did so with a nefarious purpose (*id.* ¶¶ 134, 140–46)—is squarely foreclosed by *Van Buren*. *See* 141 S. Ct. at 1662 (holding that a user does not "exceed authorized access" when he accesses a database with authorization but does so "for an improper purpose"). Plaintiff points to his allegations that Defendants obtained information that was "off limits" to them, but he misreads *Van Buren*. What must be "off limits"

is the area of the computer from which the information was obtained, not the information itself. *Id.* Post-*Van Buren*, misuse of a computer system that a user is entitled to access is not an actionable CFAA claim.

Second, Plaintiff does not allege any recoverable "loss." *See* 18 U.S.C. § 1030((4)(A)(i)(I), (g). The CFAA defines "loss" to include: (1) "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense" and (2) "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11); *see Brown Jordan*, 846 F.3d at 1174 (finding that either or both categories may suffice). Furthermore, the "loss" must amount to at least $5,000 in a one-year period. 18 U.S.C. § 1030(c)(a)(4)(A)(i)(I).

Here, Plaintiff primarily alleges losses incurred as a result of what he contends is improper use of the information obtained. (Am. Compl. ¶¶ 703, 705) (claiming losses for "defense costs" and "legal fees" related to "the various federal investigations and/or official proceedings that arose therefrom" and "harm to his business, and loss of trade secrets and/or other proprietary" data). But the CFAA does not provide for recovery of legal expenses, lost profits or other consequential damages untethered to a service interruption or restoration and/or response effort. *See* 18 U.S.C. 1030(e)(11). That makes sense, given that the CFAA prohibits unauthorized *access* to a computer, not misuse of information obtained therefrom. *See Van Buren*, 141 S. Ct. at 1659–60. Plaintiff's single reference to "the cost of investigating and responding to the unauthorized access" is conclusory and unsupported by factual allegations. (*See* Am. Compl. ¶ 705). Absent recoverable damages, there can be no CFAA claim.

The remaining CFAA Defendants—the DNC, the Clinton Campaign, Clinton, Perkins Coie and Susmann—are alleged to have conspired with Joffe and Neustar in violation of 18 U.S.C.

§ 1030(b). (Am. Compl. ¶ 701). Because Plaintiff states no cognizable CFAA claim against Joffe or Neustar, he likewise states no claim against the remaining Defendants.

### 5.   *Theft of Trade Secrets (Count VIII)*

Plaintiff fails to state a cognizable trade secrets claim under the DTSA, as explained *supra*. This claim is also untimely. The statute of limitations for a civil DTSA claim is three years from the date "on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). As previously explained, Plaintiff alleges that the DNS traffic data pertaining to him was made public, and circulated by his political rival, on October 31, 2016—eight days before the presidential election. (Am. Compl. ¶¶ 261–69). Any allegation that Plaintiff was unaware that the DNS traffic had been allegedly stolen at or around that time is implausible and contradicted by the above-cited allegations. At a bare minimum, "by the exercise of reasonable diligence" Plaintiff should have discovered the alleged offense by late October or early November 2016. The limitations period on Plaintiff's civil DTSA claim ran on October 31, 2019 or at the latest, early November 2019.

### 6.   *Stored Communications Act (Count IX)*

So too is Plaintiff's claim under the Stored Communications Act ("SCA") time barred. The limitations period for a SCA claim is two years "after the date upon which the claimant first discovered or had reasonable opportunity to discover the violation." 18 U.S.C. § 2707(f). As this claim is also premised on the DNS lookup data (*See* Am. Compl. ¶¶ 728–30), Plaintiff had more than a "reasonable opportunity to discover the violation" in late October to early November 2016. The Second Circuit's opinion in *Sewell*, which Plaintiff cites as persuasive authority (DE 237 at 17), is again helpful here, but not for the reason Plaintiff contends. "If a plaintiff cannot discover the hacker's identity within two years of the date [he] discovers the damage or violation, [his]

claims under the . . . SCA will be untimely." *Sewell*, 795 F.3d at 342. The statute of limitations therefore expired on October 31, 2018, or at the latest, early November 2018.

