No. 22-13410

(Consolidated with Nos: 22-14099-HH; 23-10387-J)

═══════════════════════════════════════════

In the United States Court of Appeals
for the Eleventh Circuit
───────────────────────────────

DONALD J. TRUMP,
*Plaintiff-Appellant,*

ALINA HABBA, MICHAEL T. MADAIO,
HABBA MADAIO & ASSOCIATES;
PETER TICKTIN, JAMIE ALAN SASSON,
and THE TICKTIN LAW GROUP
*Appellants,*

versus

HILLARY R. CLINTON, DEMOCRATIC NATIONAL COMMITTEE,
HFACC, INC., DNC SERVICES CORPORATION, PERKINS COIE,
LLC, *et al.*, *Defendants-Appellees.*
───────────────────────────────

On appeal from the Southern District of Florida
Case No. 2:22-cv-14102-DMM
Hon. Donald M. Middlebrooks, U.S. District Judge
─────────────────────────────────────────

**OPENING BRIEF FOR PLAINTIFF-APPELLANT AND APPELLANTS**
─────────────────────────────────────────

JESSE R. BINNALL
JARED J. ROBERTS
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
(703) 888-1943
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Appellants Donald J. Trump, Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group include this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1. Appellants certify that this is a complete list.

ABC Corporations

Aytch, Enjolique Dion

Barry, Stephen

Barzee, William R.

Berkowitz, Sean M.

Berman, Joshua Adam

Binnall, Jesse R.

Bosworth, Michael S.

Brozinsky, Noah

Ceresney, Andrew J.

Clattenburg, Rachel

Clinesmith, Kevin

Clinton, Hillary R.

Comey, James

Crenny, Kevin P.

Crowley, Shawn Geovjian

Danchenko, Igor

Democratic National Committee

DNC Services Corporation

Does' John

Dolan, Jr., Charles Halliday

Doumar, George R.A.

Eisen, Allison

Elias, Marc

Epps, Alexandra N.

Erickson-Pogorzelski, Anthony

Fassbender, Diana Marie

Feldman, Maximillian

Fels, Adam Seth

Fritsch, Peter

Fusion GPS

Garcez, Isabela M.

Garza, Kathryn E.

Gillenwater, James E.

Gonzalez, Juan Antonio

Greenberg, Gerald Edward

Habba, Alina

Habba Madaio & Associates

Harrington, Howard J.

Hart, Nancy

HFAAC, Inc.

Houlihan, Michael F.

Hunt, Patrick, Honorable

Janda, Sean R.

Joffe, Rodney

Kaplan, Roberta A.

Kastrenakes, Eleni Sevasti

Kendall, David Evan

Kiyonaga, Paul Y.

Klauber, Debra

Letter, Douglas

Levine, Jonathan Edward

Levy, Joshua

Lipshultz, Zachary Andrew

Madaio, Michael T.

Markus, David Oscar

Martinez, Roberto

McCabe, Andrew

McCarthy, John

McNichols, John Marcus

Meeks, Katherine Moran

Mestitz, Michael

Middlebrooks, Donald M. Honorable

Monsour, Jr. Franklin George

Mook, Robert E.

Muha, Christopher

Neuman, Sarah E.

Neustar Security Services

Neustar, Inc.

Ohr, Bruce

Ohr, Nellie

Olmedo-Rodriguez, Jennifer

Orbis Business Intelligence, Ltd.

Otterberg, April A.

Page, Lisa

Peacock, Benjamin

Perkins Coie, LLC.

Pettis, Eugene K.

Pinto, Paola

Pittard, William

Podesta, John

Reines, Phillipe

Reilly, Wendy B.

Roberts, Jared Joseph

Rosenstein, Rod

Sainvil, Akiesha Renee Gilcrist

Salzman, Joshua M

Sasson, Jamie Alan

Schar, Reid J.

Schiff, Adam

Schultz, Deborah Wasserman

Sigler, Geoffrey M.

Simpson, Glenn

Soto, Edward

Southall, Samantha

Steele, Christopher

Stekloff, Brian L.

Strzok, Peter

Sullivan, Jake

Sussman, Michael

Terrell, Stephen R.

The Ticktin Law Group

Ticktin, Peter David

Touhey, James G.

Trout, Robert P.

Trump, Donald J.

Turner, Katherine M.

Tyrrell, Steven

United States of America

Warin, Francis Joseph

Neustar, Inc. is a wholly owned subsidiary of TransUnion, which is a publicly traded entity at NYSE:TRU.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe oral argument would assist the Court in deciding the issues presented by this appeal.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................................ i

STATEMENT REGARDING ORAL ARGUMENT ...............................viii

TABLE OF CONTENTS ............................................................................ ix

TABLE OF CITATIONS .......................................................................... xi

INTRODUCTION .................................................................................... 1

STATEMENT ON SUBJECT MATTER AND APPELLATE JURISDICTION .................................................................................. 3

STATEMENT OF THE ISSUES ............................................................... 4

STATEMENT OF THE CASE ................................................................... 5

SUMMARY OF THE ARGUMENT .......................................................... 9

ARGUMENT ........................................................................................... 11

    I.    The district court erred in granting Defendants' Motions to Dismiss. ............................................................. 11

        a.    The district court erred when it found the action was untimely. ......................................................... 11

        b.    The district court erred in finding President Trump's RICO and RICO conspiracy claims failed to state a claim. ........................................................... 27

        c.    The district court erred in dismissing President Trump's injurious falsehood claim. ........................... 46

    II.    The district court erred in imposing sanctions against Appellants. ......................................................................... 48

     a.  Imposition of sanctions under the district court's inherent authority violated due process and was an abuse of discretion. .................................................. 49

     b.  Award of Rule 11 sanctions to Appellee Dolan was abuse of discretion........................................................ 69

CONCLUSION ....................................................................... 78

CERTIFICATE OF COMPLIANCE ...................................... 80

CERTIFICATE OF SERVICE ................................................ 81

# TABLE OF CITATIONS

### Cases

\* *Agency Holding Corp. v. Malley-Duff & Assoc.*,

    483 U.S. 143, 146 (1987) ......................................................................... 12

*Akkasha v. Bloomingdales, Inc.*,

    No. 17-CIV-22376, 2020 WL 6820879, at \*2 (S.D. Fla. July 20, 2020),

    report and recommendation adopted, No. 17- CIV-22376,

    2020 WL 6820878 (S.D. Fla. Sept. 14, 2020) ................................... 60, 63

*Alix v. McKinsey & Co.*,

    23 F.4th 196, 204–06 (2d Cir. 2022) ..................................................... 38

*Alyeska Pipeline Service Co. v. Wilderness Society*,

    421 U.S. 240, 259 (1975) ......................................................................... 66

\* *American Dental Ass'n v. Cigna Corp.*,

    605 F.3d 1283 (11th Cir. 2010) ................................................. 35, 40, 42

*American Pipe & Constr. Co. v. Utah*,

    414 U.S. 538, 559 (1974) ......................................................................... 14

*Amlong & Amlong, P.A. v. Denny's, Inc.*,

    500 F.3d 1230, 1238 (11th Cir. 2007) ......................................... 7, 56, 59

*Arthrex, Inc. v. W. Coast Med. Res., LLC*,

    2015 WL 12844946, at *8 (M.D. Fla. Nov. 25, 2015) ........................... 47

*Ashcroft v. Iqbal*,

    556 U.S. 662, 678 (2009)............................................................... 27

*Avirgan v. Hull*,

    932 F.2d 1572, 1577 (11th Cir. 1991) ................................................ 28

* *Barnes v. Dalton*,

    158 F.3d 1212, 1214 (11th Cir.1998) ........................................... 57, 67

*Bell Atlantic Corp. v. Twombly*,

    550 U.S. 544, 555 (2007)............................................................... 27

*Bothmann v. Harrington*,

    458 So. 2d 1163, 1168 (Fla. 3d DCA. 1984) ....................................... 47

* *Boyle v. United States*,

    556 U.S. 938, 944 (2009)........................................................... 28, 30

* *Bridge v. Phoenix Bond & Indem. Co.*,

    553 U.S. 639, 649–50 (2008).......................................................... 38, 44

* *Campos v. City of Naples*,

    202 Fed. Appx. 381, 385 (11th Cir. 2006) ......................................... 56

* *Chambers v. NASCO, Inc.*,

  501 U.S. 32, 41 (1991)..........................................................50, 52, 53, 54

*Clinton v. Jones*,

  520 U.S. 681 (1997).........................................................................17, 18

*Cooter & Gell v. Hartmarx Corp.*,

  496 U.S. 384, 402 (1990)..........................................................................8

*Corcel Corp. v. Ferguson Enters.*, Inc.,

  551 F. App'x 571, 576 (11th Cir. 2014) ...................................................44

*Davis v. Carl*,

  906 F.2d 533, 538 (11th Cir. 1990) .........................................................71

*Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*,

  2008 WL 11333071, at * 1 (S.D. Fla. Dec. 19, 2008)..............................71

* *Donaldson v. Clark*,

  819 F.2d 1551, 1559-60 (11th Cir. 1987) ..........................................50, 77

*Durham v. Bus. Mgmt. Assocs.*,

  847 F.2d 1505, 1511 (11th Cir. 1988) ......................................................36

*Durrett v. Jenkins Brickyard, Inc.*,

  678 F.2d 911, 918 (11th Cir.1982) ...........................................................56

\* *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*,

   561 F.3d 1298, 1306 n.6 (11th Cir. 2009) ..............................................55

*Forrest Creek Assoc., Ltd. v. McLean Sav. & Loan Ass'n*,

   831 F.2d 1238, 1245 (4th Cir. 1987) .....................................................76

*Freeman v. Comm., Alabama Dept. of Corrections*,

   46 F.4th 1193, 1214 (11th Cir. 2022) ......................................................7

*Fridovich v. Fridovich*,

   598 So. 2d 65, 69 (Fla. 1992) ...............................................................48

*Friedlander v. Nims*,

   755 F.2d 810, 813 n. 3 (11th Cir. 1985) ................................................36

*Gianelli v. Schoenfeld*,

   2021 WL 4690724, at \*6 (E.D. Cal. Oct. 7, 2021)...............................19

*Gust, Inc. v. Alphacap Ventures, LLC*,

   905 F.3d 1321, 1329 (Fed. Cir. 2018).....................................................63

*H.J. Inc. v. Nw. Bell Tel. Co.*,

   492 U.S. 229, 236 (1989)........................................................32, 39, 40

*Harvey v. CNN, Inc.*,

   48 F.4th 257, 280 (4th Cir. 2022) .........................................................64

*Hill v. Morehouse Med. Assocs., Inc.*,

    2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) ............................ 36

