## Nos. 22-13410, 22-14099, 23-10387, 23-13177

### In the United States Court of Appeals for the Eleventh Circuit

DONALD J. TRUMP,
*Plaintiff-Appellant,*

ALINA HABBA, MICHAEL T. MADAIO, HABBA MADAIO & ASSOC.;
PETER TICKTIN, JAMIE SASSON, and THE TICKTIN LAW GROUP,
*Appellants,*

versus

HILLARY R. CLINTON, DEMOCRATIC NATIONAL COMMITTEE,
HFACC, INC., DNC SERVICES CORP., PERKINS COIE, LLC, JOHN
PODESTA, ROBERT MOOK, DEBBIE WASSERMAN SCHULTZ,
FUSION GPS, GLENN SIMPSON, PETER FRITSCH, NELLIE OHR,
BRUCE OHR, IGOR DANCHENKO, RODNEY JOFFE, NEUSTAR
SECURITY SERVICES, NEUSTAR INC., ORBIS BUSINESS
INTELLIGENCE LTD., and CHARLES DOLAN,
*Defendants-Appellees.*

On appeal from the United States District Court
for the Southern District of Florida

### APPELLANTS' PETITION FOR REHEARING *EN BANC*

JESSE R. BINNALL
JARED J. ROBERTS
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
(703) 888-1943

RICHARD C. KLUGH
40 N.W. 3rd Street, PH1
Miami, Florida 33128
(305) 536-1191

ALEJANDRO BRITO
BRITO, PLLC
2121 Ponce de Leon Blvd.,
Suite 650
Miami, Florida 33134
(305) 614-4071

*Counsel for Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellants file this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

ABC Corporations

Aytch Lett, Enjolique Dion

Barry, Stephen

Barzee, William R.

Berkowitz, Sean M.

Berman, Joshua Adam

Binnall, Jesse R.

Bosworth, Michael S.

Brozinsky, Noah

Ceresney, Andrew J.

Clattenburg, Rachel

Clinesmith, Kevin

Clinton, Hillary R.

Comey, James

Crenny, Kevin P.

Crowley, Shawn Geovjian

Danchenko, Igor

Democratic National Committee

DNC Services Corporation

Does' John

Dolan, Jr., Charles Halliday

Doumar, George R.A.

Eisen, Allison

Elias, Marc

Epps, Alexandra N.

Erickson-Pogorzelski, Anthony

Fassbender, Diana Marie

Feldman, Maximillian

Fels, Adam Seth

Fritsch, Peter

Fusion GPS

Garcez, Isabela M.

Garza, Kathryn E.

Gillenwater, James E.

Gonzalez, Juan Antonio

Greenberg, Gerald Edward

Habba, Alina

Habba Madaio & Associates

Harrington, Howard J.

Hart, Nancy

HFAAC, Inc.

Houlihan, Michael F.

Hunt, Patrick, Honorable

Janda, Sean R.

Joffe, Rodney

Kaplan, Roberta A.

Kastrenakes, Eleni Sevasti

Kendall, David Evan

Kiyonaga, Paul Y.

Klauber, Debra

Letter, Douglas

Levine, Jonathan Edward

Levy, Joshua

Lipshultz, Zachary Andrew

Madaio, Michael T.

Markus, David Oscar

Martinez, Roberto

McCabe, Andrew

McCarthy, John

McNichols, John Marcus

Meeks, Katherine Moran

Mestitz, Michael

Middlebrooks, Hon. Donald M.

Monsour, Jr., Franklin George

Mook, Robert E.

Muha, Christopher

Neuman, Sarah E.

Neustar Security Services

Neustar, Inc.

Ohr, Bruce

Ohr, Nellie

Olmedo-Rodriguez, Jennifer

Orbis Business Intelligence, Ltd.

Otterberg, April A.

Page, Lisa

Peacock, Benjamin

Perkins Coie, LLC

Pettis, Eugene K.

Pinto, Paola

Pittard, William

Podesta, John

Reines, Phillipe

Reilly, Wendy B.

Roberts, Jared Joseph

Rosenstein, Rod

Sainvil, Akiesha Renee Gilcrist

Salzman, Joshua M

Sasson, Jamie Alan

Schar, Reid J.

Schiff, Adam

Schultz, Deborah Wasserman

Sigler, Geoffrey M.

Simpson, Glenn

Soto, Edward

Southall, Samantha

Steele, Christopher

Stekloff, Brian L.

Strzok, Peter

Sullivan, Jake

Sussman, Michael

Terrell, Stephen R.

The Ticktin Law Group

Ticktin, Peter David

Touhey, James G.

Trout, Robert P.

Trump, Donald J.

Turner, Katherine M.

Tyrrell, Steven

United States of America

Warin, Francis Joseph

Neustar, Inc. is a wholly owned subsidiary of TransUnion, which is a publicly traded entity at NYSE:TRU.

## STATEMENT OF COUNSEL

Pursuant to 11th Cir. R. 40-3(b), I express a belief, based on a reasoned and studied professional judgment, that this appeal involves the following questions of exceptional importance:

1.    Whether the statute of limitations for an individual claim for civil damages by a President of the United States is equitably tolled when the subject of that claim is also under investigation or being prosecuted by Executive Branch departments and agencies during the President's term.

2.    Whether the Clayton Act's tolling provisions, 15 U.S.C. § 16(i), apply to RICO claims, where governmental litigation is ongoing as to criminal conduct directly related to a RICO claim, even if the government does not prosecute that conduct under the RICO statute, 18 U.S.C. § 1962.

These questions are exceptionally important, including because: (1) the panel concluded, in error, that the tolling claim was frivolous where the President's making of a *choice* not to file his civil claim during his first term of office, as a discretionary exercise of Presidential decision-making, did not *prevent* him from filing the action; (2) intervening Supreme Court precedent has reaffirmed the President's complete discretion of

action—immunity—for his official duties, *Trump v. United States*, 603 U.S. 593, 607 (2024); and (3) the panel opinion could force Presidents to engage in a series of private civil actions that would alter the dynamic of the extremely limited scope of civil case distraction contemplated in *Clinton v. Jones*, 520 U.S. 681, 705–06, 707 (1997), where the Supreme Court held that the President was not immune from a lawsuit premised on matters that pre-dated and did not touch on his official duties.

 s/ Richard C. Klugh
RICHARD C. KLUGH, ESQ.
Attorney for Appellants

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . C-1

STATEMENT OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE *EN BANC* ISSUES . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF RELEVANT FACTS AND PROCEEDINGS . . . . . . 2

PETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1.  Equitable tolling applies to the statute of limitations for the
    President's personal legal claims where (1) the Executive
    Branch departments and agencies are also investigating the
    facts underlying those claims, such that an individual suit by
    the President would cause a conflict between governmental
    interests and the President's private interest; (2) no prejudice
    results to the defendant; and (3) the defendant has notice that
    the conduct is being investigated in whole or in part . . . . . . . . . . 6

2.  The tolling provisions of the Clayton Act as applied to RICO
    claims are invoked by governmental investigations of criminal
    conduct that constitutes a component of the RICO claim  . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

APPENDIX – Panel decision (11th Cir. Nov. 26, 2025)

# TABLE OF CITATIONS

Cases

*Agency Holding Corp. v. Malley-Duff & Assocs.*,

    483 U.S. 143 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Baggett v Bullit*, 377 U.S. 360 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Chung v. United States DOJ*, 33 F.3d 273, (D.C. Cir. 2003) . . . . . . . . 7

*Clinton v. Jones*, 520 U.S. 681 (1997) . . . . . . . . . . . ii, 4, 8, 9, 10, 11, 12

*Garrity v. State of New Jersey*, 385 U.S. 493 (1967) . . . . . . . . . . . . . . 15

*Holland v. Florida*, 560 U.S. 631 (2010) . . . . . . . . . . . . . . . . . . . . . . . 14

*Landis v. North American Co.*, 299 U.S. 248 (1936) . . . . . . . . . . . . . . 13

*Leh v. Gen. Petroleum Corp.,* 382 U.S. 54 (1965) . . . . . . . . . . . . . 17, 19

*Menominee Indian Tribe*, 577 U.S. 250 (2016) . . . . . . . . . . . . . 5, 13, 15

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,

    198 F.3d 823 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . 17, 18, 19

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) . . . . . . . . . . . . . . . . . . . . . . . 8

*Trump v. United States*, 603 U.S. 593 (2024) . . . . . . . . . . . . . . ii, 11, 15

Statutes and Other Authorities

U.S. Const., Art. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S. Const., Art. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 10, 12, 13

15 U.S.C. § 16(i) (Clayton Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 19

18 U.S.C. § 1962 (RICO) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

11th Cir. R. 40-3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

P. Kurland, *Watergate and the Constitution* (1978) . . . . . . . . . . . . . . 16

# STATEMENT OF *EN BANC* ISSUES

1. Does equitable tolling of the statute of limitations apply to the President's decision to postpone filing a private civil action for damages until the President's term of office has concluded in order to avoid interference with ongoing Executive Branch proceedings and investigations regarding the matters at issue, including to avoid any appearance of a conflict between the President's personal and governmental interests?  If so, must the district court determine whether the President's decision to delay filing suit satisfies the requirements for equitable tolling by falling, at least, within the outer perimeter of the President's official duties?