Even notwithstanding the timeliness issue, Plaintiff's SCA claim would still be subject to dismissal.  The wrong Plaintiff alleges here does not fit neatly, if at all, within the SCA. This is a statute typically applied to protect electronic communications, like emails, stored by network or internet service providers in remote centralized facilities, or by similar entities storing communications by similar means. *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 609 (9th Cir. 2020); *see Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 792 (5th Cir. 2012) ("telephone companies, Internet or e-mail service providers, and bulletin board services."). Congress recognized that neither the Fourth Amendment nor existing federal statutes adequately protected individual privacy rights in electronic communications stored in such a manner, and thus "the [SCA] [protects] intrusions into individual privacy arising from illicit access to  . . . 'remote computing operations and large data banks that store e-mails.'" *Hately v. Watts*, 917 F.3d 770, 782 (4th Cir. 2019); *see In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 145 (3d Cir. 2015); *Garcia*, 702 F.3d at 791.

With that background in mind, the SCA states that "[a]nyone who 'intentionally accesses without authorization a facility through which an electronic communication service is provided; or . . .  intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system' is liable[.]" *Brown Jordan*, 846 F.3d at 1175 (quoting 18 U.S.C. § 2701(a)). The elements of a SCA claim are thus: (1) access "without authorization" or "exceed[ing] an authorization" to access (2) a "facility" (3) that provides an "electronic communication service" (4) thereby obtaining a "wire or electronic communication" (5) while the communication is in "electronic storage." *Id.*; 18 U.S.C. § 2701(a).

At bottom, the SCA prohibits "'hacking' into electronic communication facilities," *Walker v. Coffey*, 956 F.3d 163, 169 (3d Cir. 2020), and in that respect it bears similarities both to the text and congressional goals of the CFAA. *United States v. Cioni*, 649 F.3d 276, 282 (4th Cir. 2011).

One notable difference, though, is that the SCA prohibits unauthorized access specifically to a "facility through which an electronic communication service is provided[.]" *Id.* (quoting 18 U.S.C. § 2701(a)). An "electronic communication service" is "any service which provides users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Although not statutorily defined, "facility" has been interpreted in this Circuit to include "the physical means or equipment for doing something." *Brown Jordan*, 846 F.3d at 1177 n.4 (citation and internal quotation marks omitted). Numerous courts of appeal have interpreted this to mean equipment and structures of internet service providers and similar entities providing communications services, and not personal devices. *See In re Google Inc.*, 806 F.3d at 147 ("In this context, 'facility' is a term of art denoting where network service providers store private communications"); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) (finding that the SCA does not apply to "hacking" into a personal computer because the computer did not "maintain[] any 'electronic communication service,'" but could apply to "information stored with [the complaining party's] Internet service provider" (citing 18 U.S.C. § 2510(15)); *Garcia*, 702 F.3d at 792  ("[T]he relevant 'facilities' that the [SCA] is designed to protect are not computers that *enable* the use of an electronic communication service, but instead are facilities that are *operated by* electronic communication service providers and used to store and maintain electronic storage." (citation and internal quotation marks omitted) (emphasis in original)).

Plaintiff alleges that here, such facilities include the "computers, networks and/or servers" of his personal residence, the EOP, and Trump Organization. (Am. Compl. ¶ 729). Based on the

foregoing, Plaintiff's personal devices are not a qualifying facility. *See, e.g.*, *Garcia*, 702 F.3d at 793. Nor can I plausibly infer from the overbroad invocation of "computers, networks and/or servers" that such devices of the EOP and Trump Organization are equipment through which electronic communication services are provided, akin to a centralized remote data bank operated by an internet service provider or the like. In fact, Plaintiff's allegations indicate that the servers/computers at issue, i.e., the computers from which the DNS queries originated, are "computers that *enable* the use of an electronic communication service," which are not covered by the SCA, and not "facilities that are *operated by* electronic communication service providers and used to store and maintain electronic storage." *See Garcia*, 702 F.3d at 792 (citation and internal quotation marks omitted) (emphasis in original). Plaintiff is correct that cloud-based email programs, like Microsoft 365, could be a "facility," *Brown Jordan*, 846 F.3d at 1177 n.4, but that is of no help to him; Plaintiff does not allege that any Defendant accessed his emails through a cloud-based email program.

The SCA claim further fails on the "electronic storage" element. There are no nonconclusory allegations that the electronic communications at issue were in "electronic storage" in such "facilities" when accessed. (*See* Am. Compl. ¶ 730). "[E]lectronic storage" is defined as "temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). Temporary storage incidental to transmission means storing communications "temporarily pending delivery." *Garcia*, 702 F.3d at 793. Storage for backup purposes would be, for example, the storage by a communications provider of an unread email, at least until the recipient receives it and opens it on a local device. *Vista Marketing, LLC v. Burkett*, 812 F.3d 954, 964 (11th Cir.