*Holmes v. Sec. Investor Prot. Corp.*,

    503 U.S. 258, 268 (1992) ...................................................................... 43

*Horgan v. Felton*,

    123 Nev. 577, 586 (2007) ...................................................................... 48

*In re Gen. Elec. Sec. Litig.*,

    2021 WL 2688695, at *7 (S.D.N.Y. Jun. 30, 2021) ................................ 76

*In re Managed Care Litig.*,

    298 F. Supp. 1259, 1280 (S.D. FL. 2003) ............................................. 42

* *In re Mroz*,

    65 F.3d 1567, 1571 (11th Cir. 1995) ................................................ 7, 50

*In re Ruben*,

    825 F.2d 977, 990 (6th Cir. 1987) ........................................................ 51

*In re South Coast Oil Corp.*,

    566 Fed. Appx. 594, 596 (9th Cir. 2014) .............................................. 76

*Indus. Risk Insurers v. M.A.N. Gutehoffriungshutte GmbH*,

    141 F.3d 1434, 1448 (11th Cir. 1998) .................................................. 71

*Irwin v. Department of Veterans Affairs,*

498 U.S. 89, 95 (1990) .............................................................. 13

*Jackson v. BellSouth Telecom.,*

372 F.3d 1250, 1264 (11th Cir. 2004) ..................................... 39

*Johnson v. 27th Avenue Caraf, Inc.,*

9 F.4th 1300, 1313–14 (11th Cir. 2021) ................................. 65

\* *Johnson v. Railway Exp. Agency, Inc.,*

421 U.S. 454, 464 (1975) ......................................................... 19

*Kaplan v. DaimlerChrysler, A.G.,* 331

F.3d 1251, 1255 (11th Cir. 2003) ........................................... 52

*La Grasta v. First Union Sec., Inc.,*

358 F.3d 840, 845 (11th Cir. 2004) ........................................ 11

\* *Leh v. Gen. Petroleum Corp.,*

382 U.S. 54, 59–63 (1965) ................................... 20, 21, 22, 26

*Lehman v. Lucom,*

727 F.3d 1326, 1330 (11th Cir. 2013) .................................... 12

*Lewis v. Lhu,*

696 F. Supp. 723, 727 (D.D.C. 1988) ..................................... 38

\* *Lozano v. Montoya Alvarez,*

572 U.S. 1, 11 (2014)...................................................................13, 14, 15

*Magnifico v. Villanueva,*

783 F. Supp. 2d 1217, 1229 (S.D. Fla. 2011) ........................................41

*Mareno v. Rowe*,

910 F.2d 1043, 1047 (2d Cir. 1990) ......................................................64

*Massengale v. Ray*,

267 F.3d 1298, 1301 (11th Cir. 2001) ...................................................70

*Mid Atlantic Telecom., Inc. v. Long Distance Serv., Inc.*,

18 F.3d 260, 264 (4th Cir. 1994) ..........................................................37

\* *Minn. Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*,

381 U.S. 311, 313 (1965)...........................................................20, 21, 23

*Nixon v. Fitzgerald,*

457 U.S. 731, 749 (1982).......................................................................15

*O'Neal v. Allstate Indem. Ins. Co. Inc.,*

2021 WL 4852222, at \*5 (11th Cir. Oct. 19, 2021)...............................65

*Pace v. DiGuglielmo,*

544 U.S. 408, 418 (2005).......................................................................13

*Peer v. Lewis*,

   606 F.3d 1306, 1313 (11th Cir. 2010) .................................................. 51

*Pelletier v. Zweifel*,

   921 F.2d 1465, 1498 (11th Cir.1991) .................................................. 35

*Pension Fund Mid Jersey Trucking Industry v. Omni Funding*,

   687 F. Supp. 962, 965 (D.N.J. 1988) .................................................. 19

*Pres. Petrified Forrest v. Renzi*,

   2014 WL 530574, at *3–4 (D. Ariz. Feb. 12, 2013)............................... 19

*Procter & Gamble Co. v. Amway Corp.*,

   242 F.3d 539, 565 (5th Cir. 2001) ....................................................... 38

*Prou v. Giarla*,

   62 F. Supp. 3d 1365, 1373 (S.D. Fla. 2014) ........................................ 29

*Ray v. Spirit Airlines, Inc.*,

   836 F.3d 1340, 1348 (11th Cir. 2016) ................................................. 29

*Riddle v. Egensperger*,

   266 F.3d 542, 556 (6th Cir. 2001) ....................................................... 51

*Riddle v. Egensperger*,

   266 F3d 542, 556 (6th Cir. 2001) ........................................................ 68

*Roadway Express, Inc. v. Piper*,

    447 U.S. 752, 767 (1980)........................................................50

*Secs. Indus. Ass'n v. Clarke*,

    898 F.2d 318, 321–22 (2d Cir. 1990) ....................................64

*Sedima, S.P.R.L. v. Imrex Co.*,

    473 U.S. 479, 498 (1985)........................................................28

*Summit Props. v. Hoechst Celanese Corp.*,

    214 F.3d 556, 561 (5th Cir. 2000) .........................................38

*Tello v. Dean Witter Reynolds, Inc.*,

    410 F.3d 1275, 1288 n.13 (11th Cir. 2005) ..........................12

*Trump v. Comm. On Ways & Means*,

    391 F. Supp. 3d 93, 95 (D.D.C. 2019)...................................17

*Trump v. Vance*,

    140 S. Ct. 2412, (2020)...........................................................17

*United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue*

    *Cross Blue Shield of. Ga. Inc.*,

    755 F. Supp. 1040, 1052 (S.D. Ga. 1990) .............................36

*United States v. Barton*,

    909 F.3d 1323, 1327, 1330–32, 1336 (11th Cir. 2018) ........59

\* *United States v. Bradley*,

  644 F.3d 1213, 1239 (11th Cir. 2011) ............................................. 35, 37

*United States v. Pendergraft*,

  297 F.3d 1198, 1208–09 (11th Cir. 2002) ............................................. 37

\* *United States v. Ronda*,

  455 F.3d 1273, 1288 (11th Cir. 2006) ............................................. 32, 33

*United States v. Ronga*,

  682 Fed. App'x 849, 855 (11th Cir. 2017) ............................................. 34

*United States v. Stinson*,

  729 Fed. App'x 891, 900 n.7 (11th Cir. 2018) ....................................... 71

*United States v. Sussmann*,

  case no. 1:21-cr-00582-CRC, Government's Motion *In Limine*

  (D.D.C April 4, 2022) ............................................................. 26

*United States v. Sylvestri*,

  409 F.3d 1311, 1328 (11th Cir. 2005) ................................................. 42

*United States v. Takhalov*,

  827 F.3d 1307, 1312–13 (11th Cir. 2016) ............................................. 35

\* *United States v. Veal*,

  153 F.3d 1233, 1252 (11th Cir. 1998) ............................................. 33, 34

*United States v. Wong*,

575 U.S. 402, 403 (2015) .......................................................... 14

*Worldwide Primates, Inc. v. McGreal*,

87 F.3d 1252, 1254 (11th Cir. 1996) ............................................ 70, 71

\* *Young v. United States*,

535 U.S. 43, 49–50 (2002) .......................................................... 13, 14

*Zenith Radio Corp. v. Hazeltine Research*,

401 U.S. 321, 336 (1971) .......................................................... 20

### Statutes

15 U.S.C. § 16(i) .......................................................... 18

18 U.S.C. § 1512(b)(3) .......................................................... 32, 33

18 U.S.C. § 1961 .......................................................... 28

18 U.S.C. § 1961(4) .......................................................... 30

18 U.S.C. § 1961(5) .......................................................... 32

18 U.S.C. § 1962(c) .......................................................... 29

18 U.S.C. § 1964(c) .......................................................... 43

18 U.S.C. 1515(a)(3)(A),(C),(D) .......................................................... 34

Other Authorities

*In the Matter of DNC Services Corp./Democratic National Committee
and William Q. Derrough in his official capacity as treasurer;
Hillary for America and Elizabeth Jones in her official capacity as
treasurer; Perkins Coie LLP; Marc Elias; Fusion GPS; Christopher
Steele*, Federal Election Commission, MURs 7291, 7331 and 7449 ...22

Senate Report No. 619, June 21, 1955, U.S. Code Cong. & Ad. News, 84
Cong. 1st Sess. P. 2332 .........................................................................20

U.S. Dept. of Justice, Office of Special Counsel John H. Durham,
*Report on Matters Related to Intelligence Activities and Investigations
Arising Out of the 2016 Presidential Campaigns* (May 12, 2023)
.......................................................16, 60, 61, 62, 63, 73, 74, 75

Rules

FED. R. CIV. P. 9(b) ...............................................................................31, 36

U.S. Constitution

U.S. Const. art. II, §§ 1, 3 .........................................................................15

\* Authorities upon which Appellants chiefly rely are marked with an asterisk.

## INTRODUCTION

Appellees orchestrated a scheme to attack their political rival, Donald J. Trump. While it is not unusual for campaigns to attack political adversaries during election seasons, Appellees went far beyond that norm, utilizing their government connections and access to engage the U.S. Department of Justice and the Federal Bureau of Investigation in their wrongful enterprise. Appellees' efforts ultimately resulted in an unprecedented and successful maneuver to weaponize federal law enforcement for political purposes against a political foe.

Accordingly, President Trump brought suit to right these wrongs. Unfortunately, his case was short-circuited at the district court. The district court's Order dismissing the case was based upon a faulty analysis of the statute of limitations as well as a wrongful determination that the claims lacked merit.

Thereafter, the district court entered two separate Orders sanctioning President Trump and his trial counsel for almost $1 million, based largely on its inherent authority. At no point did the district court notify Appellants it was considering an inherent authority sanction.

1

Indeed, it made all its rulings without ever taking evidence or holding a hearing.

After the district court's rulings, Special Counsel John Durham released his Report of his investigation regarding Appellees' scheme. The importance of that Report cannot be overstated. Its findings run directly contrary to the district court's factual determinations, both in its dismissal Order and in its imposition of sanctions. While Appellees may take issue with some of the Durham Report's findings, the Report undoubtedly shows President Trump's claims were plausible and certainly not sanctionable. If a dispute of fact exists, that should be decided at a trial, not prematurely through a motion to dismiss and for sanctions. All three district court decisions should be reversed, and the case should be remanded to a different judge.

## STATEMENT ON SUBJECT MATTER AND APPELLATE JURISDICTION

The district court had subject-matter jurisdiction over this case pursuant to 28 § U.S.C. 1331 due to federal questions regarding federal statutory violations. This Court has subject-matter jurisdiction over these appeals pursuant to 28 § U.S.C. 1291 as they are appeals of final judgments.

The district court issued its Order dismissing President Trump's claims on September 8, 2022. Doc. 267. It issued Orders granting sanctions on November 10, 2022, and January 19, 2023. Docs. 284 and 302. President Trump timely appealed each of these Orders on October 11, 2022, December 9, 2022, and February 6, 2023. Docs. 272, 291, 308.

## STATEMENT OF THE ISSUES

1. Whether the district court erred when it dismissed President Trump's RICO claims and injurious falsehood claim with prejudice.

2. Whether the district court erred when it awarded sanctions against President Trump and his counsel, pursuant to its inherent powers and under Rule 11.

## STATEMENT OF THE CASE

### 1. Factual Background

On March 24, 2022, President Trump filed suit due to Appellees' scheme to disseminate false and injurious information about him and his campaign in an effort to harm him. Doc. 177 - ¶ 9. President Trump brought these claims under the Racketeer Influenced and Corrupt Organization Act ("RICO") and injurious falsehood, in addition to other claims, which are not relevant to this appeal.

Specifically, President Trump alleged in his Amended Complaint that Appellees acted in concert to weave a false and injurious narrative that he was colluding with a hostile power. *Id.* at ¶ 1. To accomplish this goal, the conspiracy took distinct but related actions. First, Perkins Coie, through its then-partner Marc Elias, led efforts to perform opposition research and dig up any dirt possible on President Trump. *Id.* at ¶ 3. At the same time, Appellee Clinton, her campaign, the Democratic National Committee ("DNC"), and lawyers for both, hired Fusion GPS to produce the Steele Dossier. *Id.* at ¶ 4. Moreover, Perkins Coie partner Michael Sussmann led efforts to develop evidence of an alleged backchannel between President Trump's campaign and a Russian bank. *Id.* As a result

of the misleading evidence that Appellees provided to the FBI, the FBI began intensive long-term investigations into President Trump. *Id.* at ¶ 7.

## 2. Prior Proceedings

On March 24, 2022, President Trump filed this lawsuit. Doc. 1. On July 21, 2022, President Trump filed his Amended Complaint. Doc. 177. On September 8, 2022, the district court dismissed President Trump's Amended Complaint in its entirety with prejudice, except for the claims against the United States, for failing to state a claim and lack of subject matter or personal jurisdiction over certain Defendants. Doc. 267.

On July 15, 2022, Appellee Dolan's counsel served a sanctions motion on President Trump's counsel, and on September 21, 2022, filed the sanctions motion with the district court. Doc. 268. The district court granted Appellee Dolan sanctions on November 10, 2022. Doc. 284. It ordered $50,000 be paid into the registry of the court and $16,274.23 to be paid to Appellee Dolan. *Id.*

On October 31, 2022, multiple defendants moved to recover their attorneys' fees pursuant to Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, the Defend Trade Secrets Act, and the district court's inherent

powers. Doc. 280. On January 19, 2023, the district court granted this motion in the amount of $937,989.39, using only its inherent powers. Doc. 302. The district court did not hold a hearing for either sanction decision.

President Trump timely appealed each of these decisions. Docs. 272, 291, 308. On March 31, 2023, this Court consolidated these actions to be briefed and heard together.