2. Does the Clayton Act's statute of limitations, which tolls the running of the statute of limitations for private Clayton Act litigation where a prosecution of a Clayton Act violation is ongoing, apply fully to RICO private actions, and does tolling thus apply when there is a pending criminal action or grand jury proceeding regarding conduct constituting a core component of the RICO claim?

## STATEMENT OF RELEVANT FACTS AND PROCEEDINGS

In a motion to dismiss an amended civil complaint alleging RICO conspiracy and related claims filed by President Trump following his first term in office, appellees raised as a principal ground for dismissal that the statute of limitations had expired, where the causes of action accrued during the first year of the President's term, more than four years before the complaint was filed. DE:226:2–7. The President responded to the motions to dismiss, asserting equitable tolling of the statute of limitations as to all claims along with statutory tolling for his RICO claims. DE:237:1–14 (The Clayton Act's four-year statute of limitations applies to RICO claims, *see Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987), and courts in other jurisdictions have ruled that the Clayton Act's express tolling provision—during pendency of a governmental prosecution of the matter—also applies to civil RICO.) The panel assumed, without deciding, that statutory tolling extends to RICO actions, but found no such tolling without a prosecution under the RICO statute. *See* Appendix (panel opinion) at 17–18.

President Trump filed the civil action in 2022 alleging that, during and after his 2016 campaign for the Presidency, a group of political

operatives, lawyers, and associated entities engaged in an unprecedented and extraordinary conspiracy to generate and disseminate false allegations that he and his campaign had "colluded" with Russia. This fabrication of "collusion" was advanced through fraudulent "opposition research," by misleading and using members of federal law enforcement, and by selective and misleading leaks to the media. Multiple members of this conspiracy were later indicted by federal prosecutors for making false statements related to the "collusion" attack, as the result of investigations that began during President Trump's first term in office and continued until issuance of the Durham Report after the end of the first term. President Trump's complaint asserted a number of causes of action, including civil conspiracy under the Racketeering Influenced and Corrupt Organizations Act (RICO). He sought to recover for the substantial damage the conspiracy caused him, including millions in defense costs and loss of business opportunities. *See* DE:177 (amended complaint); *see also* Appendix at 6–9 (describing allegations of the President's complaint).

The district court, without conducting a hearing, granted appellees' motion to dismiss the complaint with prejudice as time-barred, DE:267:23–29, 65, and for separate grounds as to individual claims. *Id.*

at 30–65.  The district court also imposed sanctions against the President and his attorneys, DE:302, denying their request for a hearing, DE:285:13–14, including on equitable tolling issues.  On appeal, appellants raised as a central issue whether dismissal the complaint as time-barred was error:

> Whether the district court erred in dismissing the complaint as untimely and concluding, without a hearing, that Plaintiff's role as President from 2017–21—including during Executive Branch-led criminal and related investigations into Defendants' wrongful actions—did not warrant any equitable tolling.

Initial-Br:1.  Appellants also challenged dismissal of the complaint with prejudice, raised individual claims of error as to dismissal of various counts, and appealed the imposition of sanctions.  *Id*. at 1–2, 8–92.

In a published opinion, a panel of this Court affirmed the dismissal and sanctions rulings, while concluding that as to appellee Orbis Limited, dismissal should have been without prejudice.  *See* Appendix at 5, 23, 27, 27, 31, 35.

Regarding equitable tolling, the panel ruled that under *Clinton v. Jones*, 520 U.S. 681 (1997), there is no Presidential immunity or automatic pause to civil litigation, including as to statutes of limitations,

even for claims that the President might bring in his personal capacity, directly relating to pending investigations by Executive Branch agencies. The panel further ruled that the President's interest in avoiding the appearance of impropriety in litigating civil actions directly overlapping with Executive Branch investigations is insufficient to show the President was "prevent[ed]" from timely filing the civil action during his term and that the equitable tolling doctrine was therefore inapplicable. Appendix at 19–20 (citing *Menominee Indian Tribe*, 577 U.S. 250, 257 (2016)).

## PETITION

The panel decision, upholding dismissal of the complaint on the basis that the limitations period was neither equitably nor statutorily tolled, erroneously applied governing law and ignored the President's interest in avoiding a conflict between his right to pursue private litigation and his constitutional duties as head of the Executive Branch. The complaint's allegations were related to a series of governmental investigations and proceedings falling within the President's authority, including the Mueller and Durham investigations.

The panel erroneously concluded that the President's discretionary decision to postpone filing a civil action seeking relief from private harms

that are the subject of Executive Branch investigations does not constitute *prevention* of the President's ability to timely pursue civil relief. It ruled that appellants' reliance on the Presidential judgment to pause his personal litigation interests so as to maintain non-involvement in pending Executive Branch investigations of those same matters was a legally insufficient basis to invoke tolling and that the President's position was somehow "frivolous." Appendix at 19–20, 23. Appellants submit that the panel's unduly narrow construction of the applicable tolling doctrines unduly restrains the scope of presidential discretion in this context.

## I.

**Equitable tolling applies to the statute of limitations for the President's personal legal claims where (1) the Executive Branch departments and agencies are also investigating the facts underlying those claims, such that an individual suit by the President would cause a conflict between governmental interests and the President's private interest; (2) no prejudice results to the defendant; and (3) the defendant has notice that the conduct is being investigated in whole or in part.**

The panel concluded that equitable tolling was foreclosed by President Trump's acknowledgment that the timing of his filing of the lawsuit was premised on his "presidential decision to put constitutional duties and obligations to the country first." Appendix at 20. As President

Trump explained: Had he filed suit "during the Mueller and Durham investigations," it would have appeared he was "interfering with law enforcement functions." *Id.* at 19. The panel erred as a matter of law and fact in ruling that the President's decision not to exceed his Article II role was not an extraordinary circumstance that steered him from bringing a timely action.

The panel decision presents Presidents with a Hobson's choice: perform requisite duties of the Presidency, or abandon the public interest—to file personal lawsuits that, in their view, negatively impact their official duties. The panel's decision imposes an impossible-choice standard at variance from authority recognizing the availability of equitable tolling in the context of obstacles faced by individuals even outside the role of Chief Executive, such as where conflicting duties may reasonably interfere with the timeliness of court filings. *See, e.g., Chung v. United States DOJ*, 33 F.3d 273, 279 (D.C. Cir. 2003) (equitable tolling available based on Plaintiff's fear that his civil lawsuit would jeopardize his request for sentencing leniency, where Plaintiff's duty to cooperate with the government as to an investigation of federal election law

violations can be shown to interfere with his ability to prepare his civil claim).

The panel decision concludes erroneously that President Trump's claim of equitable tolling of the statute of limitations is foreclosed by *Clinton v. Jones*, 520 U.S. 681 (1997), or by his "concession" that the delay in filing suit was based on a "'presidential decision to put constitutional duties and obligations to the country first.'" Appendix at 17–20. The opposite is true. This summary rejection of President Trump's equitable tolling claim without any hearing—and despite two hearing requests, upon revelations of the Durham Report and upon the filing of a motion for sanctions, *see* DE:285:13–14; DE:331:18—ignores the unique nature of the Presidency in our constitutional structure.

"Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits, would raise unique risks to the effective function of the government." *Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982). As Justice Breyer explained in *Clinton v. Jones:* "[O]nce the President sets forth and explains a conflict between judicial proceeding and his public duty, the matter changes." 520 U.S. at 710 (Breyer, J., concurring). At that point, "Article II's vesting of

the entire executive Power in a single individual implemented through the Constitution's structural separation of powers" precludes the judiciary from forcing the President to choose between his constitutional duties and personal interests. *Id.* at 710–11. The panel's decision forces that precise choice. Thus *en banc* review is mandated.

The Supreme Court's decision in *Clinton v. Jones* did not consider the issue of equitable tolling, much less the constitutional and equitable issues at play in the instant case. Rather, *Clinton v. Jones* addressed a crucially different and limited issue—whether President Clinton was entitled to absolute immunity from judicial process during his term of office as a result of a civil lawsuit initiated by a private citizen based on allegations of sexual advances to her that occurred before he assumed the presidency—and secondarily, whether the district court abused its discretion in deferring the trial until after the President left office.

Unlike in *Clinton v. Jones*, President Trump was not sued here by a private litigant for misconduct in his personal capacity. Rather, this case concerns the circumstance where the President has suffered personal harm—including during and in relation to his serving as President—from wrongdoing that is concurrently under federal law enforcement

investigation and thus, in the President's sole discretion and evaluation, may have presented a conflict between the President's personal interests and his Article II powers. The panel's affirmance here likewise relies on a legally-preclusive application of *Clinton v. Jones* that is at odds with that decision's ruling *requiring* factual findings with respect to the President's need for delay, without which the district court necessarily abuses its discretion. 520 U.S. at 707 & n.41.