2016). Plaintiff does not include any non-conclusory allegations that the "electronic communications" (i.e., DNS internet traffic) were in "electronic storage" in a "facility" (i.e., the computers/networks/servers of the Trump Organization and EOP) *at all*, let alone temporarily pending or incidental to delivery or for backup purposes. *See In re Facebook, Inc.*, 956 F.3d at 608–09 (finding that URLs are not in electronic storage when a search is being processed). Plaintiff's boilerplate language mentioning the statutory phrase "electronic storage" does not suffice. (Am. Compl. ¶ 730).

Defendants raise two additional points: first, they contend DNS lookup data is not an "electronic communication," *see* 18 U.S.C. § 2511(12), and second, electronic communications that are "readily accessible to the general public" are exempt from liability, *Id.* § 2511(2)(g)(i). Plaintiff does not dispute the public nature of this data, and it would appear difficult to maintain an SCA claim based on public internet data. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200 (2022) ("Congress wanted to protect electronic communications that are configured to be private." (citation omitted)). Most often though, the communications at issue in SCA claims are emails. *See, e.g.*, *Vista Mktg.*, 812 F.3d at 963–64; *Brown Jordan*, 846 F.3d at 1175. But novel claims have been brought, albeit perhaps not successfully, based on other purported communications. *See In re Facebook Inc.*, 956 F.3d at 608–09 (rejecting an SCA claim premised on URL searches and noting that such an application "would stretch [the SCA's] application beyond its [congressionally-intended] limits"). The instant claim premised on DNS internet traffic is certainly novel. Cognizant of the stage of this proceeding, and given that the SCA claim is dismissible on several other grounds, I decline to reach these further questions.

7.  *Agency and Respondeat Superior (Counts X, XI, XII, XIII, XIV, XV, and XVI)*

Count X, entitled "Agency," purports to state a claim against Defendant Clinton. Following 172 pages and 734 numbered paragraphs, Plaintiff claims "Clinton is liable as a principal for all of the acts her agents committed against the Plaintiff at her request and for her benefit." (Am. Compl. ¶ 757).

There is no free-standing independent cause of action in Florida for agency. *See, e.g., Barabe v. Apax Partners Eur. Managers, Ltd.*, 359 F. App'x 82, 84 (11th Cir. 2009). Agency can be a theory of liability. But in order for a principal to be held liable for the actions of an agent, a plaintiff must allege an independent wrong. Under Florida law, ultimate facts that establish either actual or apparent agency for the wrong of another must be pled. *Goldschmidt v. Holman*, 571 So.2d 422, 423 (Fla. 1990). Count X reflects the high-water mark of shotgun pleading and is accordingly dismissed. And it is dismissed with prejudice, as none of the underlying claims survive for which, even if properly plead, Defendant Clinton could be held liable under an agency theory.

Counts XI through XVI purport to state claims against Perkins Coie, the DNC, the Clinton Campaign, Fusion GPS, Orbis Business Intelligence, Ltd., Neustar, Inc., and/or Neustar Security Services for Respondeat Superior/Vicarious Liability. But under Florida law, respondeat superior, like agency, is a doctrine of liability, not itself a cause of action. *See Turner Murphy Co. v. Specialty Constructors, Inc.*, 659 So.2d 1243, 1244 (Fla. 1st DCA 1995). Therefore no independent cause of action exists against any of the named Defendants.

In any event, each of these Defendants has also been named in the counts along with their employees or agents. In an action against an employer for the actions of the employee based on the theory of vicarious liability or respondeat superior, the plaintiff must show liability on the part of the employee. If the employee is not liable, the employer is not either. *Mallory v. O'Neil*, 69

So.2d 313, 315 (Fla. 1954); *see also Tsuji v. Fleet*, 326 So.3d 143, 148 (Fla. 1st DCA 2021) (explaining that "a plaintiff may not hold an employer liable until the employee is found to be liable."). Since the Amended Complaint fails to state a claim against the employees or alleged agents of the entities named in Counts XI–XVI, the claims brought pursuant to this doctrine fail on this basis too.