### 3. Standards of Review

This Court's review of the district court's Order dismissing President Trump's claims is *de novo* as it reviews a decision on a question of law. *Freeman v. Comm., Alabama Dept. of Corrections*, 46 F.4th 1193, 1214 (11th Cir. 2022).

The standard of review on a district court's sanctions determinations is abuse of discretion, and this Court can reverse if the district court made a "clear error of judgment, or has applied the wrong legal standard." *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1238 (11th Cir. 2007); *In re Mroz*, 65 F.3d 1567, 1571 (11th Cir. 1995). Indeed, the Supreme Court has noted that when an appellate court reviews a sanctions determination under the abuse of discretion standard, it can still correct the district court's legal errors, including

"relying on a materially incorrect view of the relevant law in determining that a pleading was not warranted by existing law *or a good faith argument for changing the law.*" *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990) (internal quotation omitted and emphasis added).

## SUMMARY OF THE ARGUMENT

This appeal stems from President Trump's endeavor to hold Appellees accountable for their concocted tale of Russian collusion to derail President Trump's presidency. The district court erred by dismissing President Trump's RICO and injurious falsehood claims and then awarding sanctions.

Specifically, the district court erred when it found the statute of limitations had expired by failing to recognize extraordinary circumstances prevented President Trump from pursuing his claims in a timely manner and failing to apply tolling during the pendency of at least two federal actions that tolled the applicable statute of limitations. It further erred when it found there was insufficient predicate acts to find President Trump had plausibly pleaded his RICO and RICO conspiracy claims.

Additionally, the district court erred when it sanctioned President Trump and his counsel without providing adequate notice for the sanctions, issued under its inherent power, as required by Supreme Court precedent. Sufficient notice is essential to ensure a district court's

inherent powers are not used as an "end run" around the notice requirements of Rule 11.

The district court also erred when it found President Trump and his counsel engaged in bad faith conduct. To the contrary, President Trump and his counsel worked to limit any unnecessary fees expended by any party during the litigation. Further, President Trump advanced numerous arguments for good faith extensions of the law, and reasonable interpretations of the facts.

Finally, the district court erred when it opted not to hold an evidentiary hearing and, instead, accepted Appellees' narration of the 'facts' as true rather than viewing them in the light most favorable to President Trump. This is especially egregious considering that many of the allegations in the Amended Complaint have now been corroborated in the Durham Report.

Accordingly, the district court's Order dismissing President Trump's RICO and RICO conspiracy claims, and Injurious Falsehood claim, should be reversed, and the sanctions Orders should be vacated.

# ARGUMENT

## I.    The district court erred in granting Defendants' Motions to Dismiss.

President Trump's Amended Complaint should have survived the motions to dismiss because the statute of limitations was tolled, and he presented well-pleaded, plausible allegations of RICO violations, as well as injurious falsehood claims. By short-circuiting the litigation in a politically-charged Order, the district court made several reversible errors.

### a.    The district court erred when it found the action was untimely.

The district court erred when it dismissed President Trump's RICO claim as barred by the statute of limitations. A "statute of limitations bar is an affirmative defense, and plaintiff[s] [are] not required to negate an affirmative defense in [their] complaint." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (quotation omitted). "A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate . . . if it is apparent from the face of the complaint that the claim is time-barred." *Id.* (quotation marks omitted). The district court admitted this requires, at the motion to dismiss stage, an action only be excluded on

statute of limitations grounds "if it appears beyond a doubt that plaintiffs can prove no set of facts that toll the statute." Doc. 267 at 23 (citing *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005)).

The statute of limitations for civil RICO actions is four years from when the injury was or should have been discovered. *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013). There is no statute of limitations contained within the RICO Act. *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 146 (1987) ("As is sometimes the case with federal statutes, RICO does not provide an express statute of limitations for actions brought under its civil enforcement provision."). The Supreme Court has read the four-year statute of limitations from the Clayton Act into the RICO Act. *Id.* at 156 ("the practicalities of RICO litigation make the selection of the 4–year statute of limitations for Clayton Act actions, 15 U.S.C. § 15b, the most appropriate limitations period for RICO actions").

The district court found President Trump knew or should have known about the existence of his claims by October 2017, wrongfully setting the statute of limitations deadline in October 2021. Due to

equitable tolling, and the pendency of government actions, the statute of limitations should have been tolled.

### 1.    *The statute of limitations should be equitably tolled.*

The Supreme Court recognizes it "is hornbook law that limitations periods are 'customarily subject to "equitable tolling[.]"'" *Young v. United States*, 535 U.S. 43, 49–50 (2002) (citing *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95 (1990)). The Supreme Court clarified equitable tolling "pauses the running of, or 'tolls,' a statute of limitations when a litigant has [1] pursued his rights diligently but [2] some extraordinary circumstance prevents him from bringing a timely action." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 11 (2014) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

The Supreme Court emphasized this determination is made on a "case-by-case basis." *Id.* And it noted "the need for 'flexibility' [and] for avoiding 'mechanical rules'" in this assessment, encouraging courts to "'relieve hardships which, from time to time, arise from a hard and fast adherence' to more absolute legal rules, which, if strictly applied, threaten the 'evils of archaic rigidity.'" *Id.* (citations omitted). Accordingly, it directed litigants and courts to look to the content of the

statutes to determine if the presumption that a federal statute may be equitably tolled is specifically foreclosed. *Id.* at 11 (citing *Young*, 535 U.S. at 49-50).

Because courts borrow the proper statute of limitations from the Clayton Act, the RICO Act necessarily does not contain any prohibition on equitable tolling. Moreover, the Supreme Court found that the Clayton Act's statute of limitations is subject to equitable tolling. *United States v. Wong*, 575 U.S. 402, 403 (2015) (citing *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 559 (1974)). The Supreme Court determined when "borrowing a state period of limitation for application to a federal cause of action, a federal court is relying on the State's wisdom in setting a limit, and exceptions thereto, on the prosecution of a closely analogous claim." *Id.* at 464. While it is true the Court was specifically considering the issue of assuming a state standard into a federal statute, the same logic would apply in assuming a part of a federal statute into another. *See Malley-Duff*, 483 U.S. at 146. Therefore, the Clayton Act's tolling provisions and interpretations would also be incorporated into the RICO statute along with the statute of limitations.

14

Here, President Trump's circumstances satisfy both prongs required for equitable tolling. He pursued his rights diligently, but extraordinary circumstances prevented him from bringing a timely action. *Lozano*, 572 U.S. at 11. President Trump was the President of the United States from January 20, 2017, until January 20, 2021. This surely qualifies as an "extraordinary circumstance." Indeed, the Supreme Court recognizes the President "occupies a unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). The President has an overarching duty to "preserve, protect, and defend the Constitution" and to take "[c]are that the Laws be faithfully executed[.]" U.S. Const. art. II, §§ 1, 3. For this reason, *Nixon* cautioned, "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 749.

During President Trump's entire term, he was forced to address allegations from a baseless investigation, largely perpetuated by Appellees. As the Durham Report now confirms,[1] the FBI opened an

---

[1] As Appellants noted in their Motion for Judicial Notice, judicial notice of the Durham Report in this case is appropriate.

investigation into President Trump without "any actual evidence." U.S. Dept. of Justice, Office of Special Counsel John H. Durham, *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* (May 12, 2023) ("Durham Report"), at Pg. 8. The FBI did so swiftly, without evaluating any of the 'evidence' given to them, through agents with hostile feelings towards President Trump. Durham Report at Pg. 9. Had the FBI carefully analyzed the information given to them from persons such as Appellees, it would have realized that there was no evidence President Trump, or his campaign was involved with Russia. *Id*.

As President, President Trump could have taken action against these investigators, but it would have created an appearance that he was attempting to wrongly shut down the investigation or otherwise interfere with law enforcement functions. Such an appearance would have undermined President Trump's belief in law and order and sent the wrong message to the Nation. Therefore, President Trump was obligated to let these investigations unfold in their entirety before he could bring this suit. These extraordinary circumstances have not been faced by a plaintiff before.

In holding equitable tolling is not allowed, the district court relied on *Trump v. Vance*, 140 S. Ct. 2412, (2020)*, and *Trump v. Comm. On Ways & Means*, 391 F. Supp. 3d 93, 95 (D.D.C. 2019) as examples of President Trump bringing suits while President. These cases are distinguishable from the present matter as these matters were not purely personal lawsuits. Instead, in those matters, President Trump sought to protect the separation of powers and the Office of the President from encroachment by the Legislative Branch. This suit, however, involves President Trump's personal injuries sustained due to Appellees actions. Thus, it was only proper to bring after his presidency.

Contrary to the district court's finding that *Clinton v. Jones,* 520 U.S. 681 (1997), forecloses equitable tolling in this case, *see* Doc. 267 - Pg. 27, in rejecting a "categorical rule" for tolling during a presidential term, *Clinton* acknowledged that the "high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of [an] entire proceeding" and stressed that "the question of whether a specific case should receive exceptional treatment is more appropriately the subject of the exercise of judicial discretion than an

interpretation of the Constitution." *Clinton*, 520 U.S. at 706. Accordingly, the holding in *Clinton* does not foreclose equitable tolling.

Reviewing this case *de novo*, this Court should right the district court's wrongs. Accordingly, given the unprecedented and extraordinary circumstances, and President Trump's diligence in dealing with them, equitable tolling is appropriate for President Trump's personal lawsuit in this matter and the Court should reverse.

### 2.    *The pendency of government actions tolled the statute of limitations.*

In addition to equitable tolling, two government actions tolled this matter under 15 U.S.C. § 16(i). As discussed *supra,* the Supreme Court has read the statute of limitations from the Clayton Act into RICO. The tolling effect of 15 U.S.C. § 16(i) is triggered upon the commencement of any "civil or criminal proceeding [] instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws." 15 U.S.C. § 16(i). The district court erred when it did not conclude Clayton Act tolling applies in this context. Doc. 267 - Pg. 28.

As a starting point, the Supreme Court previously opined that "[i]n virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling,

18

revival, and questions of application." *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 464 (1975). Therefore, a statute of limitation contained in a statute must be interrelated with the tolling provisions contained within the same statute. Here, the Clayton Act's statute of limitations is interwoven with the tolling provision included in the Clayton Act. Moreover, as discussed *supra*, the Clayton Act's tolling provisions and interpretations would also be incorporated into RICO along with the statute of limitations.

Indeed, several courts have confirmed, consistent with *Johnson v. Railway Exp. Agency, Inc*, the tolling provision of 15 U.S.C. § 16(i) applies to RICO actions. *See, e.g., Pension Fund Mid Jersey Trucking Industry v. Omni Funding*, 687 F. Supp. 962, 965 (D.N.J. 1988) ("I conclude that the tolling provisions of the Clayton Act are applicable under RICO."); *Gianelli v. Schoenfeld*, 2021 WL 4690724, at *6 (E.D. Cal. Oct. 7, 2021) ("The court is willing to assume . . . that the Clayton Act's tolling provision applies to RICO claims."); *Pres. Petrified Forrest v. Renzi*, 2014 WL 530574, at *3–4 (D. Ariz. Feb. 12, 2013) ("The Court concludes that the tolling provision in 15 U.S.C. § 16(i) applies to the RICO civil enforcement provisions.").

The time of commencement under 15 U.S.C. § 16(i) is generally considered to be the filing of an indictment or complaint. *See, e.g., Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 59–63 (1965) (giving tolling effect from when the government filed a complaint); *Minn. Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 313 (1965) (giving tolling effect from the date the FTC filed an enforcement action). When applicable, § 16(i) "tolls the statute of limitations against all participants in a conspiracy which is the object of a government suit, whether or not they are named as defendants or conspirators therein." *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 336 (1971). In drafting the tolling provision of the Clayton Act, "Congress meant to assist private litigants in utilizing any benefits they might cull from government . . . actions." *Minn. Mining & Mfg. Co.*, 381 U.S. at 317. The legislature's reasoning included allowing potential plaintiffs to "reap the benefits" of related government proceedings by allowing them to "study the [g]overnment's case, estimate his own damages, assess the strength and validity of his suit, and prepare and file his complaint." Senate Report No. 619, June 21, 1955, U.S. Code Cong. & Ad. News, 84 Cong. 1st Sess. P. 2332. Appellees argued, however, and the district court accepted, §

16(i) was inapplicable because there were no "government actions founded on the specific RICO predicate acts [] alleged." Doc. 267 - Pg. 28.