In his concurring opinion in *Clinton v. Jones*, Justice Breyer articulated the precise holding in that case: The Constitution does not automatically grant the president immunity from civil lawsuits based on his private conduct. 520 U.S. at 710. Nor does the "doctrine of separation powers … require federal courts to stay 'virtually' all private actions against the President until he leaves office." *Id.* (citing majority decision, 520 U.S. at 705–06: "We therefore hold that the doctrine of separation of powers does not require federal courts to stay all private actions against the President until he leaves office."). But this does not mean that federal courts are precluded from staying—or recognizing equitable tolling for—private actions by the President accruing while he was in office when

pursuit of those actions may conflict, in his determination, with his constitutionally-mandated duties.

In *Clinton v. Jones*, the Supreme Court expressly distinguished the purely private nature of the *Clinton v. Jones* lawsuit, which involved pre-presidential conduct, and matters within the scope of official Presidential duties: "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts." 520 U.S. at 696. In doing so, the Supreme Court recognized that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." 520 U.S. at 697–98; *see Trump v. United States*, 603 U.S. 593, 607 (2024) (upholding President's personal immunity in exercising discretion of action and decision-making within the outer perimeter of his official duties).

Although the Supreme Court never decided whether a sitting president may invoke equitable tolling to pause the limitations period for a civil lawsuit for damages suffered in his personal capacity during his

time in office, the correct notion that the President should not be personally penalized, either civilly or criminally, for actions having a relation to official responsibilities directly supports equitable tolling. A sitting President in deference to fulfilling his Article II duties (and in recognition of traditional constitutional separation-of-powers concepts) should not face forfeiture of his civil litigation rights if he makes the decision, as President, to pause advancement of his personal litigation interests in favor of performing constitutional duties to advance and further the public interest.

Unlike *Clinton v. Jones*, in which the president sought "to construct an immunity from suit for unofficial acts grounded purely in the identity of his office," this case involves something quite different: whether under Article II President Trump had the discretion to elevate his constitutional duties over his personal interests during his time in office, and whether the Constitution prohibits him from suffering personal loss and penalty as a result of the exercise of that discretion. The answer to both questions is a resounding "yes."

A president is still a citizen and has the same right to bring civil lawsuits when he is aggrieved as any other citizen. Because of his unique

office, and position in our constitutional structure, the panel erred in not recognizing that equitable tolling is necessary to resolve the conflict between the President's right to pursue litigation and his official duties.

As the Supreme Court explained in *Landis v. North American Co.*, 299 U.S. 248, 256 (1936), "[e]specially in cases of extraordinary public moment, the [plaintiff] may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted." It is hard to imagine a more extraordinary public moment than the President's responsibility to carry out the duties of the office. If a citizen may be required to submit to a delay, Article II vests in the President the discretion to devote his time to performing his constitutional duties and to exercise his discretion to temporarily forgo the filing of a lawsuit that would advance his own personal interests. This is particularly the case here, where the exercise of such discretion is both reasonable and plausible, and where the civil defendant suffers no prejudice, as is the case here.

Nor does *Menominee Indian Tribe v. United States,* 577 U.S. 250 (2016) (equitable tolling applies where an extraordinary circumstance is beyond a litigant's control), preclude equitable tolling here, contrary to the

panel's holding otherwise.  In fact, the opposite is true, as the Supreme Court has also mandated that the "exercise of a court's equity powers ... must be made on a case-by-case basis." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (*quoting Baggett v Bullit*, 377 U.S. 360, 375 (1964)); *see also id.* at 650 (in context of case addressing equitable tolling, recognizing imperative for "flexibility" and "avoidance of mechanical rules," including judicial exercise of judgment in light of "specific circumstances, often hard to predict in advance," that may warrant "special treatment in an appropriate case").  The pressing needs of the American public are, in many ways, beyond the President's control: to be sure, he ran for office, but it was the American public who elected him.  And given that he was already in office when the claims accrued, his ability to immediately prosecute those claims while the federal government pursued key aspects of them, and his official decision not to do so, does warrant special treatment.

President Trump's assertion of a legitimate need to adhere to core duties of his office—including refraining from interfering with, or appearing to interfere with, pending federal investigations on the subject of his claims—was a specific circumstance that was certainly difficult to

predict in advance and in many ways outside his control. Such circumstances fully support invoking equitable tolling.

The panel's overly-narrow reading of *Menominee* without the mandated consideration of traditional equitable concerns here impermissibly penalizes the President for exercising his sworn constitutional prerogative and obligations. That is in direct contradiction of *Trump v. United States*, 603 U.S. at 607. In effect, the panel decision demands that the President either forswear his best efforts to perform his official obligations or abandon his office in order to file a lawsuit—effectively, an illusory choice that defies the inherent structure, purpose and necessities of the proper functioning of our democratic republic and the overarching rule of constitutional law.

It is highly damaging to the office of the President and damaging to the public if Presidents are forced to forgo legitimate claims in order to pursue the public interest—or, alternatively, forced to put the public interest on hold to pursue legitimate causes of action. In other contexts, the Supreme Court has squarely held that such a choice is no choice at all and constitutionally impermissible. *See, e.g., Garrity v. State of New Jersey*, 385 U.S. 493, 496, 498, 500 (1967) (purported choice given to

government employee of self-incrimination or job forfeiture is illusory and thus constitutionally impermissible).

After all, the President is the "'sole indispensable man in government'" and "'should not be called' from his duties 'at the instance of any other … branch of government.'" 520 U.S. at 713 (Breyer, J., concurring) (quoting P. Kurland, *Watergate and the Constitution* 135 (1978)). "[U]nlike Congress, which is regularly out of session, U.S. Const., Art. I, § 4, 5, 7, the President never adjourns." *Id.* The panel decision, however, forces presidents to make official decisions which may result in losing their right to assert valid personal claims. "A Constitution that separates powers in order to prevent one branch of Government from significantly threatening the workings of another, could not grant a single judge more than a very limited power to second-guess … a President's reasonable determination of his scheduling needs." *Id.* at 723 (Breyer, J., concurring).

In rejecting these compelling bases for equitable tolling, premised on principles recognized by the Supreme Court and this Circuit, the panel erred.

**The tolling provisions of the Clayton Act as applied to RICO claims are invoked by governmental investigations of criminal conduct that constitutes a component of the RICO claim.**

The panel ruled, in error with regard to the claim of statutory tolling under the Clayton Act, that the federal proceedings identified by the Plaintiff—the FEC action against the Clinton Campaign, as well as the false statements attributed to Sussman, Danchenko and Clinesmith (as to which Clinesmith pled guilty) in the respective prosecutions against them—do not bear a "real relation" to the conduct underlying the complaint, as required by Supreme Court authority, *Leh v. Gen. Petroleum Corp.,* 382 U.S. 54, 59 (1965), nor do they allege RICO violations.  In evaluating the nature of that requisite relation, the panel acknowledged both the Clinton Campaign's mischaracterization of the true purpose of funds it transmitted to Perkins Coie and the fact that a portion of the conduct underlying the multiple false statement prosecutions also forms "parts of Trump's claims."  Appendix at 17–18.  The panel concludes nevertheless that this partial identity of conduct is inadequate, citing *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 830 (11th

Cir. 1999), for its determination that, to qualify for statutory tolling, the facts alleged by the private plaintiff must be "intertwined with and fundamentally the same as those alleged in the government actions." Appendix at 17–18.

Notably, as this Court expressly recognized in *Morton's Market,* 198 F.3d at 832, fraudulent concealment—which is alleged by the President in the complaint, DE:177:5, was a core component of the scheme to mislead law enforcement through a fabricated dossier and other obstructive actions to cause unfounded law enforcement investigations of collusion with a foreign power. The FEC proceedings against the defendant Clinton Campaign, as alleged in the complaint, *id.*, show the active, ongoing and fraudulent concealment of the motivation, purpose and origin of the falsity-ridden Steele Dossier that formed the core of the tortious wrongdoing alleged in the complaint—and thus confirmed the necessity of the governmental investigations. The secretive misconduct, as reflected in the FEC proceedings, are compounded by the facts shown in the multiple prosecutions, of defendants Sussman, Danchenko and Clinesmith, for making false statements that resulted in initiating and

exacerbating the harms suffered by President Trump, as alleged in the complaint. *Id.* at 6.

In concluding that this overlap in alleged wrongdoing is inadequate to trigger statutory tolling, the panel overlooks this Court's recognition in *Morton's Market* that "[i]f there is a significant, although incomplete, overlap of subject matter, the statute is tolled even as to the differences." *Id.* at 830 (citing *Leh*, 382 U.S. at 54). The panel decision fails to recognize, in the context of this case, that the alleged misconduct centers on obstruction of justice violations and their concealment—RICO predicates. *See generally Morton's Market,* 198 F.3d at 830 (ruling, in summary judgment context of antitrust actions alleging "collusive behavior designed to eliminate competition during the same time period and in the same geographical area," that "because these actions are based *in part* on the government's proceedings, both factually and in the proof on which these plaintiffs will rely, we conclude that Section 16(i) tolled the statute of limitations on plaintiffs' claims") (emphasis added).