### E.      Amendment

Finally, a note about amendment. Plaintiff requests that, in the event I "find[] the Complaint inadequate in any respect," I grant him leave to amend pursuant to Federal Rule of Civil Procedure 15(a).[22] Defendants argue that "[a]ny further amendment would be futile and serve only to give Plaintiff a platform for rehashing tired rivalries from the 2016 election." *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

It is true that under Rule 15 "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But a district court need not allow amendment "where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). It is not simply that I find the Amended Complaint "inadequate in any respect"; it is inadequate in nearly *every* respect. Defendants presented substantively identical arguments in support of dismissal in the earlier round of briefing on Plaintiff's original Complaint. (*See* DEs 52, 124, 139, 141, 143, 144, 145, 146, 147, 149, 157, 159, 160, 163, 165). But despite this briefing, Plaintiff's Amended Complaint failed to

---

[22] As an initial matter, Plaintiff's request is procedurally improper and, on that basis alone, I need not consider it. "Filing a motion is the proper method to request leave to amend a complaint." *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (citing Fed. R. Civ. P. 7(b)(1)). In addition, a motion for leave to amend must attach or set forth the substance of the proposed amendment. *Id.* "Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009) (quoting *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999)) (internal quotation marks omitted).

cure any of the deficiencies. Instead, Plaintiff added eighty new pages of largely irrelevant allegations that did nothing to salvage the legal sufficiency of his claims. The inadequacies with Plaintiff's Amended Complaint are not "merely issues of technical pleading," as Plaintiff contends, but fatal substantive defects that preclude Plaintiff from proceeding under any of the theories he has presented. At its core, the problem with Plaintiff's Amended Complaint is that Plaintiff is not attempting to seek redress for any legal harm; instead, he is seeking to flaunt a two-hundred-page political manifesto outlining his grievances against those that have opposed him, and this Court is not the appropriate forum.

Fundamentally, Plaintiff cannot state a RICO claim without two predicate acts, and, after two attempts, he has failed to plausibly allege even one. Plaintiff cannot state an injurious falsehood claim without allegations of harm to his property interests. And Plaintiff cannot state a malicious prosecution claim without a judicial proceeding, but he unsuccessfully attempts to misconstrue, misstate, and misapply the law to do so anyway. Moreover, Plaintiff's statutory claims premised on the DNS data rest on a misconstruction of the conduct those laws proscribe and the harms they remediate. Because Plaintiff was unable to cure his Complaint even with all its shortcomings clearly laid out for him, and because most of Plaintiff's claims are not only unsupported by any legal authority but plainly foreclosed by binding precedent as set forth by the Supreme Court and the Eleventh Circuit, I find that amendment would be futile and that this case should be dismissed with prejudice as to the Defendants that have raised merits arguments.

## III.  CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that:

(1) The United States' Motions to Dismiss Under Federal Rule 12(b)(1) (DE 224; DE 256) are **GRANTED**.

(2) Defendants Charles Halliday Dolan, Jr. and Rodney Joffe's Motions to Dismiss for Lack of Personal Jurisdiction (DE 225; DE 227) are **GRANTED**.

(3) Defendant Orbis Business Intelligence, Ltd.'s Motion to Dismiss (DE 260) is **GRANTED**.

(4) Defendants Hillary Clinton, HFACC, Inc., John Podesta, Robert Mook, Jake Sullivan, DNC, DNC Services Corporation, Debbie Wasserman Schultz, Perkins Coie LLP, Marc Elias, Michael Sussman, Charlies Halliday Dolan, Jr., Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Igor Danchenko, Rodney Joffe, Neustar Security Services, and Neustar, Inc.'s Joint Motion to Dismiss Under Federal Rule 12(b)(6) (DE 226) is **GRANTED**.

(5) Plaintiff's Motions to Set Aside the Government's Certification (DE 238; DE 265) are **DENIED**.

(6) Plaintiff's Amended Complaint (DE 177) is **DISMISSED WITH PREJUDICE** as to the Non-Federal Defendants under Rule 12(b)(6) and **WITHOUT PREJUDICE** as to the United States under Rule 12(b)(1).

(7) I reserve jurisdiction to adjudicate issues pertaining to sanctions.

**SIGNED** in Chambers at West Palm Beach, Florida, this 8th day of September, 2022.

Donald M. Middlebrooks
United States District Judge

cc:     Counsel of Record