Appellants argued at least two distinct proceedings were based on a similar theory to the RICO action: (1) a Federal Election Commission ("FEC") case, and (2) the *Sussmann* case in the United States District Court, District of Columbia, *United States v. Michael Sussmann*, case no.1:21-cr-00582-CRC (the "Sussmann Action"). *See generally,* Doc. 177 - ¶¶ 528–43. The district court failed to recognize the express language of 15 U.S.C. § 16(i) only requires a prior proceeding be "based in whole or in part on any matter complained of" in the instant proceeding. A "private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants . . . [r]ather, effect must be given to the broad terms of the statute itself—'based in whole or in part on any matter complained of.'" *Leh*, 382 U.S. at 59. President Trump must only show "the matters complained of in the government suit bear a real relation to the private plaintiff's claim for relief." *Id.* at 59; *see also Minn. Mining & Mfg. Co.*, 381 U.S. at 323 (stating that § 16(i) "provides for tolling as long as the private claim is based 'in part on any matter complained of' in the

government proceedings."). To make this determination, courts look towards "a comparison of the two complaints on their face." *Leh*, 382 U.S. at 65.

First, the FEC commenced an enforcement action against the DNC and the Clinton Campaign, under the caption *In the Matter of DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer; Hillary for America and Elizabeth Jones in her official capacity as treasurer; Perkins Coie LLP; Marc Elias; Fusion GPS; Christopher Steele*, Federal Election Commission, MURs 7291, 7331 and 7449 (the "FEC Action"). The Supreme Court has interpreted § 16(i) broadly to encompass federal administrative proceedings. Specifically, in *Minn. Mining & Mfg. Co.*, the Court found a proceeding initiated by the Federal Trade Commission ("FTC") qualified. In doing so, the Court pointed to the legislative intent of § 16(i) and implied all proceedings initiated by a federal agency would similarly qualify:

> We hold, therefore, that the limitation provision of [§ 16(i)] is tolled by Commission proceedings to the same extent and in the same circumstances as it is by Justice Department actions. In so holding we give effect to Congress' basic policy objectives in enacting [§ 16(i)]—objectives which would be frustrated should we reach a contrary conclusion and thereby

22

deprive large numbers of private litigants of the benefits of
government antitrust suits simply because those suits were
pursued by one governmental agency rather than the other.

*Minn. Mining & Mfg. Co.*, 381 U.S. at 321-322.

In the FEC Action, the First General Counsel's Report (the "FEC
Complaint") was filed on April 10, 2019. *See generally* Doc. 237.2; *see
also,* Doc. 177 - ¶ 83(f), 470–79. The FEC Complaint alleged the DNC and
the Clinton Campaign "failed to file accurate disclosure reports when
they mischaracterized the payee and purpose of certain disbursements
disclosed as made to Perkins Coie LLP for legal services, when in fact the
payments were passed through to the research firm Fusion GPS for the
purpose of opposition research and should have been disclosed as such."
Doc 237.2 - Pg. 1. The FEC Complaint also discusses many of the
prominent Appellees in this action, including Perkins Coie, Elias, Mook,
Fusion GPS, Simpson, and Steele.

The facts alleged in the FEC Complaint overlapped significantly
with the allegations contained in President Trump's Amended
Complaint, particularly with regard to the construction of the Enterprise,
the RICO Appellees' actions in furtherance of the Enterprise's goals, their
collective efforts to conceal their illicit arrangement by misreporting the

relationship between the DNC/the Clinton Campaign and Fusion GPS and funneling funds through Perkins Coie, and Appellees' knowledge of the same.

For example, the FEC Complaint described how the Clinton Campaign and the DNC, through their joint general counsel, Perkins Coie, worked with Fusion GPS, who retained Steele and Orbis Ltd., to perform opposition research on President Trump and lead a media smear campaign against him. *Id.* at Pgs. 20-30. It goes on to describe how "Steele drafted a series of memoranda based on the information he gathered (*i.e.*, the dossier) and provided the memoranda, intermittently, to Fusion, which in turn shared some of the information therein . . . with Perkins Coie, which in turn shared some of the information with [the Clinton Campaign and the DNC]." *Id.* at Pg. 39; *compare generally to* Doc. 177.

President Trump argued the significant overlap between the FEC Complaint, and the Amended Complaint qualifies the FEC Action as a "civil or criminal proceeding . . . instituted by the United States" tolling the RICO statute of limitations. Accordingly, the statute of limitations for President Trump's RICO claim was suspended beginning on April 10,

2019, when the FEC action was filed, and remained in place when President Trump's Complaint was filed on March 24, 2022.

Second, the United States commenced the Sussmann Action, a criminal case, on September 16, 2021. The Sussmann Action's indictment overlaps with the Alfa Bank-related allegations in the Amended Complaint. This indictment outlines many of the facts surrounding the coordinated efforts between Appellee Sussmann and Appellee Joffe to falsely implicate President Trump, including Sussmann's numerous meetings, conferences, and communications with other RICO Appellees and the billing of his time to the Clinton Campaign and the DNC. *Compare* Doc. 237.3 - ¶¶ 4, 9, 14, 19, 20, 24–27, 29–39; *with* Doc. 177 - ¶¶ 175–84, 195–97, 206, 224, 242. It also includes allegations regarding Sussmann's attempts to leak the false allegations through the media. *Compare* Doc. 237.3 - ¶¶ 1, 2, 22, 25, 34–37; *with* Doc. 177 - ¶¶ 174–76, 184, 191, 232.

Moreover, the indictment includes Sussmann's proffering of false statements to the FBI and the CIA, *compare* Doc. 237.3 - ¶¶ 3–7, 24, 26–28, 30–33, 39–44, 46; *with* Doc. 177 - ¶¶ 172, 198, 204–17, 297–311; and Sussmann's drafting of the various misleading and falsified 'white

papers' which were ultimately provided to the FBI and the CIA, c*ompare* Doc. 237.3 - ¶¶24, 26–27, 30; *with* Doc. 177 - ¶¶ 172, 184, 193–94, 198, 201, 204–17, 297–311.

The Sussmann indictment is also littered with references to the other RICO Defendants. It alleges they all worked together to carry out a joint conspiracy—a theory that was crystalized in a later filing in the action. *See* Doc. 237.4, *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, Government's Motion *In Limine*, Doc. 61, (D.D.C April 4, 2022) at Pg. 19 (stating that the "evidence, public information, and expected testimony clearly establishes by a preponderance of evidence that [Sussmann] and [Joffe] worked in concert with each other and with agents of the Clinton Campaign to research and disseminate the [Alfa Bank] allegations."); *see also id.* at Pg. 32 (noting a "common plan and mutual coordination among" Fusion GPS, Joffe, Sussmann, and the Clinton Campaign.).

"Suspension of the running of the statute of limitations pending resolution of the government action may not be made to turn on whether the United States is successful in proving the allegations of its complaint." *Leh*, 382 U.S. at 65. Therefore, even though Sussmann was

acquitted, the Sussmann Action qualifies as a "civil or criminal proceeding . . . instituted by the United States" tolling President Trump's RICO statute of limitations from the date of its filing—September 16, 2021—through the termination of that case, after the filing of this action.

Accordingly, whether through equitable tolling or 15 U.S.C. § 16(i), President Trump's RICO action was timely filed, and the district court's ruling as to the statute of limitations should be reversed.

### b. The district court erred in finding President Trump's RICO and RICO conspiracy claims failed to state a claim.

A complaint must "give Defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint need not include detailed factual allegations, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570). A claim is facially plausible "when Plaintiff pleads factual content that allows the court to draw the reasonable inference that Defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). President Trump satisfied this threshold.

The terms of the civil RICO statute must be "liberally construed to effectuate its remedial purposes." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961). It is an "aggressive initiative" for fighting crime. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985).

There are three elements to a RICO claim: "(1) a violation of 18 U.S.C. § 1962; (2) injury to business or property; and (3) that the violation caused the injury." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). As discussed below, Appellees violated two sections of 18 U.S.C. § 1962, subsections "c" and "d." Further, this harm occurred to President Trump's business and property, which caused President Trump injury. Accordingly, President Trump properly alleged a claim for civil RICO, and this Court should reverse the district court's Order granting Appellees' motions to dismiss.

### 1.    Appellees violated section 1962(c).

Appellees Clinton, Clinton Campaign, DNC, Perkins Coie, Elias, Sussmann, Fusion GPS, and Joffe[2] engaged in a pattern of racketeering activity violating President Trump's rights. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). Subsection (c) includes four elements: "(1) [defendants] operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016).

### A.    The enterprise existed.

An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals

---

[2] The district court erred in holding that it did not have personal jurisdiction over Appellee Joffe. The district court had personal jurisdiction pursuant to RICO's nationwide service provision because he had minimum contacts with the United States. *Prou v. Giarla*, 62 F. Supp. 3d 1365, 1373 (S.D. Fla. 2014).

associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "association in-fact" enterprise consists of "any union or group of individuals associated in fact although not a legal entity." *Id*. This encompasses any "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 944.

To establish the existence of an association in-fact enterprise, a plaintiff need only show the enterprise has three structural features: "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. at 946. Appellants adequately pleaded each of these features.

The district court erred when it found Appellant did not adequately show Appellees acted with an illegal purpose. Doc. 267 - Pg. 42. President Trump sufficiently pleaded the Enterprise had a purpose, identified with particularity as the "common, unlawful goal of corruptly and wrongfully harming Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, impeding his ability to govern effectively, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not

limited to, falsely implicating Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia." Doc. 177 - ¶ 531.

Further, the Amended Complaint plausibly alleged each of the RICO Appellees shared this goal. Indeed, President Trump affirmatively pleaded the RICO Appellees shared in the Enterprise's common purpose and had the requisite awareness of the Enterprise's racketeering activities. *See, e.g., id.* at ¶¶ 535, 568–69, 572–73, 577, 621–27; *see also* FED. R. CIV. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). Moreover, the Amended Complaint set forth many facts on this point. *See, e.g.,* Doc. 177 - ¶¶ 102, 162, 163, 165, 196, 175–84, 195–97, 199, 206, 224, 242, 245–54, 307 (Clinton); ¶¶ 50, 59, 239, 307 (DNC); ¶¶ 76–83, 98, 124, 136–39, 172, 307 (Perkins Coie, Elias, and Sussmann); ¶¶ 72, 76, 95, 176, 239, 244, 273 (Fusion GPS); ¶¶ 132, 136–39, 141, 172, 187, 188, 309–11, 324 (Joffe). Therefore, the Amended Complaint detailed the relationships among the RICO Appellees and their illegal purpose.

## B.    *Obstruction of Justice is a predicate act.*

A "pattern of racketeering activity" requires "at least two acts of racketeering activity, one of which occurred after the effective date of [the

RICO statute] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "[A]cts of racketeering activity" include "any act which is indictable under any of the [enumerated statutory provisions]." 18 U.S.C. § 1961(1). These "acts of racketeering activity" are known as "predicate acts." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 236 (1989). The Amended Complaint Alleged Appellees obstructed justice in violation of 18 U.S.C. § 1512 and committed wire fraud in violation of 18 U.S.C. § 1343. In assessing President Trump's obstruction of justice claims, the district court erred when it concluded (1) an official proceeding was required and (2) Appellees' conduct did not violate 18 U.S.C. § 1512(b)(3).

Section 1512(b)(3) criminalizes "misleading conduct toward another person, with intent to . . . hinder, delay or prevent the communication to a law enforcement officer . . . relating to the commission or possible commission of a federal offense." 18 U.S.C. § 1512(b)(3). This provision "criminalizes the transfer of misleading information which actually relates to a potential federal offense." *United States v. Ronda*, 455 F.3d 1273, 1288 (11th Cir. 2006) (citing *United States v. Veal*, 153 F.3d 1233,

1252 (11th Cir. 1998)). Importantly, § 1512(b)(3) "does not require that a defendant's misleading conduct relate in any way either to an 'official proceeding' or even to a particular ongoing investigation." *Id.* at 1288; *see also* 18 U.S.C. § 1512(b)(3) (unlike other provisions of § 1512, the language "official proceeding" is not contained in section (b)(3)). In this way, § 1512 (b)(3) applies broadly to "ensur[e] that transfers of information to federal law enforcement officers and judges relating to the possible commission of federal offenses be truthful and unimpeded." *Id.* at 1286.