The panel's erroneous rejection of statutory tolling is premised on an overly-narrow pending-case requirement that civil RICO claims mirror

substantive RICO or RICO conspiracy prosecutions. Instead, the real-relation test for statutory tolling is satisfied during a prosecution of conduct that forms a central component of a civil RICO or RICO conspiracy action, such as conduct that in this case formed an essential basis for the complaint's RICO claims.

The different focuses of the Clayton Act and the RICO Act show that the real-relation standards are distinct for each. While under the Clayton Act, the violation is ordinarily focused on a singular economic objective, RICO prosecutions link together otherwise disparate-appearing conduct to show an organized influence, despite seemingly-disconnected conduct. This distinction demonstrates that the panel's strict adherence to factual-analogy reasoning from Clayton Act cases—absent any precedent requiring that an identical conspiracy be alleged—*cannot* form the basis for its substantial narrowing of the tolling doctrine as applicable to RICO claims.

## CONCLUSION

Appellants respectfully request that this Court grant rehearing *en banc*.

Respectfully submitted,

 s/ Jesse R. Binnall                  s/ Richard C. Klugh
 s/ Jared J. Roberts                  RICHARD C. KLUGH, ESQ.
BINNALL LAW GROUP, PLLC               Counsel for Appellants
Counsel for Appellants                40 N.W. 3rd Street, PH 1
717 King Street, Suite 200            Miami, Florida 33128-1838
Alexandria, Virginia 22314            Tel. No. (305) 536-1191
Tel. No. (703) 888-1943

 s/ Alejandro Brito
ALEJANDRO BRITO, ESQ.
BRITO, PLLC
Counsel for Appellants
2121 Ponce de Leon Boulevard
Suite 650
Miami, Florida 33134
Tel. No. (305) 614-4071

**CERTIFICATE OF COMPLIANCE**

I CERTIFY that this petition complies with the type-volume limitation of FED. R. APP. P. 40(d)(3)(A). According to the WordPerfect program on which it is written, the numbered pages of this brief, in 14-point Century Schoolbook font, contain 3,821 words.

 s/ Richard C. Klugh
Richard C. Klugh, Esq.


**CERTIFICATE OF SERVICE**

I CERTIFY that a true and correct copy of the foregoing was served via ECF filing upon counsel for the Appellees on this <u>16th</u> day of January, 2026.

 s/ Richard C. Klugh
Richard C. Klugh, Esq.

# APPENDIX

*Trump, et al. v. Clinton, et al.*,
Nos. 22-13410, et al. (11th Cir. Nov. 26, 2025)

FOR PUBLICATION

# In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13410
_____

DONALD J. TRUMP,

*Plaintiff-Appellant,*

*versus*

HILLARY R. CLINTON,
DEMOCRATIC NATIONAL COMMITTEE,
HFACC, INC.,
DNC SERVICES CORPORATION,
PERKINS COIE, LLC, et al.,

*Defendants-Appellees.*

2                    Opinion of the Court                    22-13410

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:22-cv-14102-DMM

_____

_____

No. 23-10387

_____

DONALD J. TRUMP,

*Plaintiff-Appellant,*

ALINA HABBA,

HABBA MADAIO & ASSOCIATES,

*Interested Parties-Appellants,*

*versus*

HILLARY R. CLINTON,

DEMOCRATIC NATIONAL COMMITTEE,

HFACC, INC.,

DNC SERVICES CORPORATION,

DEBORAH WASSERMAN SCHULTZ, et al.,

*Defendants-Appellees,*

PERKINS COIE, LLC, et al.,

*Defendants.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:22-cv-14102-DMM

_____

22-13410          Opinion of the Court                    3

---

No. 23-13177

---

DONALD J. TRUMP,
ALINA HABBA,
MICHAEL T. MADAIO,
HABBA MADAIO & ASSOCIATES,
PETER TICKTIN, et al.,

*Plaintiffs-Appellants,*


*versus*

HILLARY R. CLINTON,
DEMOCRATIC NATIONAL COMMITTEE,
HFACC, INC.,
DNC SERVICES CORPORATION,
PERKINS COIE, LLC, et al.,

*Defendants-Appellees,*

JAMES COMEY, et al.,

*Defendants.*

---

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:22-cv-14102-DMM

---

4            Opinion of the Court            22-13410

––––––––––––––––––––

No. 22-14099

––––––––––––––––––––

DONALD J. TRUMP,

*Plaintiff,*

ALINA HABBA,
MICHAEL T. MADAIO,
HABBA MADAIO & ASSOCIATES,
PETER TICKTIN,
JAMIE A. SASSON,
THE TICKTIN LAW GROUP, et al.,

*Plaintiffs-Appellants*

*versus*

HILLARY R. CLINTON, et al.,

*Defendants,*

CHARLES HALLIDAY DOLAN JR.,

*Defendant-Appellee.*

––––––––––––––––––––

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:22-cv-14102-DMM

––––––––––––––––––––

Before WILLIAM PRYOR, Chief Judge, and BRASHER and KIDD, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

These four consolidated appeals concern five separate orders. In 2022, between his terms of office, President Donald Trump filed a lawsuit against dozens of defendants, alleging several claims, including two under the Racketeer Influenced and Corrupt Organizations Act and three under Florida law. The district court dismissed the amended complaint with prejudice for failure to state a claim. On the defendants' motions, the district court also entered sanctions against Trump and his attorneys, under Rule 11 and under its inherent authority. While those orders were on appeal, Trump and his attorneys moved the district court to reconsider each order in the light of a report by Special Counsel John Durham. They also moved to disqualify the district judge. The district court denied both motions. Two defendants ask us to sanction Trump for bringing a frivolous appeal.

We affirm the orders with a caveat. Because the district court lacked jurisdiction over one defendant, it erred in dismissing the claims against that defendant with prejudice. So we vacate the dismissal of those claims and remand with instructions to dismiss them without prejudice. Because Trump's remaining claims are untimely and otherwise meritless, we affirm the dismissal of the amended complaint with prejudice for the other defendants. And because Trump and his attorneys committed sanctionable conduct and forfeited their procedural objections, we affirm both sanctions orders. The Durham Report does not change our conclusions, and the district court lacked jurisdiction to consider the disqualification motion. Yet, because the appeal of the dismissal order is not frivolous, we deny both motions for appellate sanctions.

# I. BACKGROUND

When evaluating a motion to dismiss, "we recount and accept the allegations of [the] complaint as true." *McCarthy v. City of Cordele*, 111 F.4th 1141, 1144 (11th Cir. 2024). We review the facts alleged in the amended complaint, before outlining Trump's claims, the merits proceedings in the district court, the collateral proceedings, and the appellate proceedings that followed.

## A. The Facts as Alleged

Trump's amended complaint alleged that, in the lead-up to the 2016 election, Hillary Rodham Clinton, the presumptive presidential nominee for the Democratic Party, conspired with others to "weave a false narrative" about him. Clinton and her allies sought to "discredit, delegitimize and defame" Trump by fabricating a story that he and his campaign colluded with Russia. They enlisted a law firm, Perkins Coie, to assist them, and Perkins Coie partner Marc Elias hired Fusion GPS, a political consulting firm known to "produce false and/or misleading dossiers." Fusion in turn enlisted Orbis Limited, an England-based "private intelligence firm" run by Christopher Steele. Their effort produced the Steele Dossier, a collection of documents alleging collusion with Russia based on "unverified, falsified, and fraudulent information." Steele's main source for the Dossier was Igor Danchenko, a Russian analyst. Danchenko in turn relied on Charles Dolan, an operative with "intimate ties to the Clinton Campaign" who provided some of the material used in the Dossier. And Perkins Coie partner Michael Sussmann contracted with an information technology

firm, Neustar, to access "sensitive data sources" to "manufacture ties" between Trump and Alfa Bank, a Russian financial institution. Neustar was run by Rodney Joffe.

After they fabricated the Steele Dossier and the Alfa Bank connection, the operatives pushed them to the news media and law enforcement. Fusion fed the collusion story to news media starting in late spring 2016. Soon afterward, Steele gave his Dossier to the Federal Bureau of Investigation, which led in part to the initiation of the "Crossfire Hurricane" investigation of the Trump campaign. Sussmann, falsely claiming that he was not operating on behalf of a client or company, gave the Alfa Bank story to the Bureau, leading to a separate investigation. These investigations were "prolonged and exacerbated" by several "Clinton loyalists" in high positions within the Bureau, including James Comey. In late October, the Clinton campaign shopped the Alfa Bank story to the press and promoted it on social media. After the election, the alleged conspirators continued to spread the collusion story in the media and call for further investigations.