President Trump alleged the RICO Appellees engaged in a concerted plot to mislead and defraud federal authorities, made numerous false and misleading statements to federal law enforcement officers, withheld pertinent and relevant information, and provided falsified and fabricated materials and records, including spoofed and "user created" data, various white papers with deceptive analysis of said data, and the fraudulent Steele Dossier. *See, e.g.*, Doc. 177 - ¶¶ 94–123, 172-194, 204–25, 297–311. These actions constitute a predicate act violating § 1512(b)(3). *See Ronda*, 455 F.3d at 1290 ("The fabrication of evidence to mislead federal investigators violates § 1512(b)(3)."); *United*

*States v. Ronga*, 682 Fed. App'x 849, 855 (11th Cir. 2017) (noting §
1512(b)(3) "criminalizes attempts to provide misleading information or
inhibit truthful information from being transferred."); *see also* 18 U.S.C.
1515(a)(3)(A),(C),(D) ("[M]isleading conduct" is defined to include
"knowingly making a false statement" and "knowingly submitting or
inviting reliance on a writing or recording that is false, forged, altered, or
otherwise lacking in authenticity. . . [or] other object that is misleading
in a material respect.").

Accordingly, the district court erred when it found the statements
made to law enforcement officials themselves do not apply. Doc. 267 - Pg.
33. In *United States v. Veal*, this Court found the language in § 1512(b)(3)
is broad and "another person" can encompass state investigators. 153
F.3d 1233, 1246 (11th Cir. 1998), *rev'd on other grounds*. Following this
same logic, communicating misleading information to federal law
enforcement officials violates § 1512(b)(3). Thus, the Amended Complaint
sufficiently alleged the RICO Appellees violated 18 U.S.C. § 1512.

### C.    *Wire Fraud is also a predicate act.*

"[W]ire fraud occurs when a person (1) intentionally participates in
a scheme to defraud another of money or property and (2) uses the . . .

wires in furtherance of that scheme." *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir.1991)). The district court erred when it found Appellants' wire fraud allegations were not pled under the heightened pleading standard, that the claim is not allowed because the object of the fraud wasn't to obtain money or property, and that President Trump does not have standing for allegations that Appellees defrauded the media. Doc. 267 - Pg. 38.

"The law in the Eleventh Circuit makes clear that a defendant 'schemes to defraud'" where "he schemes to 'depriv[e] [someone] of something of value by trick, deceit, chicane or overreaching.'" *United States v. Takhalov*, 827 F.3d 1307, 1312–13 (11th Cir. 2016). "All that is necessary is that the scheme be reasonably calculated to deceive; the intent element of the crime is shown by the existence of the scheme." *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011).

The Amended Complaint detailed the RICO Appellees' fraudulent scheme. While wire fraud must be pleaded with particularity in accordance with the heightened pleading standard of FRCP 9(b), "[t]he application of the rule, however, must not abrogate the concept of notice

pleading," *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (citing *Friedlander v. Nims*, 755 F.2d 810, 813 n. 3 (11th Cir. 1985)); thus, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," FED. R. CIV. P. 9(B). Further, courts apply Rule 9(b) less stringently when specific "factual information [about the fraud] is peculiarly within Defendant's knowledge or control." *Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) (citing *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of. Ga. Inc.*, 755 F. Supp. 1040, 1052 (S.D. Ga. 1990)).

President Trump specifically identified statements, documents, and/or misrepresentations made by each RICO Appellee in furtherance of the Enterprise's fraudulent scheme, including, *see* Doc. 177 - ¶¶ 583(f), (j), (q), (r), (u), (v), (w), (y), (aa), (bb), (ee), (ff), (gg) (Clinton); ¶¶ 583(d), (e), (dd) (DNC); ¶¶ 583(j), (k), (m) (Perkins Coie); ¶ 583(j) (Elias); ¶¶ 583(k), (m) (Sussmann); ¶¶ 583(a), (b), (c), (n), (o), (p), (s), (t), (x) (Fusion GPS). In total, President Trump identified thirty-three wire transmissions sent by the RICO Appellees in furtherance of their

fraudulent scheme, each pleaded with the requisite particularity, including the time and place made and the identity of the actor.

Further, contrary to the district court's determination that the scheme must be to obtain property, this Court recognizes the wire fraud statute includes depriving another of property. *Bradley*, 644 F.3d at 1240 (stating a "'scheme to defraud' . . . signifies the deprivation of something of value by trick, deceit, chicane or overreaching.") (quoting *United States v. Pendergraft*, 297 F.3d 1198, 1208–09 (11th Cir. 2002)).

Here, President Trump properly alleged the RICO Appellees sought to "depriv[e] Plaintiff of tangible and/or intangible property, including, without limitation, causing loss of political and/or business reputation, loss of business opportunities, loss of competitive position, and/or loss of business revenue, loss of goodwill, and/or loss of contractual relations." Doc. 177 - ¶ 578. These types of losses are adequately construed as 'deprivation of property' within the context of a wire fraud claim. *See, e.g., Mid Atlantic Telecom., Inc. v. Long Distance Serv., Inc.*, 18 F.3d 260, 264 (4th Cir. 1994) (recognizing "lost customers and lost revenue" as valid wire fraud injury); *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001) (recognizing "injuries to competitive position" as valid

wire fraud injury) (citing *Summit Props. v. Hoechst Celanese Corp.*, 214 F.3d 556, 561 (5th Cir. 2000)); *Alix v. McKinsey & Co.*, 23 F.4th 196, 204–06 (2d Cir. 2022) (recognizing the loss of potential clients and contractual relations as cognizable RICO injury); *Lewis v. Lhu*, 696 F. Supp. 723, 727 (D.D.C. 1988) (recognizing reputational damages as valid wire fraud injury); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649–50 (2008) (recognizing "lost valuable liens" as valid wire fraud injury; also, contemplating "[if] an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers . . . [and] the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business 'by reason of' a pattern of mail fraud[.]").

Additionally, while Appellees sent the fraudulent statements to the media, President Trump was the target of the statements. His loss was "a foreseeable result of *someone's* reliance on the misrepresentation." *Bridge*, 553 U.S. at 656 (emphasis in the original). Therefore, President Trump has standing.

Accordingly, the Amended Complaint sufficiently alleged the RICO Appellees violated 18 U.S.C. § 1343.

### D.    There was continuity establishing a pattern.

"To successfully allege a pattern of racketeering activity, plaintiffs must allege: (1) defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature." *Jackson v. BellSouth Telecom.*, 372 F.3d 1250, 1264 (11th Cir. 2004).

As detailed above, there were two predicate acts within the last ten years. The predicate acts were related to the Enterprise's purpose, damaging President Trump, and his presidential campaign. Further, President Trump is once again a candidate for President. Thus, it is no longer speculative but likely these acts will continue. Doc. 267 - Pg. 40.

Continuity is a "closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). To plead an open-ended continuity, a plaintiff must allege an enterprise poses a continuing threat, which can be accomplished by showing "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future" or "the

predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. Here, President Trump pleaded the RICO Appellees have not relented in their efforts to tarnish his reputation. Given President Trump's decision to run for President, there is a significant risk Appellees will continue to engage in this conduct.

To plead closed-ended continuity, a plaintiff must allege defendants engaged in a "series of related predicates extending over a substantial period of time." *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010). Here, President Trump's wire fraud claim alone spans more than six years, extending from May 14, 2016, when Fusion GPS commenced its efforts to deceive a Slate journalist, Franklin Foer, into writing an article about the purported Trump-Alfa Bank connection (the article would eventually be written and become the subject of a Clinton Campaign press release and numerous misleading Clinton tweets), *see* Doc. 177 - ¶ 583(a), through February 16, 2022, when Appellee Clinton deliberately attempted to mislead the public and further the Enterprise's fraudulent scheme through a Tweet, stating that

President Trump is trying to invent a "fake scandal" to distract from "real ones," *id.* at ¶ 583(gg).

Additionally, the last known act of obstruction of justice, which occurred on November 16, 2017, when the RICO Appellees conspired with Appellees Steele and Danchenko to make false statements and misrepresentations to the FBI, provides an eighteen-month timeframe that is sufficient to satisfy the continuity requirement. *See Magnifico v. Villanueva,* 783 F. Supp. 2d 1217, 1229 (S.D. Fla. 2011).

Thus, President Trump properly pleaded both types of continuity. Accordingly, the district court erred in asserting President Trump did not establish a pattern of racketeering activity.

### 2. *Appellees violated section 1962(d).*

Appellees Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, and Joffe, conspired[3] under 18

---

[3] The district court had personal jurisdiction over Appellees Dolan and Orbis Ltd. for the same reasons it had personal jurisdiction over Appellee Joffe. *Supra,* n.2.

U.S.C. § 1962(d). Under RICO subsection (d), a plaintiff must allege "the conspirators agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity." *In re Managed Care Litig.*, 298 F. Supp. 1259, 1280 (S.D. FL. 2003).

"A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that Defendant agreed to the overall objective of the conspiracy; or (2) by showing that Defendant agreed to commit two predicate acts." *American Dental Assn.*, 605 F.3d at 1293 (citation omitted). Circumstantial evidence may be used, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Sylvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005).

While the district court did not expressly address subsection (d), Appellants met the requisite elements. As discussed above, Appellees committed two predicate acts, and they conspired in doing so. *See* Doc 177 - ¶¶ 95, 99, 105, 226, 233, 239, 272, 273, 291 (Steele); ¶¶ 109, 331, 335, 488 (Danchenko); ¶¶ 141, 165, 167, 265, 313 (Sullivan); ¶¶ 276, 313, 496, 498–501 (Podesta); ¶¶ 247, 248, 252 (Mook); ¶¶ 463, 497 (Reines); ¶¶ 88, 89, 103, 169, 170, 284, 286 (Nellie and Bruce Ohr); ¶¶ 185, 186,

328 (Neustar Inc. and Neustar Security Services). Thus, President Trump sufficiently stated a cause of action under RICO subsection (d).

### 3.    *Appellees caused injury to President Trump's business and property.*

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter." 18 U.S.C. § 1964(c). To have standing under Section 1964(c), a civil RICO plaintiff must show: (1) his alleged harm qualifies as an injury to his business or property; and (2) the harm was "by reason of" the RICO violation, including showing proximate causation. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Plaintiff has satisfied both requirements. The district court erroneously stated, "Plaintiff has not alleged facts of any specific business opportunities, revenue, or goodwill lost because of Defendants' actions." Doc. 267 - Pg. 43.

"Proximate cause . . . is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 654 (citation omitted). To effectively plead causation under RICO, a plaintiff is required only to allege "some direct relation" between the injury asserted and the injurious conduct. *Corcel Corp. v. Ferguson*

*Enters.*, Inc., 551 F. App'x 571, 576 (11th Cir. 2014). It is only necessary to plead defendants' "conduct was a substantial factor in the sequence of responsible causation." *Id.*

Here, President Trump asserted, "[a]s a direct and proximate result of the RICO Defendants' racketeering activity described herein, numerous unfounded investigations, including the FBI's Crossfire Hurricane investigation and its full-field Alfa Bank investigation, numerous congressional investigations, and Special Counsel investigations were commenced; countless false, damaging, and defamatory articles and media stories of all types (televisions, radio, internet, etc.) were published, resulting in the widespread dissemination of false, damaging and defamatory accusations of Plaintiff's purported collusion with Russia which became years-long headline story that irreparable, unjustly and permanently tarnished Plaintiff's political reputation." Doc. 177 - ¶ 614. Further, President Trump alleged he suffered at least nine independent and distinct harms to his business and property, including: (i) "loss of political []reputation"; (ii) "loss of [] business reputation"; (iii) "loss of existing and future business opportunities"; (iv) "loss of competitive position"; (v) "loss of business

revenue"; (vi) "loss of goodwill"; (vii) "loss of trade secrets"; (viii) "loss of contractual relations"; and (ix) "defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom." *Id.* at ¶¶ 615–16.