Over the next few years, a "string of federal investigations" refuted the Russian collusion narrative. The report of Special Counsel Robert Mueller, appointed to investigate possible collusion, found "no evidence" of it. The Inspector General for the Department of Justice reviewed the Crossfire Hurricane investigation and found multiple "errors [and] omissions" in procedure and concluded that the Bureau lacked probable cause for some of the warrants it secured. The Federal Election Commission investigated the

Clinton campaign and found that it and the Democratic National Committee had misreported the funds they expended through Perkins Coie for opposition research. Special Counsel John Durham, assigned to investigate the origins of Crossfire Hurricane, obtained an indictment against Kevin Clinesmith for making false statements to the Foreign Intelligence Surveillance Court, and Clinesmith pleaded guilty. Durham also obtained indictments against Sussmann for making false statements to federal officials, and against Danchenko for five counts of making false statements to federal officials during the Crossfire Hurricane investigation.

Trump alleges that the conspiracy is still ongoing, as members of the conspiracy continue to allege that he colluded with Russia during the 2016 campaign. Trump alleges that he suffered at least $24 million in defense costs and legal fees because of the conspirators' actions in addition to loss of business opportunities.

## B. Trump's Amended Complaint

Of the 16 claims in the amended complaint, only five are before us on appeal. Trump alleged two claims under the Racketeer Influenced and Corrupt Organizations Act: a civil racketeering claim against Clinton, the Clinton campaign, the Democratic National Committee, Perkins Coie, Elias, Sussmann, Fusion, and Joffe, and a racketeering conspiracy claim against the same defendants and several others. Trump also alleged three claims under Florida law: an injurious falsehood claim against several defendants, including Clinton, Danchenko, Sussmann, and Steele; a claim of conspiracy to commit injurious falsehood against them and

several others; and a claim of conspiracy to commit malicious prosecution against Clinton, Sussmann, Dolan, Elias, Steele, Danchenko, and Comey, among others. Trump does not appeal the dismissal of eleven of his claims, including his underlying claim of malicious prosecution, his claim under the Computer Fraud and Abuse Act, his claim for theft of trade secrets, and his claim under the Stored Communications Act.

### C. Merits Proceedings in the District Court

On March 24, 2022, President Trump sued 28 named defendants in the district court. His initial complaint was 108 pages long and contained 508 numbered paragraphs. Two law firms, Habba Madaio & Associates and The Ticktin Law Group, represented Trump.

Judge Donald M. Middlebrooks was assigned this case. After Judge Middlebrooks's assignment, Trump moved for his disqualification. Trump argued that Judge Middlebrooks had a "relationship to the Defendant" Hillary Clinton because President William Clinton nominated Judge Middlebrooks to his position. The district court denied this motion.

One defendant, Charles Dolan, identified several errors in Trump's pleadings and notified Trump's counsel of these errors by letter. The original complaint stated that Dolan was a former chairman of the Democratic National Committee. This allegation was false. Dolan's attorneys told Trump's attorneys that many of the material allegations against Dolan were likewise false, including his participation in the conspiracy and his having been in contact with

any defendant other than Danchenko. The letter threatened sanctions under Rule 11 if Dolan was not dropped from the complaint.

After an initial round of motions to dismiss, Trump filed an amended complaint that added over eighty pages of allegations and three defendants. Four attorneys were listed in the signature block: Alina Habba and Michael Madaio from Habba Madaio, and Peter Ticktin and Jamie Alan Sasson from Ticktin Law Group. Dolan remained a defendant in the amended complaint, which described him as the former chairman of a "national Democratic political organization" and as a "senior Clinton Campaign official." It also incorrectly described him as a resident of New York.

The defendants moved to dismiss the amended complaint. The United States moved to substitute itself for the defendants employed by the Bureau and Department of Justice and then moved to dismiss the claims against it for lack of subject-matter jurisdiction. Dolan, Joffe, and Orbis moved to dismiss for lack of personal jurisdiction. Most of the defendants jointly moved to dismiss the amended complaint for failure to state a claim for relief.

The district court dismissed the amended complaint. It ruled that the amended complaint was "foreclosed by existing precedent" and "implausible because [it] lack[ed] any specific allegations which might provide factual support for the conclusions reached," and found that it "misrepresent[ed]" its sources. It described the amended complaint as a "quintessential shotgun pleading" because it was "excessive in length" and incorporated "all the general allegations and all the allegations of the preceding counts" in later

counts. The district court ruled that the United States was the proper party for the claims against the defendants employed by the Bureau and Department of Justice and dismissed the claims against the United States without prejudice. It also ruled that it lacked personal jurisdiction over Orbis, Joffe, and Dolan. But it dismissed the claims against Orbis, Joffe, and Dolan with prejudice.

On the merits, the district court ruled that the claims failed as a matter of law. It ruled that Trump's racketeering claims were barred by the statute of limitations. It ruled alternatively that the claims failed because they lacked any valid predicate act, a pattern of activity, an enterprise, or an injury. Trump's injurious falsehood claims met a similar fate: they were largely untimely and failed to allege damage to Trump's property interests. Many of the conspirators' alleged statements were "plainly protected by the First Amendment." The malicious prosecution claims failed because no "judicial proceeding" had been filed against Trump. The district court rejected Trump's request to amend because any amendment would be "futile." It "reserve[d] jurisdiction to adjudicate issues pertaining to sanctions."

### D. Collateral Proceedings in the District Court

Soon after the district court dismissed the amended complaint, Dolan moved to sanction Trump's attorneys under Rule 11. The district court granted his motion. It found that many of the allegations against Dolan were "knowingly false or made in reckless disregard for the truth." It also ruled that the legal theory on which Trump proceeded lacked "any chance of success," and that

the action was a "shotgun lawsuit" motivated by an improper pur-
pose. It required Trump's attorneys to pay a $50,000 penalty plus
$16,274.23 in Dolan's fees because their "conduct was willful." To
support its willfulness finding, the district court cited the attorneys'
failure to correct their basic factual errors and Alina Habba's post-
dismissal appearance on Fox News where she continued to pro-
mote the theory of the case.

　　Following Dolan's motion, many of the other defendants
jointly moved for sanctions against Trump and his counsel. The
district court granted their motion. This time it issued sanctions
based on its inherent authority. It described the shotgun pleadings,
knowingly false factual allegations, and frivolous legal theories as
evidence of bad faith. It also mentioned other "[f]rivolous lawsuits"
Trump had filed to establish he had a "pattern of misusing the
courts." It calculated the fees and costs requested by defendants as
slightly more than $1 million. It ruled that the amounts requested
were largely reasonable, in part because the requests were "sub-
stantially discounted" from the total charged. It then considered
Trump's line-by-line objections to the hours billed and reduced cer-
tain attorneys' hours to account for vague or block billing. It as-
sessed a total of $937,989.39 in fees and costs. It found Trump and
Habba, along with Habba's law firm, jointly and severally liable for
that amount.

### E. Appellate Proceedings

　　Trump and his attorneys filed their initial brief on June 9,
2023. The same day, they requested that we take judicial notice of

the report of Special Counsel John Durham. In the alternative, they asked that we stay our appellate proceedings to allow them to move in the "district court for an indicative ruling" under Federal Rule of Civil Procedure 62.1(a). We stayed the appeal and allowed them to seek an indicative ruling from the district court. They filed the motion, and while that motion was pending, they again moved to disqualify Judge Middlebrooks.

The district court denied both motions. It ruled that even if the Durham Report could support some of Trump's allegations, it could not cure the legal problems with his amended complaint that required dismissal and warranted sanctions. It declined to disturb any of its prior orders. It also denied the motion to disqualify because it lacked jurisdiction over the motion based on our limited remand. It also decided, in the alternative, that the standards for disqualification were not met.

Two defendants, Orbis and Dolan, also moved for damages and double costs under Federal Rule of Appellate Procedure 38.

## II. STANDARDS OF REVIEW

We review the dismissal order *de novo*. We review *de novo* the dismissal of a defendant for lack of personal jurisdiction. *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015). We review *de novo* the dismissal of a complaint for "failure to satisfy the applicable statute of limitations." *Fedance v. Harris*, 1 F.4th 1278, 1283 (11th Cir. 2021) (citation and internal quotation marks omitted). We also review *de novo* the dismissal of a

complaint for failure to state a claim. *Evanto v. Fed. Nat'l Mortg. Ass'n*, 814 F.3d 1295, 1297 (11th Cir. 2016).

We review the other orders for abuse of discretion. We review sanctions for abuse of discretion. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1222 (11th Cir. 2017). We review a finding of bad faith "for clear error." *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1311 (11th Cir. 2023). "We review the denial of a motion for relief from judgment under Rule 60(b) for an abuse of discretion." *Howell v. Sec'y, Fla. Dep't of Corr.*, 730 F.3d 1257, 1260 (11th Cir. 2013). And we review the denial of a motion for judicial disqualification for abuse of discretion. *Giles v. Garwood*, 853 F.2d 876, 878 (11th Cir. 1988).