Additionally, the Amended Complaint set forth numerous facts indicating Appellees' conduct was the driving factor in the commencement of various federal investigations, which was a driving factor in President Trump's injuries. *See, e.g.*, Doc. 177 - ¶ 158 (alleging that Steele began sending the Dossier to the FBI on July 5, 2016, mere weeks before Crossfire Hurricane was commenced); *id.* at ¶ 204–14, 343 (alleging that the Alfa Bank 'full field investigation' launched four days after Sussmann met with Jim Baker); *id.* at ¶ 226 (alleging Inspector General Michael Horowitz's finding that the Steele Dossier was relied upon in granting FISA warrants). In addition, Appellees' misleading statements to the media contributed to these investigations.

Also, the Durham Report found the FBI was unsuccessful in finding any evidence of Russian collusion until the false allegations in the Steele dossier, which largely came from Appellee Danchenko. Durham Report

at Pgs. 10–11. The Steele Dossier, in part, triggered and sustained multiple federal investigations. *Id*. at Pg. 18.

Accordingly, President Trump properly asserted standing under RICO by showing an injury to his business and property caused by Appellees. Therefore, President Trump successfully pleaded two sufficient counts of RICO violations and respectfully requests this Court reverse the district court's Order dismissing Counts I and II of the Amended Complaint.

### c. The district court erred in dismissing President Trump's injurious falsehood claim.

The district court erred in dismissing President Trump's injurious falsehood claim. An injurious falsehood claim requires: (1) a falsehood; (2) published or communicated to a third party; (3) Defendant knew the falsehood would likely induce others not to deal with Plaintiff; (4) the falsehood played a material and substantial part in inducing others not to deal with Plaintiff; and (5) special damages. *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984). "Plaintiff must also allege damages as a result of the communicated falsehood." *Arthrex, Inc. v. W.*

*Coast Med. Res., LLC*, 2015 WL 12844946, at *8 (M.D. Fla. Nov. 25, 2015).

The district court found (1) the statute of limitations ruled out most of the statements, except for two made by Appellee Clinton, (2) President Trump did not have injury because he expressly decided to forgo reputational damages and damage to his political career is not an injury to property, (3) President Trump failed to plead that the statements were false, and (4) the First Amendment protects Appellees' statements. Doc. 267 - Pgs. 43-49.

First, as discussed above, President Trump's claims were equitably tolled. Still, Appellee Clinton made two statements within the limitations period. *Id.* at Pg. 45. Second, President Trump alleged that through Appellees' lies, he had "been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations." Doc. 177 - ¶ 664. Further, as a special damage, he was forced to pay legal fees.

47

*See Horgan v. Felton*, 123 Nev. 577, 586 (2007). Third, President Trump properly alleged that the statements were knowingly false. Doc. 177 - ¶¶ 501, 583, 673, 676, 689. Fourth, the First Amendment does not protect Appellees' statements because, as President Trump properly pled, they were made with actual malice. *See Fridovich v. Fridovich,* 598 So. 2d 65, 69 (Fla. 1992); Doc. 177 - ¶¶ 635-652.

Thus, President Trump properly stated a claim for injurious falsehood. Accordingly, President Trump respectfully requests this Court reverse the district court's Order dismissing Count III for Injurious Falsehood as to Appellees Clinton, Sullivan, Schultz, Danchenko, Sussmann, and Steele.

## II.    The district court erred in imposing sanctions against Appellants.

The arguments above amply demonstrate that President Trump advanced legitimate, good faith arguments, including for the modification and extension of existing law. Accordingly, the district court made a clear error in judgment and abused its discretion in finding that Appellants acted in bad faith and in imposing almost $1 million in

inherent authority sanctions. Additionally, the district court abused its discretion in granting Rule 11 sanctions to Appellee Dolan.

> ### a.    Imposition of sanctions under the district court's inherent authority violated due process and was an abuse of discretion.

On January 19, 2023, the district court issued sanctions under its inherent authority, on behalf of 18 defendants. Doc. 302. Sanctions issued under inherent authority of the court trigger due process protections of fair notice and hearing—protections that were not afforded. *See Donaldson v. Clark*, 819 F.2d 1551, 1559-60 (11th Cir. 1987). Fair notice—a fundamental due process requirement, even for basic Rule 11 sanctions—provides litigants an opportunity to correct or otherwise address supposedly offending behavior, to amend deficient pleadings, or to understand the reasoning behind a court's belief that they might have acted in bad faith. *Id.* In this case, the district court did not even hint at imposing $1 million sanctions until its Order granting dismissal of the entire case, when there was no off-ramp and no chance to cure.

Not only did the district court abuse its discretion by violating due process, it also made clear errors of judgment in its politicized analysis

and conclusions, including its findings of bad faith and its references to President Trump's litigation in other courts.

### 1. Lack of fair notice was abuse of discretion.

Fair notice is a fundamental due process requirement, even for basic Rule 11 sanctions. *See Donaldson*, 819 F.2d at 1559–60. This protection is particularly important where the court issues sanctions under its inherent powers, which are a drastic remedy with the potential for abuse, and "must be exercised with restraint and discretion." *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980); *Mroz*, 65 F.3d at 1575 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 41 (1991)). "Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why." *In re Mroz*, 65 F.3d at 1576.

When imposing sanctions, "[a] district judge should not await the aggregation of what he considers multiple acts of misconduct and then levy an aggregated sanction without at least warning the attorneys at the time of each act or reserving decision upon timely requests by opposing counsel." *Riddle v. Egensperger*, 266 F.3d 542, 556 (6th Cir. 2001) (citing *In re Ruben,* 825 F.2d 977, 990 (6th Cir. 1987)).

In this case, other than Appellee Dolan, whose Rule 11 sanctions motion was far narrower (as addressed below), none of the underlying Defendants provided any notice to President Trump of their intent to seek sanctions prior to the end of the case, nor did the district court. Notably, when these Defendants (other than Dolan) filed their motions for sanctions, they conceded that they were precluded from seeking Rule 11 sanctions by the safe-harbor provision. Doc. 280 - Pg. 1, n.1. Under the safe harbor provision, "a party cannot delay serving its Rule 11 motion until conclusion of the case." *Peer v. Lewis*, 606 F.3d 1306, 1313 (11th Cir. 2010). Instead, Defendants asked for sanctions under three other theories—28 U.S.C. § 1927, the court's inherent authority, and the Defend Trade Secrets Act—while also suggesting that the court could impose Rule 11 sanctions on its own initiative. Doc. 280 - Pg. 1.

If the court acts on its own under Rule 11, without a properly noticed Rule 11 motion from a party, it must meet a higher standard— akin to contempt—while also providing sufficient notice. *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003).

Here, the district court declined to impose Rule 11 sanctions on its own initiative, purportedly because Rule 11 was "backward looking,

limited to pleading and motion abuse." Doc. 302 - Pg. 6. And yet, when boiled down to its essentials, the district court's sanctions Order is largely an attack on the Amended Complaint and its factual allegations and legal theories. The district court essentially conducted a Rule 11 analysis and used its inherent authority analysis as an "end run" around the notice required.

In *Chambers,* the Supreme Court contemplated that use of the court's inherent power of sanctions at the end of litigation could be an impermissible "end run" around Rule 11 sanctions. *See Chambers*, 501 U.S. at 56. Under the extreme facts of that case, the Court did not find that the court abused its discretion in using its inherent powers because the sanctioned parties received numerous, timely warnings from the court and opposing party that their conduct was sanctionable, noting "the District Court's reliance on the inherent power did not represent an end run around the notice requirements of Rule 11." *Id.* Specifically, in one of the early hearings before the *Chambers* district court, the district court warned the appellant his "conduct had been unethical." *Id.* at 37. Appellant ignored the court's orders, resulting in civil contempt proceedings. *Chambers*, 501 U.S. at 38. The appellant's conduct

continued, scheduling meritless depositions that the court canceled *sua sponte*. *Id.* At a status conference, the district court again warned the appellant and his counsel the conduct "would not be tolerated" and even provided a scholarly article on sanctions. *Id.* at 38. And yet, the appellant continued to defy the court's orders, prompting a third civil contempt motion. *Id.* at 39. After the appellant obtained new counsel, the district court warned the new attorney that "further sanctionable conduct would not be tolerated." *Id.* The appellant once again defied the court's orders. *Id.* Ultimately, because of this repeated conduct and the repeated warnings on the record, the district court issued a sanctions award of $996,644.65 using its inherent authority, in part. *Id.* at 40. The Supreme Court upheld the use of the district court's inherent power to impose these sanctions in part because the repeated warnings constituted adequate notice. *Id.* at 56.

Here, no such warnings, adequate notice, or opportunity to cure was given. Despite citing *Chambers* multiple times, the district court did not acknowledge the notice requirements. It simply issued sanctions under its inherent authority in a wrongful end run around the required notice and warnings for Rule 11 sanctions.

The district court tacitly admits, as it must, that there was no mention of sanctions on the record until the Dismissal Order on September 8, 2022. Further, Appellees' various motions to dismiss did not deal with sanctions. By the time any mention of sanctions was made, save for Appellee Dolan's Rule 11 sanctions notice, litigation in this matter had concluded. Doc. 302 - Pg. 3.

The only objectionable conduct of Appellants that the district court identified that occurred after dismissal of the case was on September 10, 2022, when Ms. Habba sat for an interview with Sean Hannity. *Id.* This interview was outside of the purview of the judicial system after litigation concluded. Even if her interview was somehow problematic, the district court's brief reference to potential sanctions in the September 8, 2022, Order certainly did not provide her any kind of fair notice that her constitutionally protected speech would be used against her and her client in a $1 million sanctions Order.

After dismissal of the case, there was no off-ramp; no way to cure the supposed bad faith. This is the very reason for the notice requirements of Rule 11, and presumably why the district court chose to invoke its far more drastic remedy of inherent authority sanctions. Under

the facts of this case, that choice, without notice from the court of
regarding its belief that the case was frivolous and pursued in bad faith,
was an end run around notice requirements and was an abuse of
discretion.

### 2.   Lack of evidentiary hearing was abuse of discretion.

In addition to the lack of notice, the district court erred by not
holding a hearing, which is a further due process violation when issuing
sanctions under the court's inherent authority. *Eagle Hosp. Physicians,
LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 n.6 (11th Cir. 2009)
(citing *Chambers* as requiring hearings before issuing sanctions); *Mroz*,
65 F.3d at 1576 (remanding for evidentiary hearing on finding of bad
faith); *accord Amlong*, 500 F.3d at 1242 (requiring a hearing for attorneys
threatened with § 1927 sanctions). This is exemplified in the unpublished
Eleventh Circuit case of *Campos v. City of Naples*, where this Court
reversed the district court for imposing sanctions without a hearing.
*Campos v. City of Naples*, 202 Fed. Appx. 381, 385 (11th Cir. 2006).

In this case, Appellants expressly requested an evidentiary
hearing. Doc. 285 - Pgs. 13–14. Given the reputation of a law firm and its
attorneys were at stake, it was error to refuse to hold an evidentiary

hearing before imposing such significant sanctions. As such, this Court should reverse the district court's inherent sanctions Order from January 19, 2023. In the alternative, this Court should remand this case for an evidentiary hearing on sanctions.

### 3.    The district court abused its discretion in finding that Appellants acted in bad faith.

The district court also erred in finding Appellants acted in bad faith. Before a court can impose sanctions against a lawyer under its inherent power, it must find the lawyer's conduct "constituted or was tantamount to bad faith." *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 918 (11th Cir.1982); *see also Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir.1998) ("The key to unlocking a court's inherent power is a finding of bad faith."). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Barnes*, 158 F.3d at 1214 (internal quotations omitted).