## III. DISCUSSION

We divide our discussion in seven parts. First, we explain that Trump's amended complaint failed to state a claim for relief on any issue before us. Second, we explain that the district court had personal jurisdiction over Joffe and Dolan, but not over Orbis. Third, we explain that the district court did not abuse its discretion in issuing sanctions against Trump and Habba based on its inherent authority. Fourth, we explain that the district court did not abuse its discretion in sanctioning Trump's attorneys under Rule 11. Fifth, we explain that the district court did not abuse its discretion in declining to reconsider its judgment. Sixth, we explain that the district court correctly ruled that it lacked jurisdiction to grant the disqualification motion. Seventh, we decline to award sanctions under Rule 38 for Orbis or Dolan.

*A. The District Court Correctly Dismissed the Amended Complaint for Failure to State a Claim.*

We do not doubt that, in the light of the Durham Report, President Trump has concerns about some defendants' conduct during the 2016 election. The investigation by Special Counsel Durham found that some defendants played a role in orchestrating unverified allegations of him colluding with Russia. Durham Report 11–12, 16–17. And it found that key allegations in the Steele Dossier, relied on by the Federal Bureau of Investigation and the press, were never corroborated. *Id*. at 13. Some appeared to be fabricated. *Id*. at 16. The Special Counsel's investigation found that Bureau officials appeared to favor Clinton and that their investigation decisions reflected that preference. *Id*. at 9–10. And it found that the Crossfire Hurricane investigation began without "any actual evidence of collusion." *Id*. at 8. Yet, those findings do not cure the deficiencies in Trump's racketeering claims.

The district court committed no error in ruling that Trump's federal claims of racketeering and state tort claims failed as a matter of law. We reject the argument that the district court based its dismissal on the shotgun nature of the pleading. We address below why the dismissals were sound.

1. Trump's Racketeering Claims Are Untimely.

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate "if it is apparent from the face of the complaint that the claim is time-barred." *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005) (citation and internal quotation marks

omitted), *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633 (2010). A four-year statute of limitations governs civil claims under the Racketeer Act, which accrue when the plaintiff discovers or should have discovered his injury. *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013). The district court found that Trump was aware of the underlying conduct, and his purported injury, by October 2017. But he waited until March 2022 to bring suit—five months after the statute of limitations expired.

Trump does not challenge these findings. Instead, he argues that the limitations period was either statutorily or equitably tolled. We reject both theories.

### a. The Limitations Period Was Not Statutorily Tolled.

The Racketeer Act adopts the "4-year statute of limitations for Clayton Act actions" as its limitations period. *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). The Clayton Act includes a tolling provision for its statute of limitations that applies whenever "any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws." 15 U.S.C. § 16(i). Neither this Court nor the Supreme Court has decided whether this tolling provision is incorporated into the Racketeer Act along with the statute of limitations. Trump argues that we should do so now. We need not do so because Trump's claims would not be tolled even if the tolling provision of the Clayton Act applied.

To toll the limitations period under the Clayton Act, the federal proceeding must bear a "real relation" to the conduct

underlying the later civil suit. *Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 59 (1965). We have required that the facts "alleged by the private plaintiff . . . be intertwined with and fundamentally the same as those alleged in the government action." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 830 (11th Cir. 1999) (citation and internal quotation marks omitted). We have allowed the precise legal theories between the proceedings to differ, but we still require that both the federal and private proceedings allege an antitrust "conspiracy." *Id.* at 830–31. Indeed, whenever the Supreme Court has decided that the Clayton Act's tolling provision applied, both the federal and the private proceedings alleged antitrust violations. *See, e.g.*, *Leh*, 382 U.S. at 60–61; *see also Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S 311, 322–23 (1965) (tolling limitations period based on Federal Trade Commission action alleging "substantially the same claims"); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 334–38 (1971).

No "real relation" exists between any earlier proceeding and this suit. Trump presents as candidates the Federal Election Commission's action against the Clinton campaign, Durham's prosecution of Sussmann, and the Danchenko and Clinesmith prosecutions. None of these proceedings are, or even resemble, racketeering actions. At best, they are actions involving some of the conduct that Trump incorporates into his racketeering claim. But none of these actions are even prosecutions of a racketeering predicate act. The Commission's action objected to the Democratic National Committee's and Clinton campaign's "mischaracteriz[ation] . . . of certain disbursements," and at most establishes that the campaign

relayed funds through Perkins Coie to opposition research. And the Sussmann, Danchenko, and Clinesmith prosecutions for making false statements to federal officials are relevant only to discrete parts of Trump's claims. These facts do not amount to a racketeering enterprise or a racketeering conspiracy.

### b. The Limitations Period Is Not Equitably Tolled.

"Equitable tolling pauses the running of . . . a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Fedance*, 1 F.4th at 1284 (citation and internal quotation marks omitted). Equitable tolling is a "rare remedy," *Wallace v. Kato*, 549 U.S. 384, 396 (2007), and the extraordinary circumstance must be "beyond [Trump's] control." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 257 (2016). For example, we have tolled limitations periods because of a fraudulent concealment or credible fear of reprisal from death squads. *NuVasive, Inc. v. Absolute Med., LLC*, 71 F.4th 861, 876 (11th Cir. 2023); *Jean v. Dorélien*, 431 F.3d 776, 780 (11th Cir. 2005). Trump's arguments for applying equitable tolling are either squarely foreclosed by governing law or by his own concessions.

Trump argues that the limitations period should be tolled for the entirety of his first presidential term because he faced "historically-unprecedented circumstances" as president. Although Trump insists that his argument is based on a "case-by-case analysis," many of his premises support a broader rule, such as his argument that "the President occupies a unique position in the

constitutional scheme," and his reliance on his "official role." It is hard to untangle these points from an argument for a generic "presidential tolling" which would apply to *any* president during his term in office, especially because Trump requests that we toll the limitations period "for the term of his Presidency."

The Supreme Court rejected a similar request from President Clinton when it refused to excuse him from judicial process during his term. *See Clinton v. Jones*, 520 U.S. 681, 703–04 (1997). It took no issue with a private citizen subjecting the president to judicial process, in the process burdening his "time and energy" and "impair[ing] the effective performance of his office." *Id.* at 702. If a president can be haled into court, he cannot be excused from suing to enforce his rights.

Trump unpersuasively argues that two "circumstances" support his request. First, he points to the workload he faced during his first term. But it is hard to see how his presidential workload differs from any other modern president, and those concerns did not arrest the Supreme Court in *Clinton*. *See* 520 U.S. at 697–99. Second, Trump argues that he was unable to seek relief in court while in office because, if he had filed this lawsuit during the Mueller or Durham investigations, "it would have looked like [he] was interfering with law enforcement functions." But this argument gives away the game. Equitable tolling requires the circumstances "prevent[ing]" Trump from suing to be "beyond [his] control." *Menominee Indian Tribe*, 577 U.S. at 255, 257 (citation and internal quotation marks omitted). Trump concedes that he *chose* not

to bring this lawsuit because he made a "presidential decision to put constitutional duties and obligations to the country first." That concession controls our decision. Trump may not avail himself of equitable tolling.

Without statutory or equitable tolling, Trump failed to state a timely claim of racketeering or conspiracy. The district court did not err in dismissing those claims as untimely.

### 2. Trump Forfeited His Challenge to the Dismissal of His Claims of Injurious Falsehood.

Injurious falsehood is a Florida tort related to but distinct from defamation. The "gist" of injurious falsehood "is the intentional interference with another's economic relations." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. Dist. Ct. App. 1999) (citation and internal quotation marks omitted). Florida courts define the tort as a published falsehood, which the publisher knows or should know will induce others not to deal with the plaintiff, and that plays a "material and substantial part" in inducing others not to deal with the plaintiff, which proximately causes special damages. *Id*. at 388 (citing *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. Dist. Ct. App. 1984)). The district court ruled that Trump failed to satisfy several of the elements, including that special damages were warranted. And many of the statements to which Trump objected were "plainly protected by the First Amendment."

Trump forfeited his arguments as to several of these elements and so fails to convince us the judgment should be reversed.

"To obtain reversal of a district court judgment that is based on multiple, independent grounds, an appellant must convince us that every stated ground for the judgment against him is incorrect." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). If he fails to do so, "the judgment is due to be affirmed." *Id.* Trump has failed to challenge the ruling that he did not plead "special damages," which the district court called a "crucial element" of the injurious falsehood tort. Nor does Trump challenge the ruling that his claim of conspiracy to commit injurious falsehood cannot survive independent from the underlying tort.

Perhaps realizing his error, Trump contests the issue in his reply brief. But we do not consider arguments raised only in reply briefs. *Id.* at 683. Because Trump failed to provide even a possible basis for reversal, we decline to hold that the district court erred.