Here, the district court's bad faith finding centered on the allegation that Appellants filed a shotgun pleading to "serve a political purpose," that contained false allegations, foreclosed by existing law. *See generally* Doc. 302. The district court spent nine pages of its Order giving what it considers examples of Appellants' "shotgun pleading." *Id.* The claims by President Trump, however, are extremely complicated and the attacks against him unprecedented. Even the most disciplined complaint would need to contain substantial allegations. And, given the number of people and organizations who have targeted President Trump while President, the number of defendants is not evidence of bad faith, as each was alleged to have been involved in the unprecedented attacks and conspiracy alleged in the Amended Complaint. It was an abuse of discretion for the district court to find that the complaint was a shotgun pleading, much less that it indicated bad faith, in a case as far reaching as this one.

Additionally, Appellants did not knowingly make any false allegations or with reckless disregard for their truth or falsity in any pleadings. Appellants' Amended Complaint was replete with citations supporting their factual contentions and intended to rely on discovery to

further flesh out these contentions. Moreover, Appellants largely amended their Complaint to address the real-time developments in the facts alleged. *See, e.g.*, Doc. 177 - ¶¶ 17, 18, 22–24, 30, 32, 43, 59, 64–65, 91, 105–06, 122, 137, 140–46, 172–79, 180–82, 187–89, 280.

Appellants emphatically stated in their opposition to sanctions that they "engaged in good-faith efforts to substantiate the veracity of the allegations contained in the Amended Complaint by sourcing to various authorities supporting the underlying facts," and they "pursued every avenue of research which was available to them to verify the facts as understood and legitimately believed by them." Doc. 285 - Pg. 11. An evidentiary hearing would have solidified Appellants' good faith basis for pleading each fact in this litigation. Instead, the district court improperly weighed the evidence on its own based only on the briefing of the parties.

Indeed, the deference owed to the trial court on abuse of discretion review typically arises from the trial court's ability to conduct fact-finding and to see and evaluate testimony and evidence. *See United States v. Barton*, 909 F.3d 1323, 1327, 1330–32, 1336 (11th Cir. 2018) (emphasizing that in a case where the district court had conducted a two-day, fact-intensive *Daubert* hearing, the deference owed to the fact-

finding of the district court was particularly significant); *see also Amlong*, 500 F.3d at 1244–45 (noting that where a district court judge did not conduct an evidentiary hearing on bad faith, he could not reject the magistrate judge's finding that there was none without conducting another evidentiary hearing). In this case, the district court conducted no fact-finding and did not view or evaluate any testimony or evidence.

The newly released Durham Report highlights the district court's many clear errors of judgment in this regard. While that Report was obviously not available to the district court at the time, many of the facts contained therein had been publicly reported and were included in the Amended Complaint. Additionally, they could have been further explained or supported in an evidentiary hearing. Instead, the district court called many of these allegations "absurd" or "frivolous" or mere "political narrative," despite the requirement to accept well pleaded allegations as true. *Akkasha v. Bloomingdales, Inc.*, No. 17-CIV-22376, 2020 WL 6820879, at *2 (S.D. Fla. July 20, 2020), report and recommendation adopted, No. 17- CIV-22376, 2020 WL 6820878 (S.D. Fla. Sept. 14, 2020) (citation omitted). The Durham Report underscores

that the claims made in the Amended Complaint were not only plausible but likely, and certainly not sanctionable.

For example, the district court called it "implausible" and "categorically absurd" that Appellee Comey would have conspired with Appellee Clinton to harm President Trump, a blatant mischaracterization of the allegations in the Amended Complaint. Doc. 302 -Pg. 10; Doc. 177 - ¶¶161-170. The Durham Report, however, found that at least some high-level FBI actors, central to the opening and continuation of the Crossfire Hurricane investigation had a "clear predisposition" against President Trump. Durham Report at Pg. 47. This was, of course, public knowledge. The FBI rapidly opened its investigation into President Trump's campaign, during the height of his campaign for President against Appellee Clinton, despite "not possess[ing] any intelligence showing that anyone associated with the Trump campaign was in contact with Russian intelligence officers at any point during the campaign." *Id.* at Pg. 59. In fact, the Report determined the FBI's investigation significantly relied on leads from President Trump's political opponents. *Id.* at Pg. 18. Again, this was public knowledge.

Notably, it is now clear, based on the Durham Report, that Appellee Comey was actually aware of intelligence on a Clinton campaign plan to smear President Trump by associating him with Vladimir Putin, as early as August 3, 2016, three days after the FBI opened the Crossfire Hurricane investigation. *Id.* at Pg. 85. Based on the timeline of events, it is likely that Appellee Comey knew about this prior to opening Crossfire Hurricane, because (1) the CIA had received intelligence of the Clinton scheme in late July, (2) that intelligence was provided to and reviewed personally by CIA Director Brennan, (3) on July 28, 2020, Brennan briefed President Obama on "intelligence relevant to the 2016 presidential election," and (4) the next morning, July 29, 2020, Brennan briefed Appellee Comey on his meeting with the President. *Id.* at Pg. 84. While Brennan was non-committal in testimony as to whether he discussed the Clinton intelligence at that meeting and with Appellee Comey on July 29, 2020, it is certainly plausible that he did. *Id.* Much of this was alleged in the Amended Complaint. *See* Doc. 177 - ¶¶ 161–70.

Indeed, while the district court called it "categorically absurd" that Appellee Comey would conspire with Appellee Clinton, given Appellee Comey's announcements before the 2016 election, the Durham Report

found that there was disparate treatment in the way that the FBI handled candidates Trump and Clinton. Specifically, the Report found that the FBI acted considerably more favorably to Appellee Clinton's campaign than President Trump's campaign. *Id.* at Pgs. 68–81. For instance, the FBI provided defensive briefings to the Clinton campaign, but not the Trump campaign. *Id.* at Pg. 298. Again, the district court did not need the Durham Report to understand these mostly public facts, and therefore it was error to find that the claims were "categorically absurd."

Next, the district court noted that the Crossfire Hurricane investigation was opened "for an authorized purpose" and "with adequate factual predication" Doc. 302 - Pg. 16. As the Durham Report states, however, the FBI opened its Crossfire Hurricane investigation without "any actual evidence of collusion." Durham Report at Pg. 8. Further, as already discussed, at least some actors central to the Crossfire Hurricane investigation had a "clear predisposition" against President Trump. *Id.* at Pg. 47. Accordingly, much of the content in the Durham Report corroborates President Trump's factual claims.

Further, Appellants maintain their claims are supported by existing precedent or, at a minimum, present a compelling argument for

the extension of existing law. Appellants put forth good faith, reasonable bases for the claims in this case. As discussed above, the case law is either unsettled, or there is at least a reasonable request for an extension of the law. "When assessing the frivolity of a non-prevailing [party's] case, courts 'view the evidence in the light most favorable to [that party].'" *Akkasha v. Bloomingdales, Inc.*, No. 17-CIV-22376, 2020 WL 6820879, at *2 (S.D. Fla. July 20, 2020), report and recommendation adopted, No. 17-CIV-22376, 2020 WL 6820878 (S.D. Fla. Sept. 14, 2020) (citation omitted). "When the applicable law is unsettled, attorneys may not be sanctioned merely for making reasonable arguments for interpreting the law." *Gust, Inc. v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1329 (Fed. Cir. 2018) (citing *Secs. Indus. Ass'n v. Clarke*, 898 F.2d 318, 321–22 (2d Cir. 1990)), abrogated on other grounds recognized by *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990)).

Here, the district court largely relied on its Dismissal Order in determining Appellants' claims were frivolous. Doc. 302 - Pg. 19. As thoroughly briefed above, however, Appellants presented good faith arguments in asserting the statute of limitations had not run as to the RICO claim. Even if President Trump had failed to state a claim, "when

63

a district court grants leave to amend a complaint and later finds, as it often does, that an amended complaint continues to fail to state a claim, the typical outcome is dismissal of the amended complaint, not an award of sanctions against the litigant and his counsel for making an attempt." *Harvey v. CNN, Inc.*, 48 F.4th 257, 280 (4th Cir. 2022).

### 4. *The district court improperly considered litigation not before it in a display of political bias.*

The district court improperly punished President Trump for engaging in litigation outside of the Southern District of Florida. While it cited two opinions from this Court in its attempt to justify its consideration of President Trump's litigation in other forums, these cases are inapposite. Doc. 302 - Pg. 21. In *Johnson v. 27th Avenue Caraf, Inc.*, the court only analyzed the "similar cases brought by these men." 9 F.4th 1300, 1313–14 (11th Cir. 2021). Specifically, appellants in *27th Avenue* developed a scheme centered on similar facts to secure multiple settlements. *27th Avenue*, 9 F.4th at 1313-14. In *O'Neal v. Allstate Indem. Ins. Co. Inc.*, the court looked at litigation initiated by a *pro se* plaintiff responsible for "'relitigating imagined disputes that have already been dismissed in another forum' and moving for sanctions

against any person or entity who dares to oppose his frivolous claims." 2021 WL 4852222, at *5 (11th Cir. Oct. 19, 2021).

Here, the district court cited four other cases in which President Trump is or was involved. All four cases are focused on different issues with distinct factual grounds; each brought for different good faith reasons. As the district court acknowledged, all four of these cases are still pending in some capacity before each respective court. For the district court to say these cases were frivolous, "using the courts as a stage set for political theater and grievance," Doc. 302 - Pg. 34, before the cases' final adjudication, highlights a bias against President Trump, any case he brings to any court, and any attorney representing him.

Further, and injudiciously, the Order called President Trump a "mastermind of strategic abuse of the judicial process." Doc. 302 - Pg. 6. Despite the requirement to accept the factual allegations in the Amended Complaint as true, the district court said it was implausible and a "story without regard to facts." Doc. 302 - Pg. 10. The district court even called President Trump's attempts to clear his name of defamation by the media a "shameless attack on a freedom essential to democracy" and "bully[ing]

journalists." *Id.* at Pg. 24. Frankly, if the district court had such strong political reservations, recusal was warranted.

### 5. The district court improperly awarded Appellees' attorney's fees and other fees.

The amount of the sanctions awarded was inappropriate. In its January 19, 2023, sanctions Order, the district court awarded Appellees all attorney's fees. Doc. 302 - Pg. 45. The "American Rule" prohibits the shifting of attorney's fees in most cases. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975). An exception allows federal courts to exercise their inherent power to impose such fees as a sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *See Alyeska Pipeline Service Co.*, 421 U.S. at 258–259. The exception generally applies when a party practices a fraud upon the court, delays or disrupts the litigation, or hampers enforcement of a court order. *See Barnes,* 158 F.3d at 1214 (internal quotations omitted).

Here, Appellants did not cause any delays or disrupt the litigation. In fact, the opposite is true. Appellants consented to each request for an extension or similar accommodation the more than thirty Defendants requested. When it was determined an Amended Complaint would need

to be filed, Appellants filed a motion seeking to extend the deadline to amend to allow for a consolidated motion to dismiss that would save time and costs for all defense counsel involved. In this way, and in others, Appellants always dealt with Appellees' counsel professionally and courteously.

In its June 23, 2022, Order, the district court specifically noted it had "reviewed Plaintiff's Amended Complaint" and encouraged the Defendants "to the extent that the allegations against certain Defendants, and therefore the arguments relied on by those Defendants in support of dismissal, remain unchanged, and in the interest of reducing costs in this action, Defendants are advised they may readopt their prior Motions to Dismiss if they so choose." Doc. 188. In a subsequently filed Order, the district court noted the Amended Complaint "did not significantly alter the allegations as to most Defendants, and the arguments in support of dismissal of the Amended Complaint should therefore be substantially similar to the arguments in support of dismissal of Plaintiff's original Complaint." Doc. 200.

Despite the district court's urging them to "readopt" their prior arguments, Appellees proceeded to bill a similar amount of time to put

forth what has been described by the Court as "substantively identical arguments in support of dismissal [as the] earlier round of briefing." Doc. 267 - Pg. 63. In other words, Appellees claim to have incurred nearly five hundred thousand dollars in crafting a response to the Amended Complaint that was essentially unchanged from their prior response.

It is apparent the costs incurred by Appellees do not have a legitimate financial nexus to the filing of the Amended Complaint. At a minimum, Appellees made no effort to mitigate their damages. *See Riddle v. Egensperger*, 266 F3d 542, 556 (6th Cir. 2001) ("[D]efendants made a tactical decision to participate in a scorched earth approach rather than to mitigate their damages. It is now too late to change course."). Shockingly, the district court chose to punish Appellants for Appellees' conduct.