### 3. Trump Forfeited His Objection to the Dismissal of His Claim of Conspiracy to Commit Malicious Prosecution.

The district court held that Trump could not state a claim for conspiracy to commit malicious prosecution unless he also stated a claim for the underlying tort. On appeal, Trump argues that his conspiracy claim can stand alone because he pleaded "an illegal combination to cause prosecution." But he does not respond to the authorities cited by the district court that hold that a claim of conspiracy to commit malicious prosecution cannot survive the dismissal of the underlying tort. *See Balcor Prop. Mgmt., Inc. v. Ahronovitz*, 634 So. 2d 277, 279 (Fla. Dist. Ct. App. 1994); *see also Buchanan v. Miami Herald Publ'g Co.*, 206 So. 2d 465, 469 (Fla. Dist.

Ct. App. 1968) ("The gist of a civil action for conspiracy is not conspiracy itself but a civil wrong which was done pursuant to the conspiracy."). Even if Trump's forfeiture did not require us to affirm, his claim would fail under Florida law.

### B. The District Court Had Personal Jurisdiction over Joffe and Dolan but not Orbis.

To survive a motion to dismiss for lack of personal jurisdiction, a complaint must allege "sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). Orbis, Joffe, and Dolan contend that Trump failed to satisfy that burden. In the district court, Trump presented two theories of personal jurisdiction: the Racketeer Act's nationwide service provision and Florida's long-arm statute. The district court rejected both. Trump points only to the nationwide service provision on appeal. Although he argues his second theory in the reply brief, we "decline to address an argument advanced by an appellant for the first time in a reply brief." *Big Top Koolers, Inc. v. Circus-Man Snacks, Inc.*, 528 F.3d 839, 844 (11th Cir. 2008).

The Racketeer Act's nationwide service provision authorizes service "on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). Although we ordinarily "address issues relating to personal jurisdiction before reaching the merits," *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 940 (11th Cir. 1997), we can address the merits first when jurisdiction turns on a merits question, *see id.* at 941. Trump may establish jurisdiction under the

nationwide service provision unless his claim is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy." *Id*. at 941–42 (citation and internal quotation marks omitted); *cf. Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974) (requiring that federal claims be "so insubstantial . . . as not to involve a federal controversy" to undermine subject-matter jurisdiction). Although Trump's equitable tolling argument is frivolous, his statutory tolling argument is not so implausible, nor foreclosed by precedent, that it could not confer federal jurisdiction. So the district court had jurisdiction to dismiss the claims against Joffe and Dolan.

Orbis is a different matter. It contends that Trump did not serve it according to the nationwide service provision. Because Trump served Orbis in England, not in the United States, it contends, "the nationwide service of process provision . . . cannot provide for personal jurisdiction in this case."

Trump concedes that Orbis was served abroad. So we agree with Orbis that the district court lacked personal jurisdiction over it. But this defect proves only that dismissal *with prejudice* was error. *See Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1221 (11th Cir. 1999) (holding that a dismissal for lack of personal jurisdiction must be "without prejudice"). Because Trump did not prove that he served Orbis according to the requirements of the Racketeer Act, we vacate the dismissal with prejudice of the claims against Orbis and remand with instructions to dismiss them without prejudice.

*C. The District Court Did Not Abuse Its Discretion in Issuing Sanctions Based on Its Inherent Authority.*

Federal courts have the inherent authority to "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). This authority arises from the "control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962). To "unlock[] that inherent power," a court must find that a party or his attorney acted in "bad faith." *Sciaretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015). On a finding of bad faith, the district court may "assess attorney's fees." *Id.*

The district court ordered Trump and Habba (along with her law firm) to pay nearly $1 million in attorney's fees under its inherent authority. On appeal, Trump and Habba present several arguments against the sanctions. We discuss and reject each in turn.

1. *Trump and Habba Abandoned their Argument that they Lacked Adequate Notice.*

Trump and Habba argue that the district court did not provide fair notice for the sanctions order. They suggest that the district court invoked its inherent authority to issue Rule 11 sanctions. Unlike Rule 11, inherent authority sanctions lack a "safe harbor" rule. *See Huggins v. Lueder, Larkin & Hunter, LLC*, 39 F.4th 1342, 1346 (11th Cir. 2022) (describing the requirement that a movant for sanctions first give the opposing party 21 days to cure the violation

before moving for sanctions). Because the district court sanctioned Trump and Habba for their pleadings, they argue that the district court "circumvent[ed] the notice required" under Rule 11.

Trump and Habba abandoned this argument by not raising it in the district court, despite having the opportunity to do so. "[W]e do not consider issues not presented in the first instance to the trial court." *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1140 (11th Cir. 2007). After the defendants moved the district court for inherent-authority sanctions, Trump and Habba limited their discussion of notice to the possibility of sanctions based on their shotgun pleadings. And they argued only that the district court should not impose sanctions on a shotgun pleading theory "alone." The only other mention of "notice" in their opposition to the sanctions motion was a summary quote from a Supreme Court case saying that sanctions should not be assessed "without fair notice." But they did not elaborate on that principle or explain how it applies here. It is at most a "passing reference[]" to an argument unmade. *Sapuppo*, 739 F.3d at 681. We consider the issue forfeited.

### 2. Trump and Habba Abandoned their Argument that the District Court Abused Its Discretion in Not Holding a Hearing.

Trump and Habba argue that it is a due process violation for a district court not to hold a hearing when issuing inherent authority sanctions. But they did not raise this issue in the district court, even though defendants requested sanctions under the court's inherent authority. The closest Trump and Habba came was their request for a hearing "[t]o the extent" that the district court was

considering sanctions "pursuant to 28 U.S.C. [section] 1927." This request failed to mention, much less make an argument for, a hearing about *inherent authority* sanctions. And their discussion of inherent authority sanctions made no mention of a hearing. This issue too was forfeited.

3. The Finding of Bad Faith Was Not Clear Error.

We review a finding of bad faith for clear error. *Bagelheads*, 75 F.4th at 1311. Clear error review requires "that a finding that is plausible in light of the full record—even if another is equally or more so—must govern." *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 896 (11th Cir. 2024) (citation and internal quotation marks omitted). To establish bad faith under the inherent authority standard, a court must find "subjective bad faith." *Purchasing Power*, 851 F.3d at 1224. "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002) (citation and internal quotation marks omitted). An egregious failure to pursue "reasonable inquiry into the underlying facts" of a claim can also support a finding of bad faith. *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1274 (11th Cir. 2009) (citation and internal quotation marks omitted).

The district court rested its bad faith finding on three features of the amended complaint. First, it found that the amended complaint was a shotgun pleading filed for a political purpose. Second, it found that the amended complaint contained factual

allegations that were "knowingly false or made with reckless disregard for the truth." Finally, it ruled that the amended complaint was based on patently frivolous legal theories. Trump challenges all three grounds. We affirm on the first and third.

a.  The Shotgun Pleadings Suggest Bad Faith.

The district court found that Trump filed a shotgun complaint "to harass," "an abusive litigation tactic which amounts to obstruction of justice." Trump and Habba respond that "every complaint claiming an interwoven [racketeering] claim is bound to include some 'shotgun' elements." They also argue that sanctions should not be imposed for shotgun pleadings when the procedurally correct response is dismissal without prejudice. Neither argument persuades us.

First, we have recognized that racketeering plaintiffs are not exempt from the requirement to avoid shotgun pleadings. *See, e.g., Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1293–96 (11th Cir. 2018) (affirming the dismissal of a racketeering complaint because it was a shotgun pleading). Trump and Habba maintain that despite the length and complexity of their complaint, there was no "intelligibility defect" from its shotgun nature. But we have described as one of the four paradigmatic types of shotgun pleadings a complaint that "adopts the allegations of all preceding counts." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). That kind of pleading confuses both defendants and courts, who "must be able to determine which facts support which claims." *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (citation and

internal quotation marks omitted); *see also Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir. 1991) (noting that because "many of the facts alleged could not possibly be material to all of the counts[,] . . . the district court had to sift through the facts presented and decide for [itself] which were material to the particular cause of action asserted, a difficult and laborious task indeed"), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). Trump's amended complaint did not spare the district court (or this Court) that task.

For example, Trump incorporates each of the preceding 633 paragraphs in his third count, injurious falsehood. Nothing prevented him from specifying the statements he contends are injurious falsehoods under this count. Although he identified some examples in this section of his complaint, the previous paragraphs contain dozens of candidate statements that Trump obliged the district court to evaluate for itself. We consider that abuse of judicial resources sanctionable. *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1360 (11th Cir. 2018) (affirming dismissal of shotgun pleading with prejudice and ordering plaintiff to show cause why he should not be sanctioned on appeal).

Second, Trump and Habba are wrong that because the ordinary remedy for shotgun pleading is dismissal, shotgun pleading itself cannot be evidence of bad faith. Indeed, we have relied on shotgun pleadings as evidence that a plaintiff "brought [a] suit purely to harass." *Pelletier*, 921 F.2d at 1517–18. We discern no clear error in the shotgun pleadings findings.