Regardless, fees should have never been awarded in the first place. Appellants conduct throughout this litigation was nothing but civil and accommodating to the court and the other parties. Appellants have never even approached the bad faith, vexatious, wanton, or oppressive behavior found in the caselaw where fees were awarded, such as *Chambers*.

Accordingly, Appellants respectfully request this Court reverse the district court's sanctions Order of January 19, 2023.

### b.    Award of Rule 11 sanctions to Appellee Dolan was abuse of discretion.

On November 10, 2022, the district court granted Appellee Dolan's Rule 11 motion for sanctions. Doc. 284. The district court accepted three 'facts' in Appellee Dolan's favor: (1) Appellee Dolan was not "intimately" involved with the Clinton Campaign, and "there was no basis" for that belief, (2) Appellee Dolan was not the source of allegations against President Trump regarding salacious sexual activity in a Moscow Ritz Carlton hotel, and (3) Appellee Dolan did not engage with Appellee Danchenko to provide information for the Steele dossier. Doc. 268 - Pgs. 5–7; Doc. 284 - Pgs. 6–9.

To properly issue Rule 11 sanctions, the district court was required to find: (1) a party filed a pleading that has no reasonable factual basis; (2) when the party filed the pleading that the legal theory on which it is premised had no reasonable chance of success or did not advance a reasonable argument to change existing law; or (3) it was bad faith or for an improper purpose when the party filed the pleading. *Massengale v.*

*Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001) (citing *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)). Here, the Rule 11 sanctions were improper because Appellants' conduct did not reach any threshold requirement.

Appellant has already argued in detail above that its conduct was not in bad faith or for an improper purpose and that its arguments were meritorious and sought a reasonable extension of the law. This section, therefore, will focus on the factual bases for the claims relating to Appellee Dolan, and that the district court made a clear error of judgment in accepting the representations of Dolan's pleadings as true, particularly without evidentiary hearing.

For sanctions to be appropriate, "the filing for which sanctions are imposed must be frivolous, that is, it must enjoy no factual and legal support in the record." *Indus. Risk Insurers v. M.A.N. Gutehoffriungshutte GmbH*, 141 F.3d 1434, 1448 (11th Cir. 1998); *see also Davis v. Carl*, 906 F.2d 533, 538 (11th Cir. 1990) ("Rule 11 is intended to deter claims with *no* factual or legal basis at all; creative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment.") (emphasis in original)). "In deciding the

propriety of Rule 11 sanctions, a court first determines whether the party's claims are objectively frivolous and then, if so, whether the signatory to the pleading should have been aware that they were frivolous-whether he would have been aware of the frivolousness if he had made a reasonable inquiry." *Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*, 2008 WL 11333071, at * 1 (S.D. Fla. Dec. 19, 2008) (citing *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)). As discussed throughout, the filings all had merit.

As this Court has held, "sanctions may not be imposed unless a particular allegation is utterly lacking in support." *United States v. Stinson*, 729 Fed. App'x 891, 900 n.7 (11th Cir. 2018). As now confirmed in the Durham Report, President Trump's claims had significant factual support and Appellee Dolan greatly misrepresented his role to the district court.

First, while Appellee Dolan may not have been "intimately" involved with the Clinton Campaign, there was certainly a reasonable basis for thinking he was. Russian official Olga Galinka, who Appellee Dolan frequently met with, believed Appellee Dolan played a significant role in the Clinton Campaign. When Appellee Dolan told Galinka he was

71

attending a reception for Hillary Clinton, Galinka asked him to deliver a message directly to Appellee Clinton. Durham Report at Pg. 148. Galinka further stated in emails that if Appellee Clinton were elected President, Appellee Dolan would take her to the State Department. *Id.* While Appellee Dolan originally stated he did not discuss politics with Galinka, his story unraveled after Appellee Dolan was confronted with emails and social media messages between him and Galinka. *Id.* at Pg. 149. Galinka even admitted to discussing the Steele reports with Appellee Dolan. *Id.*

Further, Appellee Dolan's role in the political world was not as *de minimus* as simply knocking on doors. Appellee Dolan "previously served as (i) Executive Director of the Democratic Governors Association, (ii) Virginia Chairman of former President Clinton's 1992 and 1996 presidential campaigns, and (iii) an advisor to Hillary Clinton's 2008 presidential campaign." Durham Report at Pgs. 138–39. Thus, it was not a stretch to say Appellee Dolan previously served in significant positions within the Democratic National Party apparatus.

Second, the Durham Report suggests Appellee Dolan was, in fact, the source of salacious sexual activity rumors regarding President Trump. Durham Report at Pg. 145. Specifically, it notes, "the June 20,

2016 Steele Report reflected facts that Dolan learned during the June Planning trip to Moscow." *Id*. In June 2016, Appellee Dolan stayed at the Ritz Carlton, received a tour of the hotel, and met with senior staff, including the hotel's general manager. *Id*. Notably, on June 15, 2016, Appellee Dolan sent an email stating, "I'm in Russia making plans to be adopted in the event this mad man [President Trump] gets elected." *Id*. at Pg. 144. On June 17, 2016, after meeting with Appellee Dolan in Moscow, Appellee Danchenko flew to London to meet with Appellee Steele. *Id*. at Pg. 144. And, on June 20, 2016, Appellee Steele published the false allegation of salacious sexual activity by President Trump. *Id*. The Durham Report also described that during his interview with their office regarding these false allegations of salacious sexual activity, Appellee Dolan was "inconsistent," and his "recollection vacillated." *Id*. at Pg. 145. Ultimately, the Durham Report concluded, "[i]n light of these facts, there appears to be a real likelihood Appellee Dolan was the actual source of much of the Ritz Carlton and Pavlov information contained in the Steele Reports." Durham Report at Pg. 148.

Third, the Durham Report also outlines Appellee Dolan's role in the crafting of the Steele dossier. While it may be true Appellee Dolan first

became affiliated with Appellee Danchenko to plan a conference in Moscow, his role in this conspiracy grew over time, and it was untruthful for Appellee Dolan to claim he had no role in the Steele dossier.

Appellee Steele specifically named Appellee Dolan as one of the sources of the dossier. *Id.* at Pg. 137. While Appellee Dolan claims to have never met Steele, "[c]uriously, Steele was in Cyprus at the same time Dolan was meeting with Galinka and others in Cyprus." *Id.* at Pg. 148. Appellee Dolan further admitted he provided information to Appellee Danchenko that ultimately ended up in the Steele dossier regarding Paul Manafort's firing, and that he fabricated the information. *Id.* at Pgs. 138, 148, 152, 172. In addition, "[t]he Steele Report contained information that Danchenko had gathered directly from Dolan." *Id.* at Pg. 150. Galinka told the FBI "she provided Dolan with information that would eventually be in the Steele Reports." *Id.* at Pg. 172.

During all of this, Appellee Danchenko even emailed Appellee Dolan looking for "rumor[s]" because he was "working on a 'project against Trump.'" Durham Report at Pg. 150. While Appellee Dolan has continued to maintain he only provided [false] information on Manafort's firing, the Durham Report acknowledged allegations in the September

2016 Steele report "bore substantial similarities to information that Dolan received in May and August 2016." *Id.* at Pg. 154. As the Durham Report stated, based on Appellee Dolan's emails, he "appears to volunteer that he possesses inside information on the Steele Report allegations." *Id.* at Pg. 156.

Appellee Dolan had connections to key sources of the Steele dossier, such as Dimitry Peskov, Alexey Paclov, Olga Galinka and her employer, and Appellee Danchenko, who was the "primary sub-source for the Steele Reports". *Id.* at Pgs. 171–72. Appellee Danchenko also left out material information regarding his meetings with Defendant Dolan during interviews with the FBI. *Id.* at Pg. 161.

These facts, among many others in the Durham Report, highlight President Trump's good faith bases for his allegations against Appellant Dolan. While Appellee Dolan may not have held the official title of Chairman of the DNC, nor is he a resident of New York, these facts are immaterial to the Amended Complaint as a whole. Immaterial facts are an insufficient basis for Rule 11 sanctions. *See In re Gen. Elec. Sec. Litig.*, 2021 WL 2688695, at *7 (S.D.N.Y. Jun. 30, 2021) (holding sanctions were not appropriate where the errors of fact played no material role in the

outcome of the litigation); *Forrest Creek Assoc., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1245 (4th Cir. 1987) ("[Rule 11 sanctions] do [ ] not extend to isolated factual errors, committed in good faith, so long as the pleading as a whole remains 'well grounded in fact.'"); *In re South Coast Oil Corp.*, 566 Fed. Appx. 594, 596 (9th Cir. 2014) (denying sanctions because the alleged mischaracterizations were either aggressive advocacy or immaterial to the merits of the case).

Ultimately, the facts alleged in the indictment indicated Appellee Dolan was substantively involved in the RICO conspiracy alleged. Given the developing nature of the criminal case, it was reasonable for the Appellants to rely upon the information contained in the indictment along with their own investigation into the allegations. Accordingly, the material facts pertaining to Appellee Dolan in the Amended Complaint were undoubtedly plausible, as the Durham Report confirms. A reasonable inference can therefore be drawn that Appellee Dolan knowingly fed information to Appellee Danchenko that Appellee Steele would ultimately use in an attempt to harm President Trump and his presidential campaign. Thus, Rule 11 sanctions for any alleged mischaracterizations are wholly inappropriate.

Lastly, the district court erred in not allowing a hearing. Under Rule 11, while no hearing is necessarily required, if a court is asked to resolve an issue of credibility or to determine whether a good faith argument can be made for the legal position taken, the risk of an erroneous imposition of sanctions under limited procedures and the probable value of additional hearing is likely to be greater. *Donaldson*, 819 F.2d at 1561. Prior opportunities to respond to Rule 11 charges will also influence the extent to which further hearing is necessary. *Id*. The type of notice required depends on the facts. Here, the district court found Appellants' pleadings as to Appellee Dolan to be incredible; thus, a hearing would have been proper given the emphasis on credibility.

Given there was no hearing, the facts contained in the Durham Report indicate Appellee Dolan's involvement in the Steele dossier, and the veracity of the legal claims, the district court erred in granting sanctions to Appellee Dolan under Rule 11. This error is in addition to the district court's error in using its inherent power to impose sanctions. Thus, Appellants respectfully request this Court reverse all sanctions awards.

## CONCLUSION

The district court erred in holding the statute of limitations had expired on President Trump's RICO claims, and that the RICO and injurious falsehood claims had no merit. Further, given the merits of President Trump's claims, the district court erred in awarding sanctions. Accordingly, Appellants respectfully request this Court vacate the district court's motion to dismiss Order as it pertains to Counts I, II, and III as to Appellees Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, Schultz, and Joffe, and vacate both of the district court's sanctions Orders as to all Appellees.

Dated: June 9, 2023                    Respectfully submitted,

                                       */s/ Jesse R. Binnall*
                                       Jesse R. Binnall
                                       Jared J. Roberts
                                       BINNALL LAW GROUP, PLLC
                                       717 King Street, Suite 200
                                       Alexandria, Virginia 22314
                                       Phone: (703) 888-1943

Fax: (703) 888-1930
jesse@binnall.com
jared@binnall.com

*Counsel for Donald J. Trump,*
*Alina Habba, Michael T. Madaio,*
*Habba Madaio & Associates,*
*Peter Ticktin, Jamie Alan Sasson,*
*and The Ticktin Law Group*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this Petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c)(1), as well as 11th Cir. R. 32-4 pursuant to Appellants' unopposed motion for extension and renewed motion for extension, because, excluding the parts of the Petition exempted by Federal Rule of Appellate Procedure 32(f), it contains 14,889 words.

Undersigned counsel certifies that this Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century font.

Dated: June 9, 2023                    Respectfully submitted,

*/s/ Jesse R. Binnall*
Jesse R. Binnall

*Counsel for Donald J. Trump, Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group*

80

## CERTIFICATE OF SERVICE

I certify that on June 9, 2023, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


/s/ *Jesse R. Binnall*
Jesse R. Binnall

*Counsel for Donald J. Trump, Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group*