### b. The Amended Complaint Recklessly Forwards Frivolous Legal Theories.

The district court decided that the amended complaint advanced legal theories foreclosed by precedent "that the most basic legal research would have revealed." It listed several examples, including Trump's statutory and equitable tolling theories. Trump and Habba argue that "the case law is unsettled or there was a reasonable request for an extension of the law," at least for the tolling argument.

Many of Trump's and Habba's legal arguments were indeed frivolous. Even setting aside the tolling arguments, the district court ruled that Trump brought several frivolous claims, including a "malicious prosecution claim without a prosecution," and a "trade secret claim without a trade secret." Trump also appended seven counts to his indictment which did not allege any cause of action and which the district court found were "the high-water mark of shotgun pleading." Trump leaves all these frivolous claims behind, making a total of *11* of his 16 claims he does not appeal. Trump and Habba give us no reason to reverse the district court's ruling that these claims were frivolous.

### 4. The District Court Properly Considered Outside Conduct.

The district court bolstered its finding of bad faith by pointing to Trump's litigation conduct in other cases. It found that Trump's activity showed a "pattern of misusing the courts." Trump and Habba argue the district court was wrong to consider Trump's other litigation conduct.

The district court did not clearly err. We have affirmed a sanctions award based on a review of "similar cases" brought by a plaintiff and his attorney. *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1313–14 (11th Cir. 2021). Trump and Habba cite no contrary authority. Although they tell us that the district court misread *Johnson* and other cases, they never explain why the principle it drew from those cases is wrong. Nor do they explain how the district court clearly erred in concluding that Trump's litigation conduct in other cases was "similar" to the conduct here. All they offer is the cursory statement that the other cases were "brought for different, good faith reasons." We have no basis for vacatur.

### 5. The District Court's Fee Award Was Proper.

The district court engaged in a detailed review of the sanctions request and considered Trump and Habba's line-by-line objections. Trump and Habba argue that the district court erred because, despite the similarity of the amended complaint to the original complaint, "Defendants proceeded to bill a similar amount of time" drafting their motions to dismiss both complaints.

Trump and Habba forfeited this argument by not raising it in the district court. The closest they came to making this argument was their general statement that the fees requested were "unreasonable and excessive." All they offered to support this assertion were line-by-line objections to the fees requested, not the objection they make now. Because they did not make this argument in the district court, we decline to consider it.

*D. The District Court Did Not Abuse Its Discretion in Issuing Sanctions Under Rule 11.*

Rule 11 allows a district court to impose sanctions on a party and his attorney for filing frivolous pleadings or motions. FED. R. CIV. P. 11(b)–(c). "Rule 11 imposes an affirmative duty on an attorney to conduct a reasonable inquiry into both the facts and the law before filing a pleading or motion." *Gulisano v. Burlington, Inc.*, 34 F.4th 935, 942 (11th Cir. 2022). Before imposing sanctions, a district court must decide that the claims were "objectively frivolous," and decide that the attorney "who signed the pleadings should have been aware that they were frivolous." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). Failure to make a reasonable inquiry is grounds for sanctions "despite the attorney's good faith belief that the claims were sound." *Gulisano*, 34 F.4th at 942 (citation and internal quotation marks omitted). A pleading or motion is frivolous when it "has no reasonable factual basis"; "is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law"; or is filed "in bad faith for an improper purpose." *Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001) (citation and internal quotation marks omitted).

The district court decided that Trump's attorneys filed frivolous pleadings in all three ways available under Rule 11. *See id*. We affirm the Rule 11 sanctions order for the same reasons we affirm the sanctions issued based on the district court's inherent authority. As discussed above, the district court did not clearly err in finding that Trump's attorneys filed the amended complaint in bad faith.

Trump's attorneys give us no reason to conclude the district court clearly erred in that finding.

### E. The District Court Did Not Abuse Its Discretion in Declining to Reconsider the Judgment.

A district court "may relieve a party . . . from a final judgment, order, or proceeding" for the reasons specifically enumerated in Federal Rule of Civil Procedure 60(b)(1)-(5), or for "any other reason that justifies relief" under the catchall provision in Rule 60(b)(6). FED. R. CIV. P. 60(b). "[O]nly 'extraordinary circumstances' can justify relief under the Rule 60(b)(6) catchall." *BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612, 1617 (2025). The district court rejected the motion for reconsideration because the Durham Report was not newly discovered evidence under Rule 60(b)(2) and because it did not satisfy the stringent standard required by Rule 60(b)(6). In their initial brief, Trump and his attorneys argue only for relief under the Rule 60(b)(6) catchall. In their reply brief, they also argue that the Report was newly discovered evidence, but we "refuse[] to consider issues raised for the first time in an appellant's reply brief." *Johnson v. Miami-Dade County*, 948 F.3d 1318, 1327 (11th Cir. 2020) (citation and internal quotation marks omitted).

Trump and his attorneys failed to satisfy their burden under Rule 60(b)(6). The release of a long-expected report is hardly extraordinary, especially when the movants fail to identify a single material fact in the report previously unknown to them. Trump and his attorneys argue that the Durham Report should be

considered in the interests of justice, but this argument does not cure the extraordinary circumstances problem or explain how the report would aid them. To try to prove the latter, Trump and his attorneys return to their equitable tolling argument. They tell us that the report establishes "that a federal investigation of the relevant conduct was ongoing during" Trump's first presidential term. But the existence of an investigation was already evident at the time of—and expressly mentioned in—the amended complaint. Trump and his attorneys offer us no reason to reverse the district court.

### F. The District Court Lacked Jurisdiction to Consider the Second Disqualification Motion.

A judge is required to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The district court rejected the second disqualification motion because it lacked jurisdiction to consider anything but the Rule 60(b) motion. Trump and his attorneys contend that disqualification is a duty that does not "dissipate[] upon appeal."

The district court lacked jurisdiction to rule on the motion to disqualify. We assume jurisdiction "over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). Because the dismissal and sanctions orders were on appeal when the disqualification motion was filed, there were no "aspects of the case" left for the district court to "control" other than Trump and his attorneys' request for an indicative ruling as permitted by Rule 62.1 *Id.* Rule 62.1 allows a district court

presented with a motion for relief from judgment to "defer consider[ation]" of the motion, "deny" it, or "state . . . that it would grant the motion if the court of appeals remands for that purpose." FED. R. CIV. P. 62.1(a). Rule 62.1 does not permit a party to simultaneously request that a new district court judge consider the motion for relief, much less take over "all future proceedings," as Trump and his attorneys requested.

Trump and his attorneys rely on a Tenth Circuit decision for the proposition that a judge has a "continuing duty to recuse . . . in some circumstances, after a proceeding." *United States v. Cooley*, 1 F.3d 985, 992 (10th Cir. 1993). But that appeal involved post-trial motions for acquittal, not motions for relief from judgment pursuant to Rule 62.1. *Id.* at 991–92. In other words, *Cooley* discussed recusal when a district court has plenary jurisdiction, unlike here. They also point to *Cooley*'s statement that the disqualification requirement "is waivable, and, therefore, not jurisdictional in nature," *id.* at 996 n.9, as if to suggest that disqualification is "not limited by formalities." The former does not imply the latter. For example, personal jurisdiction "is waivable"—and our personal jurisdiction jurisprudence is certainly bound by formalities. Here we rely on nothing more than the "formalities" of the federal court system embodied in our rules of procedure. The district court correctly ruled that it lacked jurisdiction to consider anything more than the Rule 60(b) motion.

### G. *We Decline to Sanction Appellants Under Rule 38.*

Orbis and Dolan have moved for fees and double costs under Rule 38. Rule 38 allows us to "award just damages and single or double costs to the appellee" if "an appeal is frivolous." FED R. APP. P. 38. An appeal is frivolous when the legal claim at issue lacks an "underlying factual basis," or when appellants "ignore[] the governing law and rel[y] on clearly frivolous arguments." *Jackson*, 898 F.3d at 1359 (citation and internal quotation marks omitted). Both Orbis and Dolan object to the appeal of the dismissal order.

We deny the motions for sanctions. Trump presented meritorious arguments that the district court erred in dismissing the claims against Orbis and Dolan. In Orbis's case, dismissal of the claims against it with prejudice was wrong because the district court lacked personal jurisdiction over it. And in Dolan's case, the district court erred in ruling that it lacked personal jurisdiction over him. Trump presented valid grounds for relief. And even though Trump also presented frivolous arguments, we do not intend to grant Rule 38 sanctions "every time one or two arguments in an appeal might arguably be deemed frivolous." *McCoy v. Iberdrola Renewables, Inc.*, 769 F.3d 535, 538 n.1 (7th Cir. 2014).

### IV. CONCLUSION

We **VACATE** the dismissal with prejudice of the claims against Orbis and **REMAND** with instructions to dismiss them without prejudice. We **AFFIRM** the dismissal with prejudice of the claims against the other defendants, both sanctions orders, and the denials of the reconsideration and disqualification motions. We

36                    Opinion of the Court                 22-13410

**DENY** the motions filed by Orbis and Dolan for appellate sanctions.